UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 22-CR-10038-IT |
| ARIEL LEGASSA, ) | |
| Defendant. ) | |

**OPPOSITION TO DEFENDANT'S MOTION
FOR ORDER RELEASING SEIZED ASSETS**

Defendant Ariel Legassa seeks an evidentiary hearing pursuant to *United States v. Monsanto*, 491 U.S. 600, 614 (1989), to determine whether there is probable cause that seized assets are traceable to criminal proceeds—$46,000 from a bank account (the "4170 Account") that were seized pursuant to a post-Indictment seizure warrant on a finding of probable cause that these funds were traceable proceeds of fraud and involved in a Section 1957 offense.[1]  He seeks this finding of lack of probable cause so that seized funds may be released to pay for Legassa's reasonable and necessary living expenses and to retain counsel of his choice—*despite the fact that his attorney—the same attorney he retained in a parallel civil case—is currently Court-appointed*.  His request should be denied.

A defendant is not entitled to use criminal proceeds to pay for reasonable and necessary living expenses or attorney's fees.  And he is not automatically entitled to a *Monsanto* hearing to determine probable cause.  As a threshold matter, he must (1) demonstrate that he has no assets available outside of the seized assets to pay for attorney's fees (or reasonable living expenses) and (2) make a *prima facie* showing of a *bona fide* reason to believe that the probable cause finding of a nexus between the assets and crime was in error.

---

[1] At the same time, the government obtained seizure warrants for a 2020 Tesla Model 3 and a Piper Aircraft, which Legassa does not include in his motion to release and thus is not part of his request.

As Legassa has court appointed counsel, and that attorney is currently also retained by him to represent him in the civil case brought by his former employer to recover funds allegedly fraudulently taken by Legassa, he cannot demonstrate financial need for the release of funds to pay for an attorney of his choice in this criminal action. Nor does he specify the amount of funds necessary to retain counsel of his choice. In the financial affidavit filed in support of his request for release of funds, Legassa identifies a $3,000 shortfall between his wife's income of $▇▇▇ a month, and his family's living expenses. Notably, the affidavit is from February 2022 and may not be up to date. Additionally, Legassa has a retirement account worth over $▇▇▇, which the government did not seize, and another $31,236.77 from the 4170 Account, which the government did not seize. Although his residence in Burlington, CT is in his wife's name only, it has a current valuation of about $587,000, according to Redfin. Legassa also has been working as an Uber driver, and has not disclosed his earnings. Based on this information, he has not met his burden to show financial need and the Court should not release the seized funds.

Moreover, Legassa has not made a *prima facie* showing of a *bona fide* reason to believe that the probable cause finding underlying the seizure warrants was in error. As set forth in the Indictment, a Federal Grand Jury found probable cause that from approximately December 2020 to January 2022, Legassa devised a scheme to fraudulently obtain $575,500 from his former employer, New England Spots Network ("NESN"). The proceeds from that fraud, as outlined in the affidavit in support of the seizure warrants, were deposited into and transferred among bank accounts, including the 4170 Account, and paid off the financing on a Tesla (about $49,000) and a Piper Aircraft (about $26,000). From the 4170 Account, the government *only* seized amounts traceable to the fraud—it did not seize the entire account.

Finally, even if the $46,000 seized from the 4170 Account was released by the government, Legassa and his wife have *stipulated* that those funds are subject to an attachment in the parallel civil case against Legassa brought by NESN.

## FACTUAL BACKGROUND

### A. The Indictment

On February 17, 2022, a Federal Grand Jury found probable cause that Legassa orchestrated a scheme to defraud NESN. As charged in the Indictment, while Legassa was negotiating a contract with Alley Interactive LLC ("Alley NY") to provide web development services to NESN, he created a fictitious but identically named business that purported to do business in Connecticut—Alley Interactive, LLC ("Alley CT"). Legassa submitted fraudulent invoices to NESN in the name of Alley CT and caused NESN to pay to it $575,500. Legassa transferred the proceeds of the scheme from Alley CT to bank accounts that he controlled and spent the money on personal expenses. Indictment, ¶ 5 (Docket No. 13).

The Grand Jury found probable cause that Legassa deposited $575,000 in checks, obtained as result of the fraud, into a bank account at Santander. *Id*., ¶¶ 16, 17. The Grand Jury also found probable cause that on April 16, 2021, Legassa, using $49,777.03 in fraudulently obtained funds deposited into the Santander account, paid of a personal auto loan. *Id.*, ¶¶ 18, 19, 25. That loan was for the 2020 Tesla Model 3 that the government later seized. *See* March 29, 2022 Affidavit of FBI Special Agent Brendan Donlan ("Donlan Aff.") ¶¶ 28-33 (redacted version attached hereto at Exhibit A). The Grand Jury also found probable cause that on or about May 11, 2021, Legassa wired $60,000 in criminal proceeds to an account at the American Broadcast Employees Federal Credit Union ("ABEFCU") in his and his wife's name. Indictment, ¶¶ 18, 20, 25.

3

The Indictment charged Legassa with seven counts of mail fraud, in violation of 18 U.S.C. § 1341, *id.*, ¶¶ 22-23, and three counts of money laundering in violation of 18 U.S.C. § 1957. *Id.*, ¶¶ 24-25. The Indictment also contained a fraud forfeiture allegation and a money laundering forfeiture allegation, putting Legassa on notice that, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), he was subject to forfeiture of any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses of mail fraud, and, pursuant to 18 U.S.C. § 982(a)(1), he was subject to forfeiture of any property, real or personal, involved in the § 1957 offense and any property traceable to such property. *Id.*, ¶¶ 26-29.

**B. The Government Traced $46,000 in Fraud Proceeds to the 4170 Account and Obtained a Seizure Warrant Based on Probable Cause**

In March 2022, the government sought post-indictment seizure warrants for $46,000 in funds held in or behalf of ABEFCU Prime share account ending in 4170 (the "4170 Account"); a 2020 Tesla Model 3 (the "Tesla Model 3"); and a Piper Aircraft, on the basis that these assets are traceable to fraud proceeds and property involved in money laundering. On March 29, 2022, United States Magistrate Judge Hennessy found probable cause to issue Warrants to Seize Property Subject to Forfeiture for these assets, as described in the Affidavit of FBI Special Agent Brendan Donlan. *See* 22-mj-4113-DHH, 22-mj-4114-DHH; 22-mj-4115-DHH. The seizure warrants were issued pursuant to the criminal forfeiture provisions of 18 U.S.C. § 982(a)(1), 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), and the civil forfeiture provisions of 18 U.S.C. § 981(a)(1)(A) and (C). *See* Donlan Aff., ¶¶ 4, 5.

As described in the Donlan Affidavit, although the overall fraud proceeds are believed to be $575,500, the government has to date only traced a portion of that amount to assets that it could seize. In all, between approximately April 1, 2021 and November 23, 2021, NESN mailed seven

4

checks totaling $575,500 to Alley CT, that Legassa deposited into an account at Santander in the name of Alley CT that he controlled (the "Santander Account").

| Approximate Date | Check Amount |
|---|---|
| 4/1/21 | $110,000 |
| 4/27/21 | $135,000 |
| 6/15/21 | $85,000 |
| 6/24/21 | $100,000 |
| 8/24/21 | $48,500 |
| 10/5/21 | $48,500 |
| 11/23/21 | $48,500 |

Donlan Aff., ¶¶ 13-15; Indictment, ¶¶ 16-17.

Legassa had opened the Santander Account in February 2021. Based on a review of bank records, between February 2021 and January 2022, the only deposits into the Santander Account were the NESN checks issued to Alley CT, a $100 account opening deposit, and a $4,000 deposit on May 20, 2021. Donlan Aff., ¶ 16. Accordingly, there is probable cause to believe that all but $4,100 of the funds deposited in the Santander Account are proceeds from fraud scheme.

### *Tracing Analysis of $46,000 to the 4170 Account*

Between April 16, 2021 and December 7, 2021, Legassa sent five wire transfers totaling approximately $156,000 from the Santander Account to an account in his and his wife's name at ABEFCU (the "750 Account"). Donlan Aff., ¶ 18; *see also* Indictment, ¶¶ 20, 25. The 750 Account as well as the 4170 Account had a "Prime Share," or savings account, and a "Basic Share Draft," or checking account. "Ariel Legassa" was listed as the beneficiary of these five wire transfers and all the wires were sent to the 750 Account (Checking). Donlan Aff., ¶ 18.

As detailed in the Donlan Affidavit, Legassa would periodically transfer the proceeds from the Santander Account to the 750 Account (Checking), and then on the same day or the following day, pay off various debts, including two car loans, personal loans and credit cards. *Id.*, ¶ 19. Of the $156,000 proceeds transferred from the Santander Account to the 750 Account (Checking),

5

Legassa used over $90,000 to pay off his and his wife's personal debts, including $34,000 in credit card debt alone. *See id.*

Legassa would also periodically transfer the proceeds from the Santander Account to the 750 Account (Checking), and then on the same day, or in the following days, transfer proceeds from the 750 Account (Checking) directly to the 750 Account (Savings). On or about July 12, 2021, for example, Legassa wired $45,000 from the Santander Account to the 750 Account (Checking). That same day, he transferred $18,000 from 750 Account (Checking) to the 750 Account (Savings). On or about July 16, 2021, Legassa also transferred $10,000 from the 750 Account (Checking) to the 750 Account (Savings). On or about July 30, 2021, Legassa transferred $6,000 from the 750 Account (Checking) to the 750 Account (Savings).[2] On or about November 4, 2021, Legassa wired $8,500 from the Santander Account to the 750 Account (Checking). That same day, he transferred $12,000 from the 750 Account (Checking) to the 750 Account (Savings). In total, $46,000 of proceeds from the Santander Account, upon transfer to the 750 Account (Checking), were nearly contemporaneously transferred to the 750 Account (Savings). *Id.*, ¶ 19 c. and d.

On or about July 1, 2021, the 750 Account (Savings) had a balance of $7,472.45. On or about July 31, 2021, the 750 Account (Savings) account had a balance of $47,472.45. On or about January 1, 2022, the 750 Account (Savings) account had a balance of $108,166.82. From approximately July 31, 2021 through January 10, 2022, at no point, did the 750 Account (Savings)

---

[2] Legassa appears to have routinely received direct deposit salary payments from NESN into the 750 Account (Checking). On or about July 16, 2021, Legassa received a direct deposit salary payment of $6,934.93 from NESN into the 750 Account (Checking). This brought the account balance to $34,169.09. On or about July 30, 2021, Legassa received a direct deposit salary payment of $6,967.50 into the 750 Account (Checking). This brought the account balance to $28,575.30. Each one of these salary direct deposits took place prior to the transfer from the 750 Account (Checking) to the 750 Account (Savings) described above. Donlan Aff. ¶ 19.c. n.3.

account drop below $47,000.  Donlan Aff., ¶ 21, 22.  Accordingly, Judge Hennessy correctly concluded that the government had established probable cause to believe that $46,000 in the 750 Account (Savings) were proceeds traceable to the fraud scheme and/or funds involved in a violation of 18 U.S.C. § 1957.  *See id.*, ¶ 20.

On January 6, 2022, NESN fired Legassa.  Prior to terminating Legassa's employment, NESN confronted Legassa about the suspected fraudulent invoices in the name of Alley CT.  *Id.*, ¶ 23.  On or about January 10, 2022, Legassa transferred $79,625.96 from the 750 Account (Savings) to the 4170 Account (Savings), an account in his wife's name only.  Prior to the transfer, on or about January 5, 2022, the 4170 Account (Savings) held $1,757.91.  *Id.*, ¶ 24.

On or about January 20, 2022, ABEFCU froze the then-balance of the 4170 Account.  At that time, bank records indicate that the 4170 Account (Savings) had a balance of approximately $64,469.52 and the 4170 Account (Checking) had a balance of approximately $12,767.25.  After the freeze, ABEFCU allowed Legassa's wife Legassa to make subsequent deposits in the 4170 Account, but only to withdraw funds up to the amount deposited after the January 20, 2022 freeze.  *Id.*, ¶¶ 25-26.

Accordingly, Judge Hennessy correctly concluded that the government had established probable cause to believe that $46,000 in the 4170 Account were proceeds traceable to the fraud scheme and/or property involved in a violation of 18 U.S.C. § 1957, and subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) and 18 U.S.C. §§ 981(a)(1)(A) and 982(a)(1).  *Id.*, ¶ 27.

### C. In the Event the Government Releases the $46,000, Legassa Agreed to an Attachment in the Civil Case, in Exchange for the Release of $31,242 in June 2022

Prior to the government's decision to seek the seizure warrants described above, on January 19, 2022, Judge Burroughs attached the entirety of the 4170 Account in the civil case brought by

NESN. *See New England Sports Network, L.P. v Alley Interactive LLC (CT) and Ariel Legassa*, Civil Action No. 22-cv-10024-ADB (D. Mass.), Docket No. 14. On February 22, 2022, Legassa and his wife moved to dissolve that attachment. *See id.*, Docket No. 26. Pursuant to a Joint Stipulation and Order, the parties (including Legassa's wife) agreed to dissolve the attachment on $31,242.82 that the government did not seize from the 4170 Account, and further the Legassas *stipulated* that the attachment would remain on the $46,000 seized from the 4170 Account *if the Department of Justice were to return it*. *See id.*, Docket No. 61; *see also* Docket No. 63 (clarifying that the Stipulation resolved the pending motion to dissolve). A copy of that Stipulation and Order is attached hereto at Exhibit B.

### D. Legassa's Motion to Release Funds

Based on affidavits submitted in the civil case in February 2022, Legassa and his wife have a monthly income of at least $█████. Docket Nos. 44-1 and -2. This figure is based only on his wife's earnings. Legassa notes he also has been working as an Uber driver, but has not provided information about any income from that work. Docket No. 44, p.1. Legassa also identified a retirement account in his name valued at over $█████, and a Land Rover valued at $████.[3] Docket No. 44-1. His wife, a nearly 20-year employee of ████████████████████████, has disclosed nothing about any retirement or other financial accounts that might be available to cover the family's monthly expenses. Docket No. 44-2. In June 2022, pursuant to a stipulation in their civil case, the Legassas were allowed to access over $31,000 from the 4170 Account. *See* Exhibit B. Although his residence in Burlington, CT is in his wife's name only, it has a current valuation of about $587,000, according to Redfin. *See* Docket No. 44-1; Exhibit C.

---

[3] The Land Rover, along with a 2020 Tesla Model 3 and a Piper Aircraft, are currently securing the Defendant's appearance bond.

With respect to his proffered need for the seized funds to pay expenses, since Legassa already has a court appointed lawyer, whom he also retained in the civil case, it stands to reason that the requested funds are sought for living expenses. However, Legassa has failed to provide sufficient detail for the Court to determine whether his estimated living expenses are, in fact, reasonable. He has similarly failed to provide sufficient detail as to the family's liabilities, including whether he is responsible for the HELOC on the home owned by his wife. Finally, based on the financial information reviewed in this investigation, it appears that, absent the $575,000 in alleged fraud proceeds, the Legassas could not meet their monthly living expenses.

## ARGUMENT

"Forfeitures help to ensure that crime does not pay: They punish wrongdoing, deter future illegality, and 'lessen the economic power' of criminal enterprises." *Kaley v. United States*, 571 U.S. 320, 323 (2014) (quoting *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 630 (1989)). "Accordingly, 'there is a strong governmental interest in obtaining full recovery of all forfeitable assets.'" *Id*. In enacting forfeiture laws, "Congress decided to give force to the old adage that 'crime does not pay.'" *Monsanto*, 491 U.S. at 614.

**A. Forfeiture Is Mandatory for Mail Fraud and Money Laundering Violations and the Government Is Entitled to Pre-Trial Restraint and Seizure to Preserve the Availability of Forfeitable Property**

Forfeiture is mandatory for mail fraud and money laundering violations. Specifically, the forfeiture statutes applicable here state that "[t]he court, in imposing sentence on a person convicted of an offense in violation of section 1956, 1957, or 1960 of this title, <u>shall order</u> that the person forfeit to the United States <u>any property, real or personal, involved in such offense, or any property traceable to such property</u>," 18 U.S.C. § 982(a)(1) (emphasis added); and "the court <u>shall order</u> the forfeiture of the property as part of the sentence in the criminal case," namely, "<u>any property, real or personal, which constitutes or is derived from proceeds</u> traceable to [a specified

9

unlawful activity]." 28 U.S.C. § 2461(c) (emphasis added) and 18 U.S.C. § 981(a)(1)(C). Pursuant to 18 U.S.C. § 1961(1), as incorporated through 18 U.S.C. § 1956(c)(7)(A), the mail fraud offenses Legassa is charged with constitute a specified unlawful activity. Thus, upon a conviction, property derived from, obtained, or involved in, directly or indirectly, his criminal activity must be forfeited.

The government's interest in forfeitable property vests at the time the crime was committed, because a defendant has no ownership entitlement to the fruits of his crime. *See* 18 U.S.C. § 981(f); 21 U.S.C. § 853(c), as incorporated by 18 U.S.C. § 981(b)(1) and 28 U.S.C. § 2461(c). Thus, upon a conviction, property received, directly or indirectly, from mail fraud and property involved in money laundering must be forfeited.

The forfeiture statutes specifically authorize the government to seize assets based on probable cause to believe that the property is subject to forfeiture "to preserve the availability of property" subject to forfeiture. 21 U.S.C. § 853(f), incorporated by 18 U.S.C. § 981(b)(1) and 28 U.S.C. § 2461(c); 18 U.S.C. § 981(b)(1) and (2) (civil seizure). The issuance of a pre-trial restraining order is not discretionary. If the government establishes probable cause that the property is subject to forfeiture, the Court *must* enter the restraining order. *See* 21 U.S.C. § 853(f) ("the court shall issue a warrant authorizing the seizure of such property"); *Monsanto*, 491 U.S. at 612-13 (the word "may" in section 853(e) [or 981(b)(1)] "cannot sensibly be construed to give district court[s] discretion to permit the dissipation of the very property that [the law] requires to be forfeited upon conviction").

### B. A Defendant Is Not Entitled to Use Criminal Proceeds—Or Seized Funds—to Pay for Attorney's Fees or Living Expenses

In *Monsanto*, the Supreme Court held that "there is no exemption from § 853's [or § 981 or § 982's] forfeiture or pretrial restraining order provisions for assets which a defendant wishes

10

to use to retain an attorney," because "[w]e find no evidence that Congress intended to modify that nostrum to read, 'crime does not pay, except for attorney's fees.'" 491 U.S. at 614. Pretrial restraint of assets is "constitutionally permissible whenever there is probable cause to believe that the property is forfeitable," meaning "probable cause to think (1) that the defendant has committed an offense permitting forfeiture, and (2) that the property at issue has the requisite connection to that crime." *Kaley*, 571 U.S. at 323-24 (citing *Monsanto*, 491 U.S. at 615 n.10).

Accordingly, the question before this Court is *not* whether Legassa is entitled to the release of forfeitable proceeds to pay for his legal defense (or living expenses).[4] He is not. *See Kaley*, 571 U.S. at 326-27; *Monsanto*, 491 U.S. at 616; *Caplin & Drysdale*, 491 U.S. at 626 ("A defendant has no Sixth Amendment right to spend another person's money for services rendered by an attorney, even if those funds are the only way that that defendant will be able to retain the attorney of his choice."). Rather, the question is whether Legassa is entitled to a hearing to challenge the probable cause findings that (a) he committed an offense permitting forfeiture and (b) the seized assets have the requisite nexus to that crime. *See, e.g., United States v. Farmer*, 274 F.3d 800, 804-5 (4th Cir. 2001); *United States v. Jones*, 160 F.3d 641, 647 (10th Cir. 1998).

1. **Legassa Cannot Challenge the Grand Jury's Determination of Probable Cause**

As to whether probable cause exists that the defendant committed the offense, it is black-letter law that "the grand jury gets the final word." *Kaley*, 571 U.S. at 340-41 ("If the question in a pre-trial forfeiture case is whether there is probable cause to think the defendant committed the crime alleged, then the answer is: whatever the grand jury decides."). Accordingly, Legassa cannot challenge the Grand Jury's determinations of probable cause that he committed the mail

---

[4] A defendant has no right to choose counsel that he cannot afford. *Wheat v. United States*, 486 U.S. 153, 159 (1988), *see also Kaley*, 571 U.S. at 345 (Roberts, C.J., dissenting).

11

fraud and money laundering offenses. Nor does this Court have discretion to overturn those findings. *See id.* To the contrary, after the return of the Indictment against Legassa, Judge Hennessy *also* found that there was probable cause for the government to seize the Tesla, Piper Aircraft, and $46,000 in the ABEFCU 4170 Account that is now the subject of Legassa's motion. *See* 22-mj-4113-DHH, 22-mj-4114-DHH; 22-mj-4115-DHH.

2. **Legassa Must Make a Threshold Showing Before Obtaining a *Monsanto* Hearing to Challenge the Probable Cause Finding that the Seized Funds Have the Requisite Nexus to the Offense**

To obtain a hearing on the probable cause determination that the seized funds have the requisite nexus to the offense (a *Monsanto* evidentiary hearing), courts routinely require that the defendant make a threshold showing.[5] Although the First Circuit has not ruled on the specific factors comprising such a threshold test, numerous jurisdictions have adopted a two-part test known as the "*Jones-Farmer*" rule,[6] *see United States v. Bokhari*, No. CR 14-30044-MGM, 2015 WL 7303535, at *4 (D. Mass. Nov. 19, 2015) (discussing cases), and Chief Justice Roberts noted, in

---

[5] Criminal procedure regularly requires a defendant to make a threshold showing before an evidentiary hearing is granted. As the First Circuit has repeatedly held, "a criminal defendant does not have a presumptive right to an evidentiary hearing on a motion to suppress." *See, e.g., United States v. D'Andrea*, 648 F.3d 1, 5 (1st Cir. 2011). Rather, a "hearing is required only if the movant makes a sufficient threshold showing that material facts are in doubt or dispute, and that such facts cannot reliably be resolved on a paper record." *Id*.

[6] *See, e.g., United States v. Jamieson*, 189 F. Supp. 2d 754, 757 (N.D. Ohio 2002) (following *Jones*), *aff'd*, 427 F.3d 394 (6th Cir. 2005) (approving district court's application of *Jones*.); *United States v. Yusuf*, 199 Fed. Appx. 127, 132-33 (3d Cir. 2006) (following *Jones, Farmer,* and *Jamieson); United States v. Vogel*, 2010 WL 547344, *2 (E.D. Tex. Feb. 10, 2010) (adopting *Jones-Farmer*, even though the Fifth Circuit has not formally done so, based on favorable statements in *Melrose East* (357 F.3d 493) and *Holy Land Found*. (493 F.3d 469)); *United States v. Buholtz*, 2011 WL 4100918, *3 (E.D. Tex. Aug. 31, 2011) (same); *United States v. Simpson*, 2011 WL 195676, *3-4 (N.D. Tex. Jan. 20, 2011) (same); *United States v. Lewis*, 2006 WL 1579855, *8-10 (D. Minn. 2006) (applying *Jones-Farmer* and denying defendant's right to a hearing because she could satisfy neither of the two requirements); *United States v. Mueller*, 2008 WL 2890258, *1-2 (D. Minn. 2008) (Rule 65 does not apply in criminal forfeiture cases; the defendant's right to a post-restraint hearing is governed by *Jones-Farmer*).

his dissent in *Kaley*, that a threshold showing is required, *Kaley*, 574 U.S. at 353 (Roberts, C.J. dissenting) ("To even be entitled to the hearing, defendants must first show a genuine need to use the assets to retain counsel of choice.").

Under the *Jones-Farmer* test, first, "a defendant must demonstrate to the Court's satisfaction that []he has no assets, other than those restrained, with which to retain private counsel and provide for [himself] and [his] family." *Jones*, 160 F.3d at 647. Second, "a defendant must make a *prima facie* showing of a *bona fide* reason to believe" that the probable cause finding of a nexus between the assets and the crime was in error. *Id*. Legassa has failed to satisfy either of these requirements.[7]

### a. Legassa Cannot Make a Threshold Showing of Financial Need

Courts applying the "*Jones-Farmer*" test focus first on whether the Defendant can make a threshold evidentiary showing of financial need—meaning that he has no alternative, unrestrained assets to fund counsel of his choice and to provide for his family. *See, e.g., United States v. Bonventre*, 720 F.3d 126, 129-32 (2d Cir. 2013) (to obtain Monsanto hearing, defendant must make sufficient threshold evidentiary showing that he does not have alternative unrestrained assets to fund counsel of choice); *see also Bokhari*, 2015 WL 7303535, at *3-5. This threshold showing of financial need is necessary to balance the defendant's and the government interests in the seized assets. If the defendant "possessed the means to hire an attorney independently of assets that were seized," the defendant's interest in a *Monsanto* hearing "would be absent." *See Farmer*, 274 F.3d

---

[7] Assuming *arguendo* that Legassa were to qualify for an evidentiary hearing—which for all the reasons set forth herein he does *not*—he would need to "'prove by a preponderance of the evidence that the government seized untainted assets without probable cause and that he needs those same assets to hire counsel.'" *Farmer*, 274 F.3d at 805; *see also Bokhari*, 2015 WL 7303535, at *4. Legassa is not entitled to use any hearing to challenge the probable cause of the substantive offenses. *Kaley,* 571 U.S. at 328.

at 804; *see also Bokhari*, 2015 WL 7303535, at *4 (discussing the purpose of the threshold showing and the balancing test).

Some courts have described the required showing of financial need as establishing that a "defendant truly has no alternative, unrestrained assets to pay his counsel of choice," *Bokhari*, 2015 WL 7303535, at *5, while other courts have allowed a hearing upon a showing that the seizure "effectively rendered [the defendant] indigent." *Farmer*, 274 F.3d at 802.

Here, Legassa cannot make his threshold showing of financial need. First, his counsel is court appointed, and apparently the counsel of his choice as Legassa similarly retained this attorney in his parallel civil case. Even if appointed counsel were not counsel of his choice, Legassa has failed to provide any information as to how much money he would need to retain counsel. Second, his contention that he requires $▮ per month for "reasonable and necessary" living expenses, and is short several thousand dollars, is wholly unsupported. Legassa has failed to fully disclose his family's expenses as well its assets, including but not limited to, his income as an Uber driver. *See* Docket No. 44-1. To the contrary, what has been disclosed shows that he has access to close to $▮ in assets—a retirement account of $▮ in his name and $31,242.82 from the 4170 Account. *Id.* Additionally, his wife earns $▮ a month, and publicly available information shows that he resides in a house with an estimated value of $587,000. Bankruptcy courts have developed the general rule that "reasonably necessary" living expenses means those that are "adequate, but not first class." *In re McDonald*, 2015 WL 1524096, *3 (Bankr. W.D. La. March 27, 2015); *In re Sandercock*, 2005 WL 6522759, *4 (Bankr. E.D. Pa. January 20, 2005) (same). In short, Legassa cannot meet the required showing of financial need. Indeed, based on the personal debt that Legassa paid off with the fraud proceeds that are the subject of the Indictment

in this case, it may be the case that Legassa's lifestyle is ultimately unsustainable absent the receipt of the $575,000 of fraud proceeds.

A defendant's desire to maintain a certain lifestyle does not outweigh the government's significant interest in preserving property for forfeiture in the event of conviction, as mandated by Congress, and in conserving prosecutorial resources to defend against frivolous claims. Indeed, the Supreme Court has made clear that "there is a strong governmental interest in obtaining full recovery of all forfeitable assets, an interest that overrides any Sixth Amendment interest in permitting criminals to use assets adjudged forfeitable to pay for their defense." *Caplin & Drysdale*, 491 U.S. at 631. Similarly, as the *Jones* Court explained, "[t]he government certainly has a valid interest in assuring that funds illegally obtained are not laundered or secreted between the time a defendant is indicted and the time when his criminality is determined by actual conviction." *See Jones*, 160 F.3d at 647. The reason that Congress provided for pre-trial seizure was precisely to avoid further dissipation of ill-gotten gains. *See id.* ("[t]his interest was in fact the impetus for the legislation," quoting the Senate Committee's Report that "the availability of restraining orders [to stop the dissipation of forfeitable assets] is essential in the area of criminal forfeiture").

Legassa's effort to access legitimately seized funds, despite having appointed counsel, because he is living beyond his means is frivolous. His request—little more than a thinly-veiled attempt to dissipate assets that will otherwise be forfeited upon conviction—fails to meet his threshold burden of demonstrating financial need sufficient to qualify for a *Monsanto* hearing.

### b. Legassa Also Cannot Make a Prima Facie Showing That the Probable Cause Determination Was in Error

Assuming *arguendo* that Legassa were able to meet his threshold burden of demonstrating financial need, he cannot, in any event, satisfy the second threshold requirement for a *Monsanto*

15

hearing: a *prima facie* showing of a *bona fide* reason to believe that Magistrate Judge Hennessy erred in finding probable cause that there was a nexus between the seized asset and the charged crime. *See Jones*, 160 F.3d at 647; *see also United States v. Li*, 2018 WL 1299724, *10 (M.D. Pa. Mar. 13, 2018) (defendant not entitled to a post-indictment probable cause hearing to determine whether some of his seized assets were untainted when he failed to put forth any reason to believe that the grand jury erred in its determination that there was probable cause to believe the seized assets were traceable to the offenses charged in the indictment); *United States v. St. George*, 241 F. Supp. 2d 875, 878-80 (E.D. Tenn. 2003) (denying hearing where defendant failed to show reason to believe there was no probable cause for forfeiture of restrained property); *United States v. Peppel*, 2008 WL 687125, *2, *6 (S.D. Ohio 2008) (defendant not entitled to probable cause hearing because there was no reason to believe grand jury erred in finding that restrained property was traceable to criminal proceeds); *United States v. Vogel*, 2010 WL 547344, *3 (E.D. Tex. Feb. 10, 2010) (defendant cannot rely on self-serving statement regarding the legitimate source of the property to satisfy the second requirement).

"Probable cause, we have often told litigants, is not a high bar: It requires only the 'kind of 'fair probability' on which 'reasonable and prudent [people,] not legal technicians, act.'" *Kaley*, 571 U.S. at 338. And, "[t]he probable cause determination in forfeiture cases looks to all of the circumstances and 'must be judged ... with a common sense view ...'" *United States v. Melrose E. Subdivision*, 357 F.3d 493, 506 (5th Cir. 2004).

Legassa asserts that the government lacks probable cause because legitimately earned money was deposited into the accounts through which the fraud proceeds flowed. It is *the defendant's* burden to provide a *prima facie* basis to believe that Judge Hennessy erred. Here,

16

Legassa has failed to meet that threshold burden, where Judge Hennessy specifically found that the government *did* make a probable cause showing.

In any event, Legassa is incorrect. For all the reasons set forth above, the government has established probable cause that $46,000 in the 4170 Account are proceeds traceable to the fraud scheme <u>and</u> property involved in a violation of 18 U.S.C. § 1957. Indeed, the Grand Jury indicted Legassa based on its finding of probable cause that he obtained fraud proceeds (the proceeds of an SUA), via U.S. Mail, in the form of checks (monetary instruments), and that he engaged in money laundering in violation of § 1957 by, among other things, transferring fraud proceeds to the ABEFCU account and paying off the Tesla.

The Donlan Affidavit followed the tracing analysis the Second Circuit laid out in *United States v. Banco Cafetero Panama*, which has since been followed by many other courts.[8] In *Banco Cafetero,* the Second Circuit rejected the argument that seizure and forfeiture were improper because untainted funds were also deposited into an account with the tainted funds. 797 F.2d 1154, 1159 (2d Cir. 1986). The Second Circuit identified several acceptable tracing theories, including the (1) the "lowest intermediate balance" rule; (2) the "averaging" rule; and (3) the "drugs-in, first-out" rule. *See id.* at 1160. The Court held that the government "can establish a prima facie case for forfeiture in the context of bank accounts by relying on either the '[fraud proceeds]-in, last-out' approach or the '[fraud proceeds]-in, first-out' approach. In almost all cases, once the Government has shown probable cause to believe that a person … has deposited the [fraud proceeds] into a bank account, there will be probable cause to believe that the bank

---

[8] "The leading case on the use of accounting principles to satisfy the tracing requirements is the Second Circuit's decision in *United States v. Banco Cafetero,*" which has been "cited countless times over many years." Cassella, Stefan, *Asset Forfeiture Law in the United States*, §11-4(a) (3d ed. 2022).

account contains 'traceable proceeds' of the sale (if the balance has not fallen below the amount of the deposit) *and* probable cause to believe that a withdrawal contains such "traceable proceeds" (if the withdrawal exceeds the deposit.)" *Id.* at 1160-61. Indeed, "[t]he cash in the hands of the bank does not cease to be 'traceable proceeds' just because it is commingled with .., other cash. … Money remains vulnerable to forfeiture when the money is moved into its account at a second bank or into a second bank's account at a third bank." *Id.* at 1161-62; *see also United States v. Walsh*, 712 F.3d 119, 124 (2d Cir. 2013) ("We have three 'accounting choices' at our disposal to determine what amount of commingled funds are traceable to criminal activity. Of relevance here is the 'drugs-in, first-out' approach, which 'consider[s] 'traceable proceeds' to be any one withdrawal, or any asset purchased with such withdrawal, to the extent of' the amount of the deposited tainted funds.") (quoting *Banco Cafetero*, 797 F.2d at 1159). With respect to which rule to apply, "the Government is entitled, and indeed required, to apply the approach that better accords with the reality of the transaction and that 'preserves the proceeds to the greatest extent possible as the account is depleted.'" *United States v. Miller*, 295 F. Supp. 3d 690, 706 (E.D. Va.), aff'd, 911 F.3d 229 (4th Cir. 2018) (quoting *Sony Corp. of Am. v. Bank One*, 85 F.3d 131, 139 (4th Cir. 1996)).

Here, applying this well-established tracing analysis, based on the financial records for these bank accounts, the government had probable cause to seize $46,000 because that was the amount of traceable mail fraud proceeds from the deposits into the Santander Account that were then transferred to the 4170 Account. *See* Donlan Aff. ¶¶ 14-16 (deposit of fraud proceeds to Santander Account and minimal other deposits); 18, 19 (transfers from Santander Account to 750 Account (Checking) and then in close proximity transfers to 750 Account (Savings)); 21 (balance

of 750 Account Savings did not fall below $47,000); 24-25 (transfer from 750 Account (Savings) to 4170 Savings, balance history and subsequent account freeze).

Legassa argues that to seize comingled property involved in a money laundering offense the government must establish that the funds were comingled for the purpose of facilitating money laundering. Docket No. 44, p. 11. This is not so. As described above, the government may use well-established tracing principles to establish probable cause and distinguish tainted and untainted assets. *See Banco Cafetero*, 797 F.2d at 1160-61; *see also Luis v. United States*, 578 U.S. 5, 22-23 (2016) (explaining that "the law has tracing rules that help courts implement the kind of distinction" to determine "whether a particular bank account contains tainted or untainted funds" and courts "have experience separating tainted assets from untainted assets"). Indeed, here, the government did precisely that: it did not seize the entire balance of the 4170 Account, nor did it seize the entire $79,625.96 Legassa transferred from the 750 Account (Savings) to the 4170 Account on January 5, 2022. Applying well established tracing principles, it seized only the $46,000 that it had probable cause to believe were traceable to fraud proceeds.

In any event, pursuant to 18 U.S.C. § 1957(a), "[w]hoever … knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished …". By transferring SUA proceeds in excess of $10,000 through various accounts, and ultimately to the 4170 Account, *regardless of his purpose in doing so*, Legassa violated § 1957, and these funds became property involved in the offense or traceable to such property and subject to forfeiture. Pursuant to 18 U.S.C. § 982(a)(1), the Court "shall order that the person forfeit to the United States any property,

real or personal, involved in such [§ 1957] offense, or any property traceable to such property." *See also* 18 U.S.C. § 981(a)(1)(A) (civil forfeiture).[9]

In addition, under civil forfeiture laws, the government is entitled to a one-year look-back, and to seize any money in an account where illegal proceeds were deposited within the last year, *without tracing the proceeds directly to the offense*.   *See* 18 U.S.C. § 984(b) (civil forfeiture of fungible property).   Accordingly, even if Legassa's commingling of money in the accounts meant that tracing could not be accomplished (which it can), the government is entitled to seize property an amount equal to the fraud proceeds transferred to the 4170 Account in the last year.

## CONCLUSION

For all the reasons stated herein, the Court should deny the Defendant's request for the release of funds that were seized for forfeiture, enabling the assets to be preserved during the pendency of the case, and his request for an evidentiary hearing on the same should likewise be denied.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By:   /s/ *Carol E. Head*
CAROL E. HEAD
BENJAMIN SALTZMAN
Assistant United States Attorneys
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100
Carol.Head@usdoj.gov

Date:  August 23, 2022

---

[9] The government could have, but chose not to, seize the entire 4170 Account as property involved in a 1957 offense.  Instead, the government seized only up to the amount of fraud proceeds traceable to the transfers from the Santander Account to the 7150 Account (Checking), and then to the 7150 Account (Savings) and that finally came to rest in the 4170 Account.