<pre>
 1                   UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
 2

 3    _____

 4    UNITED STATES OF AMERICA,        )
                                       )
 5            Plaintiff,               )
                                       )
 6        v.                           )    Criminal Action No.
                                       )    1:22-cr-10038-IT
 7    ARIEL LEGASSA,                   )
                                       )
 8            Defendant.               )
                                       )
 9    _____

10

11       BEFORE THE HONORABLE INDIRA TALWANI, DISTRICT JUDGE

12

                            JURY TRIAL - DAY 3
13

14
                        Wednesday, November 1, 2023
15                             8:35 a.m.

16

17

18

19

20
      John J. Moakley United States Courthouse
21    Courtroom No. 9
      One Courthouse Way
22    Boston, Massachusetts

23
      Robert W. Paschal, RMR, CRR
24    Official Court Reporter
      rwp.reporter@gmail.com
25
</pre>

1                        **A P P E A R A N C E S**

2

      On behalf of the Government:

3

            UNITED STATES ATTORNEY'S OFFICE
4           BY:  MACKENZIE A. QUEENIN
                 BENJAMIN SALTZMAN
5           One Courthouse Way
            Suite 9200
6           Boston, MA  02210
            (617) 748-3338
7           mackenzie.queenin@usdoj.gov
            benjamin.saltzman2@usdoj.gov
8

9

      On behalf of the Defendant:

10

            LAW OFFICE OF E. PETER PARKER
11          BY:  E. PETER PARKER
            The Wheelhouse at Bradford Mill
12          33 Bradford Street
            Concord, MA  01742
13          (617) 742-9099
            peter@parkerslaw.com
14

15

16

17

18

19

20

21

22

23

24

25

## TABLE OF CONTENTS

## TRIAL WITNESSES

On behalf of the Government:                          Page

RAYMOND GUILBAULT

     By Mr. Saltzman                                  12

SAVANNAH REININK

     By Ms. Queenin                                   25

FRANK SCATURCHIO

     By Mr. Saltzman                                  28

NANCY NICOLESCU

     By Ms. Queenin                                   33

MAMEK CHAREPOO

     By Ms. Queenin                                   40

BRADFORD CAMPEAU-LAURION

     By Mr. Saltzman                                  54

     By Mr. Parker                                    80

LEATHA FISHER

     By Ms. Queenin                                   84

     By Mr. Parker                                    119

     By Ms. Queenin                                   139

PAUL KING

     By Mr. Saltzman                                  140

**EXHIBITS**

<u>Admitted</u>

| | |
|---|---|
| Number 41, 43, 44, and 45 | 46 |
| Number 42 | 42 |
| Number 48 | 30 |
| Number 81 | 27 |
| Number 82 | 89 |
| Number 83 | 92 |
| Number 85 | 98 |
| Number 87, 90 and 91, 100–102, 106, 109–111, and 113 | 115 |
| Number 88 | 103 |
| Number 89 | 104 |
| Number 93– 95 and 103, 107, 112, 114, and 115 | 108 |
| Number 98 | 113 |
| Number 121 | 36 |
| Number 122 | 150 |
| Number 123 | 152 |
| Number 126 | 156 |
| Number 127 | 164 |
| Number 129 | 168 |
| Number 130 | 170 |
| Number 131 | 176 |
| Number 148 | 57 |

1    Number 149                                          59

2    Number 150                                          61

3    Number 151                                          65

4    Number 173                                          67

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

(In open court at 8:35 a.m.)

THE COURT:  Good morning.

MR. SALTZMAN:  Good morning, Your Honor.

THE COURT:  I understood something from the
government?

MS. QUEENIN:  Yeah, Your Honor, we're just looking
for some clarity as to like scheduling, when Your Honor is
envisioning doing a charge conference.  We anticipate that we
will rest tomorrow morning.

THE COURT:  Wow.

MS. QUEENIN:  And so for our prep purposes, we're
trying to figure out whether we should be ready to close
tomorrow, and I think your preference is, if we rest tomorrow
morning, and there are no defense witnesses, we would like to
go on to closings.  But I don't know, from Mr. Parker at this
point, whether -- we've been discussing the defendant
testifying, but I would just note we don't even have a
witness list with the defendant on it.  So we need some
clarity on it, as we have provided the courtesy to Mr. Parker
about our witnesses.

THE COURT:  Anything you can help, at this point,
as to anybody you're sure you're going to call?

MR. PARKER:  I don't anticipate calling any
witnesses other than potentially Mr. Legassa.  And, I mean,

1     that's a decision that has to be a game-time decision when

2     the government's evidence is in.

3                    THE COURT:  Fair enough.  But I think that means we

4     do need to get moving on the charge conference.  I mean, I

5     can't have the charge conference until we finish with the

6     evidence; that said, I try to have a courtesy -- as a

7     courtesy, I try my best to give you where I'm intending to go

8     in advance so it's a useful charge conference.  So let's get

9     some deadlines in here.

10                   So if you are anticipating your last witness on

11    tomorrow morning, then that would mean scheduling the charge

12    conference after -- or at least the final charge conference

13    after your last witness.  And the question is, can we do

14    anything this afternoon as to a preliminary of where we are

15    on the objections?  I think -- on the proposed instructions.

16    I think that's where you are?  I'm not sure what else you're

17    proposing.

18                   MS. QUEENIN:  Yes.  It's possible.  Of course, we

19    don't know the extent of cross-examinations, and so it's

20    possible that we'll be behind where we think, but we're just

21    trying to figure out if we should be prepared to, A, close

22    tomorrow, and when you want to do the charge conference.  And

23    we defer to you as to what is best for you and your schedule.

24                   THE COURT:  Well, my schedule isn't good, but what

25    time -- I have a sentencing this afternoon.

1          That's at 2:30?

2          THE DEPUTY CLERK:  Yes, Your Honor.

3          THE COURT:  Do I have anything after that?

4          THE DEPUTY CLERK:  You do not, Your Honor.

5  Three o'clock, actually, you have a sentencing, Your Honor.

6          THE COURT:  Three o'clock I have a sentencing.

7  Okay.

8          Am I correct that, from what I have so far from the

9  parties, I have a dispute over -- I have a specific dispute

10  regarding the -- how the good faith should or shouldn't be

11  instructed.  Do I have any other large disputes in front of

12  me?

13          MS. QUEENIN:  I don't believe so, Your Honor.  And

14  my initial memory was that you had ruled on that, but I think

15  you said it was a preliminary ruling subject to -- you gave a

16  caveat.  So I believe --

17          THE COURT:  Correct.

18          MS. QUEENIN:  -- that's the only dispute before the

19  Court.

20          THE COURT:  Is that your recollection of the

21  record?

22          MR. PARKER:  Yes.  And just for scheduling --

23          THE COURT:  Yes.

24          MR. PARKER:  -- I was kind of hoping that I could

25  go from court here to some other work that I need Mr. Legassa

1   for.  And so if Your Honor has a sentencing at 3:00, and if

2   we're going to have any kind of charge conference today, I

3   would like to have it at 3:30 or 4:00, rather than at 2:00.

4            MS. QUEENIN:  Your Honor, at the risk of belaboring

5   a point, like, I understand that the --

6            THE COURT:  So let me just --

7            MS. QUEENIN:  -- defense can't make a call on

8   whether the defendant's testifying, but we would appreciate

9   the courtesy of -- I don't know what some other work I need

10   the defendant for --

11            THE COURT:  So let me just cut through -- I don't

12   need to get into the dispute between the parties.  I need to

13   do a little bit more prep for my three o'clock sentencing.

14   So I am planning when we're done here to go back and work on

15   that.

16            I tend to take about an hour on my sentencings, not

17   half an hour -- not very efficient.  And I think the more

18   efficient use of time would be for me to put pen to paper on

19   what I'm anticipating doing, so I think what I will -- I

20   think what might make sense is for me to endeavor to get you

21   the jury instructions I'm anticipating giving at some point

22   this afternoon or evening, and that you endeavor to give me

23   at least your first pass of objections before we come in, you

24   know, for tomorrow morning at 8:30.

25            That would then allow us to have a brief charge

1    conference, assuming you're finished and you're not putting

2    someone on.  That would allow us to do a brief charge

3    conference while the jury is taking a break and would mean,

4    yes, closing arguments would be tomorrow then.

5              MS. QUEENIN:  Okay.

6              MR. PARKER:  That's fine.  That sounds fine,

7    Your Honor.

8              THE COURT:  I mean, obviously, if your testimony

9    goes on longer then, you know, I may only instruct the -- or

10   I may only give you the things.  We may then do closing the

11   following morning.  But let's be prepared to go forward with

12   closing, if necessary, on Thursday.

13             Okay.  Anything else?

14             MS. QUEENIN:  I had one other thing, Your Honor.  I

15   was just thinking more about our discussions surrounding

16   nullification; and at the end, Your Honor had to leave the

17   bench, and so I didn't want to raise this point then and

18   inconvenience you.  But we were talking about the reference

19   to Jones Day lawyers, and if names are coming up, the jury

20   needs to be aware of them.  And our position is the Jones Day

21   lawyers should not be brought up.  They --

22             THE COURT:  I thought I made clear that they

23   shouldn't be brought up anymore.

24             MS. QUEENIN:  I think Your Honor -- I think Your

25   Honor addresses -- my memory, without looking at a

1    transcript, is that you addressed that the jury should be

2    aware of the names.  But the reference to them is a direct

3    attempt at nullification, and it's implying that a witness

4    doesn't have a right to an attorney, and if they do, that

5    attorney should be called out in court.  It's just improper.

6    And so I just wanted to put that on the record and that's it.

7                THE COURT:  Anything else?

8                MS. QUEENIN:  No.

9                THE COURT:  So I'm going to get off the bench and

10   we'll come back in as soon as we have a full jury.

11               MS. QUEENIN:  Thank you.

12               THE DEPUTY CLERK:  We are in recess.

13               (Court in recess at 8:43 a.m.

14               and reconvened at 9:00 a.m.)

15               THE COURT:  We're still missing one juror, but I

16   thought I'd wait in here rather than out there so that we are

17   able to convey to the juror that they need to be here.

18               And I take it they will knock -- she'll knock when

19   we're all set?

20               THE DEPUTY CLERK:  Yes.

21               THE COURT:  So we are -- yes?

22               MR. SALTZMAN:  Your Honor, would you like the

23   witness to wait on the witness stand or to wait outside and

24   have them --

25               THE COURT:  Witness can proceed to the --

```
1              Any objection to that?
2              MR. PARKER:  No.
3              THE COURT:  The witness can proceed.
4              MR. SALTZMAN:  Okay.  Thank you.
5              (Pause in proceedings.)
6              (Jury present.)
7              THE COURT:  Good morning.
8              And you may proceed with your direct.
9              MR. SALTZMAN:  Thank you.
10             THE COURT:  And you are still under oath.
11             THE WITNESS:  Thank you.
12             MR. SALTZMAN:  Thank you, Your Honor.
13                      RAYMOND GUILBAULT
14         having been duly sworn, testified as follows:
15     REDIRECT EXAMINATION BY COUNSEL FOR THE GOVERNMENT
16  BY MR. SALTZMAN:
17  Q.   Good morning, Mr. Guilbault.
18  A.   Good morning.
19  Q.   So yesterday Mr. Parker showed you an email and asked you
20  a series of questions about whether or not the defendant was
21  important to NESN.  Do you remember that?
22  A.   Yes, I do.
23  Q.   Now, do you also recall on direct examination when I was
24  asking you questions that the defendant was a vice president
25  at NESN?
```

1    **A.**  Yes.

2    **Q.**  And he was part of the executive team?

3    **A.**  Yes, he was.

4    **Q.**  And I believe you testified that he was important to

5    NESN?

6    **A.**  Yes, I did.

7    **Q.**  Was the defendant so important to the company that you

8    would have entered into a side deal with a sham entity to pay

9    him more money?

10   **A.**  No.  I would never enter into that kind of deal for

11   anybody.

12   **Q.**  Now, you recall that you discussed Mr. Legassa, the

13   defendant, asking for a raise to a $360,000 base salary in

14   the fall of 2021?

15   **A.**  Correct.

16   **Q.**  And I believe you testified about an email exchange that

17   you had with him related to that request?

18   **A.**  Yes, I did.

19           MR. SALTZMAN:  And can we have Exhibit 137 briefly?

20   For -- it's in evidence.  Can we have it for the --

21           MR. PARKER:  Your Honor, I'm going to object.  I

22   think this is beyond the scope of cross-examination.

23           THE COURT:  I don't believe it is.  Go ahead.

24   BY MR. SALTZMAN:

25   **Q.**  Very briefly, Mr. Guilbault, what was the request from

1 Mr. Legassa at the bottom for what his base salary should be?

2 **A.** He requested that Sean McGrail and myself approve a

3 $360,000 base salary.

4    MR. SALTZMAN:  If we can take this down, please.

5 Can we briefly have Exhibit 144.

6 BY MR. SALTZMAN:

7 **Q.** And I direct your attention -- when it's up --

8    MR. SALTZMAN:  It's in evidence.

9 BY MR. SALTZMAN:

10 **Q.** So it's 144.  And the --

11    MR. SALTZMAN:  If you can just blow up the

12 current -- Ms. Hallagan, thank you.

13 BY MR. SALTZMAN:

14 **Q.** So just take a look at this blown-up portion.  What was

15 the amount of salary that Mr. Legassa ultimately received in

16 the fall of 2021?

17    MR. PARKER:  Same objection, Your Honor.

18    THE COURT:  Overruled.

19    THE WITNESS:  $325,000.

20 BY MR. SALTZMAN:

21 **Q.** So what was the difference in what he asked for versus

22 what he got?

23 **A.** Approximately $35,000.  He asked for $360,000 and he

24 received $325,000.

25 **Q.** And NESN said no to that additional $35,000?

1    **A.**   Correct.

2    **Q.**   And this was in the fall of 2021?

3    **A.**   Yes, it was.

4    **Q.**   So --

5            MR. SALTZMAN:  We can take that down, Ms. Hallagan.

6    Thank you.

7    BY MR. SALTZMAN:

8    **Q.**   If NESN had wanted to pay Mr. Legassa more, who could

9    have authorized that?

10   **A.**   That could have been authorized by the CEO and myself.

11   **Q.**   So could you have authorized that $360,000 salary?

12   **A.**   Yes, we could have.

13   **Q.**   Would that have required any higher approval?

14   **A.**   No, it would not have.

15   **Q.**   And in your 22 years at NESN, did you decide to pay any

16   employees through a fake vendor?

17           MR. PARKER:  I'm going to --

18           THE WITNESS:  Absolutely not.

19           MR. PARKER:  -- object.  This has been asked and

20   answered.

21           THE COURT:  I'm going allow it.  Go ahead.

22           THE WITNESS:  No, I did not.  Employees were always

23   paid through normal payroll and they were -- as a W-2

24   employee.

25

BY MR. SALTZMAN:

**Q.**  And why did you never do that?

      MR. PARKER:  Objection.

      THE COURT:  Overruled.

      THE WITNESS:  Because there were normal practices within the company.  There were ways to give people the appropriate compensation and that would not be -- that kind of a scheme wouldn't be appropriate, wouldn't be --

      MR. PARKER:  Objection, Your Honor.

      THE COURT:  I'll strike the second sentence there and just leave it at the first.

      MR. SALTZMAN:  Okay.

BY MR. SALTZMAN:

**Q.**  Now, do you also recall testifying about Ahmed Darwish on cross-examination and direct-examination?

**A.**  Yes, I do.

**Q.**  And I believe you testified that his salary was roughly, I think, $600,000 when he was hired in January of 2022?

**A.**  Roughly.  I think it was a little bit below that, but yes.

**Q.**  And did -- and he also received -- did he also receive a signing bonus?

**A.**  Yes, he did.

**Q.**  And can you just remind the jurors what kind of work was Mr. Darwish hired to perform?

1  **A.**  He was hired to manage the sales, marketing, and

2  distribution of the direct-to-consumer product.

3  **Q.**  Okay.  And that's -- is that related to the work of the

4  digital group?

5  **A.**  Yes, it is.

6  **Q.**  When NESN hired Mr. Darwish, how did it decide to pay

7  him?

8  **A.**  We entered into an employment contract with him, paid him

9  through our normal payroll practices.

10 **Q.**  In order to receive his salary and bonus, did Mr. Darwish

11 have to do anything other than set up direct deposit with the

12 accounting department or finance department?

13 **A.**  No, he did not.

14           MR. PARKER:  Objection, Your Honor.

15           THE COURT:  Sustained.  Strike the answer.

16 BY MR. SALTZMAN:

17 **Q.**  So you were also asked some questions about master

18 services agreement and the statement of work?

19 **A.**  Correct, yes.

20 **Q.**  And can you just -- since there's been a night, can you

21 just -- just very briefly remind the jurors what's the

22 difference between a master services agreement and a

23 statement of work.

24 **A.**  A master services agreement is the overall umbrella

25 agreement between a vendor and the company in terms of

1    broadly what type of work they would do, how much they'd be

2    paid for that work, and some other, you know, legal language

3    that goes with that.

4            A statement of work is more specific, a description

5    of a project that the vendor will work on.  It falls under

6    the terms of the master services agreement, but is specific

7    to detailed project work.

8    **Q.**  And Mr. Parker asked you about those -- those documents

9    on cross-examination, and for -- the documents with respect

10   to Alley Interactive, right?  The master services agreement

11   and the statements of work; is that correct?

12   **A.**  Yes.

13   **Q.**  So those documents, those three documents, who negotiated

14   them on behalf of NESN?

15   **A.**  Mr. Legassa.

16   **Q.**  Okay.  And I believe you testified on -- yesterday that

17   you did review that master services agreement with Alley

18   Interactive; is that right?

19   **A.**  Yes, that is correct.

20   **Q.**  And when you did, did you commit Alley Interactive's

21   address to memory?

22   **A.**  No, I did not.

23   **Q.**  Why not?

24   **A.**  That's not a level of detail that I would need to be

25   looking at.  It's really more important about what the vendor

1   work would be done and how much we would pay with that -- pay

2   that vendor.  It's just not -- It's not necessary.  The

3   person who drafted the master services agreement, in this

4   case Mr. Legassa, would be responsible for all the fine-point

5   details.

6   **Q.**  So I believe you testified yesterday that your general

7   practice was to see -- well, let me back up.  Mr. Parker --

8   strike the question.

9           Mr. Parker asked you on cross-examination about

10  certain checks that were approved to Alley Interactive.  Do

11  you remember that?

12  **A.**  Yes, I do.

13  **Q.**  And I believe yesterday you had testified that your

14  general practice was to review checks and see whether they

15  were in line with the budget for a particular vendor?

16  **A.**  Yes, that is correct.

17  **Q.**  Okay.  Now, who set the overall budget for digital

18  vendors?

19  **A.**  Digital vendor budget was established by Mr. Legassa.

20  **Q.**  And with respect to the budget for Alley Interactive, how

21  often did you have conversations with Mr. Legassa about the

22  work that Alley Interactive was doing?

23  **A.**  Frequently.

24  **Q.**  And did you have conversations with him before NESN

25  entered into the master services agreement?

1    **A.**  Yes, I did.

2    **Q.**  And what -- what did he tell you during those

3    conversations?

4              MR. PARKER:  Objection, Your Honor.

5              (Beginning of sidebar.)

6              MR. PARKER:  It's a hearsay objection, Your Honor.

7              THE COURT:  Why doesn't Mr. Legassa's statement

8    come in as the opposing party?

9              MR. PARKER:  I'm objecting on -- as to hearsay.  If

10   Your Honor lets it in as that, I'm just objecting.

11             THE COURT:  Okay.  The hearsay objection is

12   overruled.

13             (End of sidebar.)

14             THE COURT:  You can answer the question.

15   BY MR. SALTZMAN:

16   **Q.**  I can ask it again, if it would be helpful.

17   **A.**  It would be helpful.

18   **Q.**  All right.  Before you entered into the master services

19   agreement, before NESN entered into the master services

20   agreement with Alley Interactive, did you have conversations

21   with Mr. Legassa?

22   **A.**  Yes, I did.

23   **Q.**  And what type of information kid he tell you about Alley

24   Interactive in connection with those conversations?

25   **A.**  He was -- he explained to me why he was recommending them

1    as a vendor, why he chose them, was choosing them as a vendor

2    based on their credentials and their experience in the

3    digital business.

4    **Q.**   And what, if anything, did he tell you about the scope of

5    work that they would be doing?

6    **A.**   Very broadly, the scope of work would be

7    website-development work.

8    **Q.**   Okay.  And just -- yesterday, you also testified about

9    what your understanding was as to the size of the budget for

10   Alley Interactive.  Do you recall that?

11   **A.**   Yes, I do.

12   **Q.**   And roughly, what did you understand the size of the

13   budget to be?

14   **A.**   Roughly $1 million.

15   **Q.**   So when Mr. Parker showed you those checks yesterday,

16   when you're reviewing the checks, what, if any, consideration

17   are you providing to -- or having as to the -- how those

18   checks relate to the size of the budget?

19   **A.**   When sizing -- when signing -- excuse me -- when signing

20   those checks, I was mindful of whether they would be still

21   within the budget, even in aggregate.  And that was always a

22   consideration, and those checks were well within the budget

23   that we established for Alley Interactive.

24        MR. SALTZMAN:  Can we please have 155 and 156 in

25   evidence, side by side, please?

1    BY MR. SALTZMAN:

2    **Q.**   And do you mind just reminding the jurors what each one

3    of these charts reflects?

4    **A.**   Certainly.  The chart on the left is the invoices

5    submitted and paid -- submitted by and paid to Alley

6    New York; and the chart on the right are the invoices

7    submitted for Alley Connecticut.

8    **Q.**   And which chart reflects the invoices submitted by the

9    party that NESN contracted with in the master services

10   agreement?

11   **A.**   The chart on the left.

12   **Q.**   And I'm not asking you to do the exact math, but roughly,

13   if you were to add up the two total paid figures, roughly,

14   what does it amount to?

15   **A.**   Almost $1.1 million, between $1 million and $1.1 million.

16   **Q.**   And how does that relate to the size of the budget, or

17   the amount budgeted that you understood was budgeted to Alley

18   Interactive in 2021?

19   **A.**   It was consistent and reasonably close to the amount

20   budgeted for Alley.

21          MR. SALTZMAN:  Okay.  We can take these down,

22   please.  Thank you.

23   BY MR. SALTZMAN:

24   **Q.**   So, finally, Mr. Guilbault, you were asked a series of

25   questions about -- by Mr. Parker, about work being done

1    outside of the statement of work.  Do you remember that?

2    **A.**  Yes, I do.

3    **Q.**  About the rate, about the -- the number of hours billed

4    and the amount billed for those hours?  Do you remember that?

5    **A.**  Yes, I do.

6    **Q.**  Okay.  So just stepping back, who was the individual at

7    NESN that was tracking the relationship with the vendor,

8    Alley Interactive?

9    **A.**  Mr. Legassa.

10   **Q.**  And when you -- when you reviewed the master services

11   agreement, do you recall reading what the vendor hourly rate

12   was in that master services agreement?

13   **A.**  I do not recall what that was prior to being shown

14   yesterday.

15   **Q.**  Were you -- were you tracking the number of hours that

16   Alley Interactive was working on NESN-related projects?

17   **A.**  I personally was not doing that.

18   **Q.**  And when you were approving invoices for Alley

19   Interactive, would you review them alongside a statement of

20   work before you signed the checks?

21   **A.**  No, I would not.

22   **Q.**  When you were signing the checks, would you take out the

23   master services agreement and --

24   **A.**  No, I would not.

25   **Q.**  Why not?

1      **A.**   Because I trusted that Mr. Legassa was properly managing

2      the relationship with that vendor, that was his account, that

3      was his vendor to manage, and that he had already previously

4      preapproved all the invoices before they came to me and all

5      the invoices behind every check that came to me.  So I

6      trusted him that the work was being done appropriately and it

7      was within the scope of what was outlined in those

8      agreements.

9      **Q.**   So I understand that you trusted him, but why did you

10     trust him?

11     **A.**   Well, I -- I hired Mr. Legassa into the role as VP at

12     digital.  Others were involved in the hiring, but I hired

13     him.  He worked directly for me.  And in his role and in my

14     dealings with him in over two years, he had the authority for

15     that position to approve the vendor work, and I personally

16     trusted him in that role.  He was given a lot of

17     responsibility and he was entrusted to carry those

18     responsibilities out appropriately.

19              MR. SALTZMAN:  One moment, Your Honor.

20              Nothing further.  Thank you.

21              MR. PARKER:  I have no questions.

22              THE COURT:  Okay.  Thank you.  You may step down.

23     You're free to leave.

24              THE WITNESS:  Thank you very much, Your Honor.

25              THE COURT:  Ready to call your next witness?

```
 1              MS. QUEENIN:  Yes, Your Honor.  The government
 2    calls Savannah Reinink.
 3              THE DEPUTY CLERK:  Before you sit, could you please
 4    raise your right hand.
 5              (Witness duly sworn.)
 6              THE DEPUTY CLERK:  Please state your name for the
 7    record and spell your last name.
 8              THE WITNESS:  My name is Savannah Reinink, last
 9    name is spelled R-e-i-n-i-n-k.
10              THE DEPUTY CLERK:  Thank you.  You may have a seat.
11              THE WITNESS:  Thank you.
12                          SAVANNAH REININK
13          having been duly sworn, testified as follows:
14          DIRECT EXAMINATION BY COUNSEL FOR THE GOVERNMENT
15    BY MS. QUEENIN:
16    Q.  Good morning.
17    A.  Good morning.
18    Q.  If you could just pull the microphone a little bit closer
19    to you.  I want to make sure the jury can hear you when
20    you're talking.
21              Where do you work?
22    A.  I work at Google.
23    Q.  And how long have you worked at Google for?
24    A.  I worked at Google for three years.
25    Q.  What is your position at Google?
```

1    **A.**   I'm a custodian of records on the legal investigations

2    support team.

3    **Q.**   Can you describe for the jury briefly what you do for

4    your job?

5    **A.**   We receive and respond to requests for user data from law

6    enforcement in the form of subpoenas, search warrants, and

7    court orders.

8    **Q.**   And you mentioned you worked for Google.  What types of

9    services, generally, does Google provide?

10   **A.**   Google provides a variety of services, including Gmail,

11   Chat, and phone services as well.

12   **Q.**   In connection with your job, are you familiar with Gmail

13   subscriber records?

14   **A.**   Yes, I am.

15          MS. QUEENIN:  Can I have Exhibit 81, for now for

16   the witness only?

17   BY MS. QUEENIN:

18   **Q.**   Ms. Reinink, do you recognize this document?

19   **A.**   Yes.

20   **Q.**   What is it?

21   **A.**   This is a Google subscriber information file.

22          MS. QUEENIN:  Your Honor, I'd offer it.

23          MR. PARKER:  No objection.

24          THE COURT:  Exhibit 81 is admitted and may be shown

25   to the jury.

```
 1              (Exhibit 81 admitted into evidence.)
 2    BY MS. QUEENIN:
 3    Q.  Now that the jury has this in front of them, can you just
 4    read the title that's in all capitals?
 5    A.  Yes.  "GOOGLE SUBSCRIBER INFORMATION."
 6    Q.  Okay.  And directing your attention to the section that
 7    says "email," it's in the top paragraph there, what is the
 8    email address this Google subscriber information relates to?
 9    A.  It is listed as alleyinteractivellc@gmail.com.
10              MS. QUEENIN:  Okay.  And we can exit out of that
11    view.
12    BY MS. QUEENIN:
13    Q.  And I want to focus on the creation date, which is right
14    below that paragraph.  Can you read for the jury what date
15    this Gmail account, alleyinteractivellc@gmail.com, was
16    created on?
17    A.  It is listed as February 8, 2021.
18    Q.  Okay.  And, now I want to focus your attention on the
19    section that says "account recovery."  What is the recovery
20    email for the alleyinteractivellc@gmail.com address?
21    A.  Yes.  It is listed as alegassa@gmail.com.
22              MS. QUEENIN:  And we can exit out of this.
23              I have no further questions for this witness, Your
24    Honor.
25              MR. PARKER:  No questions.
```

1      THE COURT:  Thank you.  You may step down.

2      THE WITNESS:  Thank you.

3      MR. SALTZMAN:  Your Honor, the government calls

4  Frank Scaturchio.

5      THE COURT:  Okay.

6      THE DEPUTY CLERK:  Sir, before you take a seat,

7  could you please raise your right hand.

8          (Witness duly sworn.)

9      THE DEPUTY CLERK:  Please state your name for the

10  record and spell your last name.

11      THE WITNESS:  Frank Scaturchio,

12  S-c-a-t-u-r-c-h-i-o.

13      THE DEPUTY CLERK:  Thank you.  You may have a seat.

14                   **FRANK SCATURCHIO**

15      having been duly sworn, testified as follows:

16      **DIRECT EXAMINATION BY COUNSEL FOR THE GOVERNMENT**

17  BY MR. SALTZMAN:

18  **Q.**  Good morning, Mr. Scaturchio.

19  **A.**  Good morning.

20  **Q.**  Where do you work, sir?

21  **A.**  PostNet.

22  **Q.**  What is PostNet?

23  **A.**  Shipping and printing.

24  **Q.**  Does it also offer mailbox services?

25  **A.**  Yes, it does.

1    **Q.**   What is your job at PostNet?

2    **A.**   Owner.

3    **Q.**   How long have -- well, where is the PostNet that you own

4    located?

5    **A.**   680 East Main Street, Stamford, Connecticut 06901.

6    **Q.**   How long have you been the owner of that PostNet for?

7    **A.**   Almost eight years.

8    **Q.**   So if someone wants to get a physical mailbox with your

9    company, how can that person do that?

10   **A.**   Either online through an app or in front of -- inside the

11   store.

12   **Q.**   Once someone has a mailbox, how can that person access

13   their mailbox?

14   **A.**   Walk in and request to pick up, or use the key to open up

15   their mailbox.

16           MR. SALTZMAN:  For the witness, can we please have

17   Exhibit 48?

18   BY MR. SALTZMAN:

19   **Q.**   Do you recognize this document?

20   **A.**   Yes.

21   **Q.**   And what is it?

22   **A.**   It's an application for a P.O. Box for a United States

23   Postal Services.

24           MR. SALTZMAN:  I'd offer Exhibit 48 in evidence.

25           MR. PARKER:  No objection.

```
 1              THE COURT:  48 is admitted and may be shown to the
 2    jury.
 3              (Exhibit 48 admitted into evidence.)
 4              MR. SALTZMAN:  Thank you.
 5    BY MR. SALTZMAN:
 6    Q.  Sir, who fills out -- as a general matter, who fills out
 7    this application?
 8    A.  If they do it online through an app, it's done
 9    electronically.  If they walk into the store, we key it in
10    through our POS.
11    Q.  So I want to just show you a few parts of the
12    application.  First, part 1.  What is the date of the
13    application?
14    A.  February 9, 2021.
15              MR. SALTZMAN:  And if we could have Section 2,
16    please.
17    BY MR. SALTZMAN:
18    Q.  Who is the applicant in Section 2?
19    A.  Ariel Legassa.
20    Q.  Is that the person who is applying for the mailbox?
21    A.  Yes.
22    Q.  All right.  And in Section 3, what's the address to be
23    used for delivery?
24    A.  680 East Main Street, Box 729, Stamford,
25    Connecticut 06901.
```

1    **Q.**   And is that the address for your business?

2    **A.**   Yes.

3    **Q.**   Okay.  And in Section 8, it's -- Section 8, what's

4    provided there?

5    **A.**   Two forms of ID.

6    **Q.**   By the applicant?

7    **A.**   Yes.

8    **Q.**   And Section 9, name a firm or corporation, do you see the

9    response listed there?

10   **A.**   9?

11   **Q.**   Section 9?

12   **A.**   Oh.  Alley Interactive LLC.

13   **Q.**   And how does the business address for -- that's listed

14   for Alley Interactive relate to the mailing address at your

15   office?

16   **A.**   It's -- so it would -- the mail would come Alley

17   Interactive LLC, 680 East Main Street, Box 729, Stamford,

18   Connecticut 06901.

19   **Q.**   And type of business, what is the type of business?

20   **A.**   Consultant services.

21   **Q.**   Okay.  And then if we could go to Section 16, do you see

22   a signature of the applicant?

23   **A.**   Yes.

24   **Q.**   Does an applicant need to produce identification in

25   connection with an application?

**A.**   Yes.

**Q.**   Does PostNet maintain a copy of the identification provided?

**A.**   Yes.

MR. SALTZMAN:  Could we have page 5?

BY MR. SALTZMAN:

**Q.**   I'll direct you to the item at the top.  What is this document?

**A.**   A Connecticut driver's license.

**Q.**   And what is the name of the individual listed on the driver's license?

**A.**   Ariel Legassa.

MR. SALTZMAN:  No further questions.  Thank you.

MR. PARKER:  No questions.

THE COURT:  Thank you.  You may step down.

MS. QUEENIN:  Your Honor, the government calls its next witness, Nancy Nicolescu.

THE DEPUTY CLERK:  Before you take your seat, could you please raise your right hand.

(Witness duly sworn.)

THE DEPUTY CLERK:  Please state your name for the record and spell your last name.

THE WITNESS:  Nancy Nicolescu, N-i-c-o-l-e- -- "s" as in "Sam" -- -c-u.

THE DEPUTY CLERK:  Thank you.  You may have a seat.

**NANCY NICOLESCU**

having been duly sworn, testified as follows:

**DIRECT EXAMINATION BY COUNSEL FOR THE GOVERNMENT**

BY MS. QUEENIN:

**Q.**  Good morning.

**A.**  Good morning.

**Q.**  Can you please describe where you work?

**A.**  I work for the Connecticut Secretary of the State's Office.

**Q.**  What do you do there?

**A.**  I'm the assistant director in the business services division.  I'm in --

**Q.**  And how long have you held that position?

**A.**  I've held that position since 2021.

**Q.**  What are your responsibilities as the assistant director in the business services division at the Connecticut Secretary of State?

**A.**  My responsibilities are to oversee a staff of 35 full-time employees for a number of different units.  There's the business services division.  There's document review, authentications, notary, publications, regulations.

**Q.**  Are you familiar with the process of incorporating an entity with the Connecticut Secretary of State?

**A.**  Yes.  So one of the biggest divisions for the Secretary of State is where we receive filings for business formations

1  and -- is that -- can you repeat the question?

2  **Q.**  Sure.  I just asked are you familiar with the process of

3  incorporating an entity with the Connecticut Secretary of

4  State?

5  **A.**  Yes.

6  **Q.**  And how are you familiar with it?

7  **A.**  Okay.  Thank you.

8         Our document review unit is responsible for taking

9  in business filings.  We receive probably about 50 --

10  $50 million a year in filings with business formations in the

11  State of Connecticut.

12  **Q.**  And what type of information does an applicant need to

13  provide in order to register an entity?

14  **A.**  It depends on the type of entity, but generally the

15  business name, the business owner, agent information, address

16  information, that kind of thing.

17  **Q.**  And why -- why does a company register with the Secretary

18  of State?  What are the benefits of doing so?

19  **A.**  A company -- there's a number of different reasons, but a

20  company is required to register if you're conducting business

21  in the State of Connecticut.  They would want to potentially

22  reserve a business name, open a bank account, things of that

23  nature.

24  **Q.**  Is any diligence conducted by the Connecticut Secretary

25  of State into whether these entities that are being

1    registered are actually functioning entities?

2    **A.**   The Secretary of State's office is ministerial in its

3    functions, so what that means is we don't actually validate

4    any of the filings, or what's submitted to our office.

5            MS. QUEENIN:  Can I have Exhibit 121 for the

6    witness only for now?

7    BY MS. QUEENIN:

8    **Q.**  And you should see on the screen in front of you, there's

9    a document, and I'm just going to ask Ms. Hallagan to quickly

10   scroll through it so you can see the other pages.

11           Do you recognize this document, Ms. Nicolescu?

12   **A.**   I do.

13   **Q.**   What do you recognize it to be?

14   **A.**   Well, there's --

15   **Q.**   Just generally?

16   **A.**   -- a number of different documents, scrolling through

17   here.  Which one?

18           MS. QUEENIN:  Let's focus on the first document.

19   If you can go to the first page, Ms. Hallagan.  And go to the

20   next page, please.

21   BY MS. QUEENIN:

22   **Q.**   What do you recognize this to be?

23   **A.**   Okay.  This is the certificate of organization, what we

24   also call the birth certificate for the business.

25           MS. QUEENIN:  Your Honor, I would offer

1    Exhibit 121.

2              MR. PARKER:  No objection.

3              THE COURT:  So are you offering the whole thing

4    or --

5              MS. QUEENIN:  Yes.

6              THE COURT:  -- are you offering just --

7              MS. QUEENIN:  The whole thing.

8              THE COURT:  Okay.

9              No objection?

10             MR. PARKER:  No objection.

11             THE COURT:  Exhibit 121 is admitted.

12             (Exhibit 121 admitted into evidence.)

13             MS. QUEENIN:  Okay.  And can we please go to

14   page 2, Ms. Hallagan.

15   BY MS. QUEENIN:

16   **Q.**  And, Ms. Nicolescu, now that the jury has this document

17   in front of them and is able to look at it, can you just

18   describe for me what the title of this document is at the

19   top, under the logo?

20   **A.**  Yes.  Certificate of organization for a limited liability

21   company, domestic.

22   **Q.**  And focusing your attention on numeral 1, where it says

23   name of limited liability company, can you please read for me

24   what entity is listed in Number 1?

25   **A.**  Alley Interactive LLC.

1  **Q.**  Okay.  And if we can take a look in the upper right-hand

2  corner of the document, in that text box, when was this

3  certificate of incorporation filed for Alley Interactive LLC

4  in Connecticut?

5  **A.**  On February 11, 2021.

6  **Q.**  Okay.  And we could exit out of that view, and if we

7  could zoom in on Section 2, where it says, "LLC's principal

8  office address," can you just read for me the city and state

9  of the LLC's principal office address provided to the

10  Secretary of State?

11  **A.**  Stamford, Connecticut.

12  **Q.**  Okay.  And in part 3, what is the mailing address for

13  Alley Interactive LLC?

14  **A.**  680 East Main Street, Number 729.

15  **Q.**  Okay.  And if we could go to the next page, and directing

16  your attention to Part 7 -- Part 6 where it says "manager of

17  member information," whose name is listed there?

18  **A.**  Ariel Legassa.

19  **Q.**  And the city and state of the business address and

20  residence address?

21  **A.**  Stamford, Connecticut.

22  **Q.**  Okay.

23           MS. QUEENIN:  And can we blow up Part 7 where it

24  says "entity email"?

25

1    BY MS. QUEENIN:

2    **Q.**   What email address is listed there?

3    **A.**   Alleyinteractivellc@gmail.com.

4    **Q.**   Okay.  Thank you.

5              Now, I want to focus your attention on Part 8 at

6    the bottom of the page.  Who is the signatory on this company

7    registration?

8    **A.**   Ariel Legassa.

9              MS. QUEENIN:  Thank you.  And we can take that down

10   for now.

11   BY MS. QUEENIN:

12   **Q.**   Was this certificate of organization approved for Alley

13   Interactive LLC?

14   **A.**   Yes.

15   **Q.**   I asked you before about diligence in connection with the

16   application process.  Does the Connecticut Secretary of

17   State's Office have any role in diligence once entities are

18   formed?

19   **A.**   No.

20   **Q.**   So is there any review of whether an entity is actually a

21   functioning corporate entity?

22   **A.**   No.

23   **Q.**   Are you familiar generally with the concept of

24   disillusion of a corporation?

25   **A.**   Yes.

1   **Q.**   And what does it mean to dissolve a corporation?

2   **A.**   It means to close the business, to dissolve it.

3   **Q.**   Based on your review of the records for Alley

4   Interactive, did there come a time when that entity was

5   dissolved?

6   **A.**   Yes.

7   **Q.**   And do you recall when that was?

8   **A.**   April 2022.

9   **Q.**   Okay.

10          MS. QUEENIN:  No further questions, Your Honor.

11          MR. PARKER:  No questions.

12          THE COURT:  Thank you.  You may step down.

13          MS. QUEENIN:  Your Honor, the government calls its

14   next witness, Mamek Charepoo.

15          THE COURT:  Feel free to stretch while we're

16   waiting for people to come in and out.

17          THE WITNESS:  Do I just --

18          THE DEPUTY CLERK:  You can stand.  Before you sit,

19   can you please raise your right hand.

20          (Witness duly sworn.)

21          THE DEPUTY CLERK:  Please -- excuse me -- please

22   state your name and spell your last name.

23          THE WITNESS:  Mamek Charepoo, C-h-a-r-e-p-o-o.

24          THE DEPUTY CLERK:  Thank you.  You may have a seat.

25

| | |
|---|---|
| 1 | **MAMEK CHAREPOO** |
| 2 | having been duly sworn, testified as follows: |
| 3 | **DIRECT EXAMINATION BY COUNSEL FOR THE GOVERNMENT** |
| 4 | BY MS. QUEENIN: |
| 5 | **Q.** Good morning.  Where you do you work? |
| 6 | **A.** I work at Santander Bank. |
| 7 | **Q.** How long have you worked at Santander Bank? |
| 8 | **A.** Seven years. |
| 9 | **Q.** What is your current position at Santander? |
| 10 | **A.** I'm a branch manager. |
| 11 | **Q.** What are your responsibilities as a branch manager? |
| 12 | **A.** Basically hiring, operations, sales -- everything. |
| 13 | **Q.** And where are you a branch manager?  What location? |
| 14 | **A.** Right here at Seaport. |
| 15 | **Q.** Is Santander an FDIC-insured bank? |
| 16 | **A.** Yes. |
| 17 | **Q.** And in connection with your work at Santander Bank, are |
| 18 | you familiar with Santander business checking accounts? |
| 19 | **A.** Yes. |
| 20 | **Q.** What is a business checking account? |
| 21 | **A.** Basically, it's a checking account for a business entity. |
| 22 | **Q.** And are you familiar with the process of opening a |
| 23 | business checking account? |
| 24 | **A.** Yes. |
| 25 | **Q.** Can you describe for the jury how someone may go about |

1    opening a business checking account at Santander?

2    **A.**   Certainly.  They have to present their business

3    certificate.  Usually they have an EIN number for that and

4    their ID.

5    **Q.**   Can you open a bank account without a business

6    certificate for a business?

7    **A.**   No.

8    **Q.**   And what does the bank do with that documentation once

9    it's received?

10   **A.**   We make a copy and we keep it for our records.

11   **Q.**   What, if any, due diligence does the bank conduct on a

12   business that's looking to open a business checking account

13   with Santander?

14   **A.**   So, basically, we do go on the state website of whatever

15   the business document has been presented to us, and we see if

16   we can see that on the state website.

17   **Q.**   And when you say see something on the state website, what

18   are you referring to?

19   **A.**   To see if the business is listed on the state website as

20   it is on the business certificate.

21   **Q.**   In connection -- strike that.

22          Is the process of opening a business checking

23   account the same across all Santander branches?

24   **A.**   Yes.

25   **Q.**   And in connection with your testimony today, have you had

1    a chance to review account documents for a bank account held

2    by an Alley Interactive LLC based in Connecticut?

3    **A.**   Yes.

4            MS. QUEENIN:  Can I have Exhibit 42, just for the

5    witness?

6    BY MS. QUEENIN:

7    **Q.**   Ms. Charepoo, do you recognize this document?  I'm going

8    to ask Ms. Hallagan to just scroll through the pages to show

9    you.

10   **A.**   Yes.

11           MS. QUEENIN:  If you can go back to the first page.

12   BY MS. QUEENIN:

13   **Q.**   Ms. Charepoo, what, generally, are these documents?

14   **A.**   This is basically a business checking account package all

15   the documents that we need to be able to open up the -- to

16   open up the account.

17           MS. QUEENIN:  Your Honor, I'd offer Exhibit 42.

18           MR. PARKER:  No objection.

19           THE COURT:  Exhibit 42 is admitted and can be shown

20   to the jury.

21           (Exhibit 42 admitted into evidence.)

22   BY MS. QUEENIN:

23   **Q.**   Okay.  Now that the jury has this in front of them, can

24   you just read for me the title of the first page here?

25   **A.**   Certainly.  It's -- the title is the

1    "Business/Non-Business Entity Signature Card."

2    **Q.**   And what is listed under "participant 1"?

3    **A.**   It's alley -- Alley Interactive LLC and it -- basically,

4    that's the first participant.

5    **Q.**   Great.  And what is the date of organization for that

6    entity that's listed on this Santander business checking

7    account?

8    **A.**   It's February 11, 2021.

9    **Q.**   And what is the address listed?

10   **A.**   It's 680 East Main Street, Suite 729, Stamford,

11   Connecticut 06901.

12   **Q.**   Okay.  And if we could take a look at the email address

13   listed?

14   **A.**   It is alleyinteractivellc@gmail.com.

15           MS. QUEENIN:  Okay.  If we can exit out of this

16   view and go to participant 2.

17   BY MS. QUEENIN:

18   **Q.**   Can you please read for me, Ms. Charepoo, the name of the

19   individual listed under participant 2 on this business

20   checking account?

21   **A.**   It's Ariel Legassa.

22   **Q.**   And what is listed under the section "employer's name"?

23   **A.**   It's Kaulike LLC.

24           MS. QUEENIN:  Okay.  We can take that down.

25   BY MS. QUEENIN:

1    **Q.**   What does it mean to be listed as a participant on a bank

2    account?

3    **A.**   That means you have direct ownership and you're able to

4    transact on the account.

5    **Q.**   Okay.  Are there any other individual signatories listed

6    on this account other than Ariel Legassa?

7    **A.**   No.

8              MS. QUEENIN:  If we could go to page 5 of this

9    document, please?  Actually, can we go back to the first

10   page?

11   BY MS. QUEENIN:

12   **Q.**   I just want to look at the date at the top.  What is the

13   date of this signature card on the account opening document?

14   **A.**   It's February 19, 2021.

15   **Q.**   Thank you.

16             MS. QUEENIN:  If we could go to page 5.

17   BY MS. QUEENIN:

18   **Q.**   What is this document?

19   **A.**   This is the state website business certificate.

20   **Q.**   And if we could go to page 12 of the PDF, what is this?

21   **A.**   This is a document that says who owns and how much do

22   they own the company.

23   **Q.**   So if we could just focus on the box there that

24   Ms. Hallagan has highlighted, who is listed there?

25   **A.**   Ariel Legassa.

1    **Q.**  And what is the percentage of ownership listed?

2    **A.**  100.

3           MS. QUEENIN:  Okay.  If we could exit out of this

4    and I'd like to go to page 14.

5    BY MS. QUEENIN:

6    **Q.**  What is this document, Ms. Charepoo?

7    **A.**  This is the Connecticut driver's license.

8    **Q.**  And why is this in the file?

9    **A.**  We always make a copy of the person's ID.

10   **Q.**  Okay.

11          MS. QUEENIN:  And we could take this down.

12          We could take it down.

13   BY MS. QUEENIN:

14   **Q.**  Ms. Charepoo, in connection with your review of this

15   Santander business checking account, did you also review

16   account statements and details of withdrawals and deposits?

17   **A.**  I did.

18   **Q.**  In front of you on the table there is a folder, and in

19   that folder you're going to see Exhibits 41, 43, 44, and 45.

20   I just want you to take a minute and look through them and

21   then look up when you're done.

22   **A.**  Yes.

23   **Q.**  Do you recognize the documents in the folder in front of

24   you?

25   **A.**  I do.

1    **Q.**  What are they?

2    **A.**  One of them are just copies of checks from transactions.

3    Another is a signature card, which I was just talking about.

4    Another is statements from the business.  And the other one

5    is a report for wires that were conducted, and another one is

6    showing that official checks were created at the bank.

7              MS. QUEENIN:  Your Honor, I'd offer Exhibits 41,

8    43, 44, and 45.

9              MR. PARKER:  No objection.

10             THE COURT:  41, 43, 44, and 45 are admitted.

11             (Exhibits 41, 43, 44, and 45 admitted into

12             evidence.)

13             MS. QUEENIN:  Thank you, Your Honor.

14             Okay.  I want to take a look at Exhibit 43 first,

15   for the witness and the jury, please.

16   BY MS. QUEENIN:

17   **Q.**  Ms. Charepoo, what is this document?

18   **A.**  This is a statement for Alley Interactive LLC.

19   **Q.**  And what is the date on the first statement in this

20   account, focusing on the top?

21   **A.**  It's February 19, 2021 to March 19, 2021.

22   **Q.**  Okay.  And what was the opening deposit in the account on

23   February 19th?

24   **A.**  It was $100.

25   **Q.**  Okay.  Now, I want to highlight a few transactions for

1   you.

2          MS. QUEENIN:  First, I'd like to look at the

3   account activity on April 8th, which is page 2 of the PDF,

4   Ms. Hallagan.  And if we could just blow up that section.

5   Thank you.

6   BY MS. QUEENIN:

7   **Q.**  Ms. Charepoo, do you see a deposit in this account on

8   April 8th?

9   **A.**  I do.

10  **Q.**  And if you could just read the line for me?

11  **A.**  It's a branch transaction at Bristol, Connecticut, check

12  deposit, $110,000.

13  **Q.**  Okay.

14         MS. QUEENIN:  And can I have Exhibit 1 -- sorry --

15  41 for the witness and for the jury, and I would ask

16  Ms. Hallagan to scroll to page 7 of this document.

17  BY MS. QUEENIN:

18  **Q.**  Ms. Charepoo, based on your review of the account, what

19  entity was this $110,000 deposit from?

20  **A.**  It was from New England Sports Network.

21  **Q.**  And if we could scroll to the next page, do you see a

22  marking on the back of the check?

23  **A.**  I do.

24  **Q.**  And to the best of your ability, what does that marking

25  say?

 1    **A.**  It says, "pay to the order of Santander, Alley

 2    Interactive LLC."

 3           MS. QUEENIN:  And if we could exit out of that

 4    view.

 5    BY MS. QUEENIN:

 6    **Q.**  Do you see any signatures on the check?

 7    **A.**  On this part of the check, I do not.

 8           MS. QUEENIN:  Okay.  And if we could go back to

 9    Exhibit 43 and I'd like to ask you to go back to page 2 of

10    the PDF, Ms. Hallagan.

11    BY MS. QUEENIN:

12    **Q.**  So having just reviewed the April 8th transaction, I'd

13    like to focus on the transaction below that, which is

14    April 16th.  Do you see that transaction?

15    **A.**  I do.

16    **Q.**  And what is it?

17    **A.**  It's a check purchase for $76,398.70.

18    **Q.**  What is a check purchase?

19    **A.**  It's an official check that's purchased from the bank,

20    which basically guarantees that that money is guaranteed.

21    **Q.**  Ms. Charepoo, were you able to review records of those

22    checks drawn on this account?

23    **A.**  Yes.

24           MS. QUEENIN:  Can I have Exhibit 45 for the witness

25    and the jury, please?

BY MS. QUEENIN:

**Q.**   What is this document?

**A.**   This is basically from our transactions.  It shows that checks were created for this account and bought.

MS. QUEENIN:  Okay.  I'd like to scroll to the next page, please.  And if we could just blow up the check so it's easier for the witness and the jury to see it.

BY MS. QUEENIN:

**Q.**   What is this check, Ms. Charepoo?

**A.**   It's an official check.

**Q.**   And what is the amount?

**A.**   $49,777.03.

**Q.**   And who is it payable to?

**A.**   Wells Fargo Auto - Payoff.

MS. QUEENIN:  Okay.  And we could exit out of this view and go to the next page.  And focusing on the second image of the check -- no, the one below that.

BY MS. QUEENIN:

**Q.**   What is this check?

**A.**   This is another official check.

**Q.**   And what is the amount of this check?

**A.**   $26,621.67.

**Q.**   And what is the date on this check?

**A.**   This date is April 16, 2021.

**Q.**   And who is it payable to?

1    **A.**   Tompkins Mahopac Bank.

2         MS. QUEENIN:  Great.  And we can exit out of this

3    document, please.

4         And can I have Exhibit 45 for both the witness and

5    the jury, please?  44.  Apologies.

6    BY MS. QUEENIN:

7    **Q.**   Ms. Charepoo, do you recognize this document?

8    **A.**   I do.

9    **Q.**   What is it?

10   **A.**   This is a report for wires.

11   **Q.**   And when you say "wires," what do you mean by that?

12   **A.**   It's an electronic transfer of money from one account to

13   another.

14         MS. QUEENIN:  Okay.  I'd like to go back to

15   Exhibit 43.  And page 3, please.

16   BY MS. QUEENIN:

17   **Q.**   Do you see a deposit in the Alley Interactive Santander

18   account on May 10th?

19   **A.**   Yes.

20   **Q.**   And if you could read that line to the jury?

21   **A.**   Branch transaction at Bristol Connecticut, check deposit,

22   $135,000.

23         MS. QUEENIN:  And if we could have Exhibit 41,

24   please.  And go to page 10?

25

1   BY MS. QUEENIN:

2   **Q.**   What entity is this deposit of $135,000 from?

3   **A.**   New England Sport Network.

4          MS. QUEENIN:   And if we could go to Exhibit 43, and

5   what I'd like to do is go to May 11th, which is on page 3 of

6   the PDF.

7   BY MS. QUEENIN:

8   **Q.**   Ms. Charepoo, after that $135,000 deposit from

9   New England Sports Network, do you see an outgoing wire

10  transfer?

11  **A.**   I do.

12  **Q.**   And what is the amount of that wire transfer?

13  **A.**   60,000.

14  **Q.**   Okay.

15         MS. QUEENIN:   And now could I have Exhibit 44.

16  We're going to go back to this document.

17  BY MS. QUEENIN:

18  **Q.**   Can you just remind the jury what Exhibit 44 shows?

19  **A.**   This shows a report of wires that were performed.

20  **Q.**   And wires are what?

21  **A.**   Electronic transfers of money from one account to

22  another.

23  **Q.**   Okay.   So I would like to focus your attention below that

24  first line there, to the transaction that says May 11, 2021.

25  Do you see that?

1    **A.**   I do.

2    **Q.**   What does this transaction show?  What is the date?

3    **A.**   May 11, 2021.

4    **Q.**   And the amount?

5    **A.**   60,000.

6    **Q.**   Who is the beneficiary?

7    **A.**   Ariel Legassa.

8    **Q.**   And who is the receiving institution?

9    **A.**   The receiving institution is American Broadcast.

10   **Q.**   And what about the originator of the wire transaction?

11   **A.**   The originator is Alley Interactive LLC.

12           MS. QUEENIN:  Okay.  And I'd like to go back to

13   Exhibit 43.  And go to page 15 of the PDF, to look at October

14   of 2021.

15   BY MS. QUEENIN:

16   **Q.**   Do you see a transaction, a wire transfer on October 4th?

17   **A.**   I do.

18   **Q.**   What is the amount of that transaction?

19   **A.**   20,000.

20   **Q.**   Okay.

21           MS. QUEENIN:  And now I'd like to go back to

22   Exhibit 44.  And if we could go to page 3 and focus on the

23   top of the page.  Ms. Hallagan is highlighting a section

24   here.

25

BY MS. QUEENIN:

**Q.**  I just want to ask you the same questions:  What is the date of this wire?

**A.**  October 4, 2021.

**Q.**  And the amount?

**A.**  20,000.

**Q.**  And the beneficiary?

**A.**  Ariel.

**Q.**  And what about the originator of the wire?

**A.**  The originator is Alley Interactive LLC.

**Q.**  And what about the receiving institution?

**A.**  Citibank NA.

            MS. QUEENIN:  Okay.  We can take that down.

BY MS. QUEENIN:

**Q.**  Ms. Charepoo, based on your review of the account, did there come a time when the Santander Bank account for Alley Interactive was closed?

**A.**  Yes.

**Q.**  Do you recall when that was?

**A.**  January 2022.

            MS. QUEENIN:  Okay.  Your Honor, I have no further questions for this witness.

            MR. PARKER:  No questions.

            THE COURT:  Thank you.  You may step down.

            MR. SALTZMAN:  Your Honor, the government calls

1    Bradford Campeau-Laurion.

2              THE DEPUTY CLERK:  Mr. Saltzman, did you want to

3    take that folder, or did you want to leave it there?

4              MR. SALTZMAN:  I will take it.

5              THE DEPUTY CLERK:  Okay.  Thank you.

6              Sir, before you sit, could you please raise your

7    right hand.

8              (Witness duly sworn.)

9              THE DEPUTY CLERK:  Please state your name for the

10   record and spell your last name.

11             THE WITNESS:  Bradford Campeau-Laurion,

12   C-a-m-p-e-a-u, hyphen, L-a-u-r-i-o-n.

13             THE DEPUTY CLERK:  Thank you.  You may have a seat.

14                   **BRADFORD CAMPEAU-LAURION**

15             having been duly sworn, testified as follows:

16        **DIRECT EXAMINATION BY COUNSEL FOR THE GOVERNMENT**

17   BY MR. SALTZMAN:

18   **Q.**  Good morning, Mr. Campeau-Laurion.

19   **A.**  Good morning.

20   **Q.**  Where do you work, sir?

21   **A.**  I work for Alley Interactive.

22   **Q.**  What is your position at Alley Interactive?

23   **A.**  My position is currently managing partner.

24   **Q.**  And did you hold a previous position before being

25   managing partner?

1    **A.**   Yes.  For the prior 2½ years, I was the CEO.

2    **Q.**   And why did you change positions?

3    **A.**   We have eight partners that share ownership of the

4    business, and we occasionally rotate roles for a fresh

5    perspective on leadership.

6    **Q.**   What is Alley Interactive?

7    **A.**   We are a digital agency.

8    **Q.**   And what type of work do you do?

9    **A.**   So we typically work for large media organizations, like

10   magazines, newspapers, local TV stations, and we build

11   websites for them.

12   **Q.**   Where is Alley Interactive located?

13   **A.**   Our headquarters is in New York, but we are a remote

14   company.  We have employees all over the United States.

15   **Q.**   Does Alley Interactive have any related businesses?

16   **A.**   Yes.  We have a subsidiary called Alley Lead, Inc., which

17   is a platform for startup journalism.

18   **Q.**   Anything else?

19   **A.**   No, that's it.

20   **Q.**   How many employees work at Alley Interactive?

21   **A.**   Approximately 60 currently.

22   **Q.**   When you were the -- were you the CEO of Alley

23   Interactive in 2020 and 2021?

24   **A.**   Yes, I was.

25   **Q.**   And during that time, what were your responsibilities as

1    the CEO?

2    **A.**   Besides providing overall strategic leadership and

3    direction for the company, I played a key role in our

4    business development, sales, and marketing efforts.

5    **Q.**   So in connection with those efforts, were you involved in

6    securing new business for Alley?

7    **A.**   Yes.  That was one of the primary functions of my job.

8    **Q.**   Are you familiar with New England Sport Network, or NESN?

9    **A.**   Yes, I am.

10   **Q.**   And are you familiar with an individual named Ariel

11   Legassa?

12   **A.**   Yes, I am.

13   **Q.**   How are you familiar with NESN and Ariel Legassa?

14   **A.**   Besides growing up here, they were our client from 2021

15   into 2022.

16   **Q.**   And what about Mr. Legassa?  How are you familiar with

17   him?

18   **A.**   He was our primary contact at the beginning of our

19   relationship with NESN.

20   **Q.**   In connection with that relationship, did you do -- did

21   your company do work for NESN?

22   **A.**   Yes, we did.

23   **Q.**   What kind of work did you do for NESN?

24   **A.**   We primarily worked on some video features for their

25   website.

1   **Q.**  And I think you just mentioned this before, but just to
2   be clear, who was your point of contact at NESN?
3   **A.**  That was Ariel Legassa.
4   **Q.**  And approximately, when did you first start speaking with
5   Ariel Legassa about doing work for NESN?
6   **A.**  In December of 2020.
7          MR. SALTZMAN:  Okay.  For the witness only, can I
8   please have Exhibit 148?
9   BY MR. SALTZMAN:
10  **Q.**  Do you recognize this document?
11  **A.**  Yes, I do.
12  **Q.**  And what is it?
13  **A.**  That is an email thread between myself and Ariel Legassa.
14         MR. SALTZMAN:  I'd offer Exhibit 148.
15         MR. PARKER:  No objection.
16         THE COURT:  148 is admitted.
17         (Exhibit 148 admitted into evidence.)
18         MR. SALTZMAN:  Thank you.
19         THE COURT:  It may be shown to the jury.
20         MR. SALTZMAN:  Thank you.
21  BY MR. SALTZMAN:
22  **Q.**  All right.  If I can direct your attention to the top of
23  the email, what is the date and subject?
24  **A.**  The date is January 29, 2021, and the subject is "project
25  estimate."

1   **Q.** So roughly how soon after you started speaking with

2   Mr. Legassa about doing work did you send him this email,

3   approximately?

4   **A.** Approximately a month.

5   **Q.** And at the top of -- can you please read your email at

6   the top of the chain?

7   **A.** Yes.  It says, "Ariel, find our statement of work for

8   this project attached with the estimate and high level terms

9   we've discussed thus far.  After you've had a chance to

10  review, I'm happy to discuss any questions or feedback for

11  this, or the MSA, which I previously sent over (attached

12  again here for reference and updated to today's date).

13  Excited to move this forward."

14  **Q.** What is an MSA?

15  **A.** That is a master services agreement.

16  **Q.** Did you attach any documents to this email?

17  **A.** I did.  I attached a -- the MSA, as well as the first

18  statement of work.

19  **Q.** Who drafted these documents?

20  **A.** I did.

21  **Q.** And we'll take a look -- I'll show them to you briefly in

22  a moment, but before doing so, I just want to ask you, does

23  Alley generally enter into master services agreements with

24  clients?

25  **A.** With every single client that we work with.

1    **Q.**   Why?

2    **A.**   A master services agreement defines the terms and

3    conditions for a business relationship.  It's standard

4    practice to sign a document in our industry and would also be

5    required by our insurance provider.

6    **Q.**   Does Alley generally enter into statements of work with

7    clients?

8    **A.**   Yes, for every project that we work on with a client.

9    **Q.**   Why?

10   **A.**   The statement of work is a separate legal document that

11   defines the specific deliverables, specifically what we are

12   building for that project, as well as how long it's going to

13   take, and how much it's going to cost.

14          MR. SALTZMAN:  Can I please have Exhibit 149 for

15   the witness only?

16   BY MR. SALTZMAN:

17   **Q.**   Mr. Campeau-Laurion, do you recognize this document?

18   **A.**   Yes.  This is another email thread between myself and

19   Ariel Legassa.

20          MR. SALTZMAN:  I'd offer Exhibit 149.

21          THE COURT:  Any objection?

22          MR. PARKER:  Oh, I'm sorry.  I was reading,

23   Your Honor.  No objection.

24          THE COURT:  149 is admitted.

25          (Exhibit 149 admitted into evidence.)

1          MR. SALTZMAN:  Thank you.

2     BY MR. SALTZMAN:

3     Q.   What is the subject of this email thread?

4     A.   W-9.

5     Q.   What is a W-9?

6     A.   It's a tax document that we would typically send to a

7     client.  It has our company's tax ID and it's used to ensure

8     that, you know, the income that we are generating from that

9     project is appropriately reported to the IRS.

10    Q.   Okay.  Let's start at the bottom, and I'll go ahead and

11    read the email from Mr. Legassa on February 1st, and then

12    I'll ask you about your response.

13          So he writes, "Hello, Brad.  Quick ask, can you

14    please send me Alley's W-9?  Regarding the estimate you sent

15    me, what will be the hourly rate?  I'm asking because I'll

16    need an invoice to start the admin process internally, and I

17    want to give finance the heads-up.  Please send me an invoice

18    for 10 hours for research and discovery for NESN Watch."

19          And if I can ask you, with respect to your

20    response, I'm only going to ask you to read the last two

21    paragraphs, please.

22    A.   Sure.  "As far as time spent thus far, I consider that

23    part of our business development process, and there's no need

24    for us to invoice for that time.  We only need to bill for

25    time moving forward.  Find our W-9 attached.  Happy to answer

1    any further questions."

2    **Q.**   Okay.  So did you send anything to Mr. Legassa?

3    **A.**   I did not send an invoice at this time, no.

4    **Q.**   Why not?

5    **A.**   It would be unusual for us to send an invoice prior to

6    actually signing the master services agreement and statement

7    of work.

8    **Q.**   Okay.  And did you send him the W-9?

9    **A.**   I did.

10        MR. SALTZMAN:  Can we have Exhibit 150, please,

11   just for the witness.

12   BY MR. SALTZMAN:

13   **Q.**   Do you recognize this document?

14   **A.**   Yes, I do.

15   **Q.**   And what is it?

16   **A.**   It is another email thread between myself and Ariel

17   Legassa.

18        MR. SALTZMAN:  I'd offer Exhibit 150.

19        MR. PARKER:  No objection.

20        THE COURT:  Exhibit 150 is admitted and may be

21   shown to the jury.

22        (Exhibit 150 admitted into evidence.)

23        MR. SALTZMAN:  Thank you.

24   BY MR. SALTZMAN:

25   **Q.**   I'm going to direct your attention -- well, first, the

1   subject is "project estimate"; is that right?

2   **A.**  That is correct.

3   **Q.**  All right.  I'm going to direct your attention to

4   Mr. Legassa's email on February 10th at 9:59 a.m.  And same

5   thing, I'm going to read you his email and then I'll ask you

6   to read the response.

7           He writes, "Hello, Brad, I'm still waiting on legal

8   to get back to me.  Can you please send me the first invoice

9   per the SOW description, and like to have everything ready.

10  Also, I'd like to set up a time to talk about UHD and DTC and

11  what we will need.  I think we should think about doing

12  research and discovery work to align NESN's needs and level

13  of effort.  I'll send you an invite."

14          Then I want to direct your attention to your

15  response.  And if you could please read it to the jury.

16  **A.**  Sure.  My response was, "So technically I can't invoice

17  you, yet, because a signed contract triggers all the setup in

18  our project management and billing systems.  We haven't done

19  that yet.  However, once the contracts are signed, we'll be

20  ready to move forward immediately and we won't be holding off

21  on commencing work for invoicing.  No worries there.  Happy

22  to participate in the research and discovery work on those

23  projects, and we can chat about the scope there during the

24  kickoff for this project, if that sounds good to you."

25  **Q.**  So how long had passed since the email we previously

1    reviewed, Exhibit 149, where Mr. Legassa asked you for an
2    invoice and now asks you for an invoice again in Exhibit 150?
3    **A.**   A little over a week.
4    **Q.**   Did you send him an invoice when he asked for it the
5    second time?
6    **A.**   No, I did not.
7    **Q.**   Why not?
8    **A.**   Because, again, we hadn't signed the master services
9    agreement or statement of work.
10   **Q.**   Okay.  Now moving forward, did there come a time when
11   Alley, your company, and NESN signed a master services
12   agreement and statement of work?
13   **A.**   Yes, a few weeks after this email thread that we were
14   just reviewing.
15             MR. SALTZMAN:  All right.  Can we have Exhibit 36,
16   which is in evidence?
17   BY MR. SALTZMAN:
18   **Q.**   And I'm just going to ask you briefly about these
19   documents.
20   **A.**   Uh-huh.
21   **Q.**   Is this the master services agreement that you were
22   referencing, Mr. Campeau-Laurion?
23   **A.**   Yes, it is.
24   **Q.**   And it's dated March 3rd; is that right?
25   **A.**   That is correct.

1    **Q.**  And the address that's reflected there, is that your

2    company address?

3    **A.**  Yes, that is our mailing address.

4    **Q.**  All right.  And I'll just ask you, if we can turn to the

5    last page, who signed the contract?

6    **A.**  I did, as well as Ariel Legassa for NESN.

7            MR. SALTZMAN:  Okay.  And if we could have

8    Exhibit 37, please.

9    BY MR. SALTZMAN:

10   **Q.**  Again, is the first statement of work that you've been

11   referring to --

12   **A.**  Yes, it is.

13   **Q.**  -- in the email correspondence?

14   **A.**  Yes, that's correct.

15   **Q.**  And it's also dated March 3rd?

16   **A.**  Yes, it is.

17           MR. SALTZMAN:  And if we could turn to page 7, the

18   last page.

19   BY MR. SALTZMAN:

20   **Q.**  Did you sign this document?

21   **A.**  Yes, I did.

22   **Q.**  And did Mr. Legassa sign the document, as well?

23   **A.**  Yes, he did as well.

24           MR. SALTZMAN:  Can we have Exhibit 151 just for the

25   witness, please.

BY MR. SALTZMAN:

**Q.**  Do you recognize this document?

**A.**  Yes, I do.

**Q.**  What is it?

**A.**  It is another email thread between myself and Ariel Legassa, as well as one of my employees.

MR. SALTZMAN:  I'd offer Exhibit 151.

MR. PARKER:  No objection.

THE COURT:  151 is admitted.

(Exhibit 151 admitted into evidence.)

MR. SALTZMAN:  Thank you.

BY MR. SALTZMAN:

**Q.**  So the subject is "account setup"; is that correct?

**A.**  Yes, that's correct.

**Q.**  And I want to direct your attention to your email on March 4, 2021.  Who is Rebecca Sherman?  I see that she's also copied on this email?

**A.**  Yes.  At the time she was our director of client services.

**Q.**  Okay.  Can you please read the email that you sent to Mr. Legassa?

**A.**  Yes.

"I wanted to introduce you to our director of client services, Rebecca Sherman.  She'll be assisting in getting you set up on the business side of things at Alley to

1    make sure we have information for your primary contacts and

2    your billing information.  I'll let you two take it from

3    here.  Thanks."

4    **Q.**  So how soon after the execution of the master services

5    agreement did you send this email?

6    **A.**  Almost immediately.

7    **Q.**  Okay.  And let's turn to Mr. Legassa's response.  He

8    writes, "Thank you, Brad.  Nice to e-meet you, Rebecca.

9    Please send invoices to me."

10           Going forward, where did Alley, where did your

11   business, send its invoices to NESN?

12   **A.**  Directly to Ariel Legassa.

13   **Q.**  Okay.

14           MR. SALTZMAN:  Can we have Exhibit 173, please.

15   BY MR. SALTZMAN:

16   **Q.**  Do you recognize this document?

17   **A.**  Yes, I do.

18   **Q.**  What is it?

19   **A.**  It's an email that's automatically generated by our

20   invoicing system.

21   **Q.**  By Alley Interactive's invoicing system?

22   **A.**  Yes, that's correct.

23           MR. SALTZMAN:  I'd offer Exhibit 173.

24           MR. PARKER:  No objection.

25           THE COURT:  173 is admitted and may be shown to the

1    jury.

2              (Exhibit 173 admitted into evidence.)

3              MR. SALTZMAN:  Thank you.

4    BY MR. SALTZMAN:

5    **Q.**  Can you please read the date and subject of the email?

6    **A.**  Yes.  The date is March 4, 2021.  The subject is "You

7    have an invoice from Alley Interactive due on April 3, 2021."

8    **Q.**  And so what -- we've gone through a few emails.  Where

9    does this one now fall in that timeline of contract execution

10   and sending invoices?

11   **A.**  Yes.  So the contracts had been executed, we had sent the

12   email that we had previously reviewed between myself and

13   Ariel and Rebecca Sherman, and then this email was generated

14   by our invoicing system for the initial payment for Statement

15   of Work Number 1.

16   **Q.**  And how many times did Mr. Legassa ask you for an invoice

17   before you sent him this invoice on March 4th?

18   **A.**  He had asked two times.  The -- I don't recall him asking

19   more than that.

20   **Q.**  Okay.  And let's take a look at the attachment.  What did

21   Alley attach to this email to Mr. Legassa?

22   **A.**  Yeah, this is our standard invoice template, and this is

23   for a payment that's due upon execution, or signing of the

24   first statement of work.

25   **Q.**  So the invoice is dated on March 4th; is that right?

1   **A.**  Yes, that's correct.

2   **Q.**  And I'm sorry.  When is -- so when would payment have

3   been due on this invoice?

4   **A.**  On April 3rd.  All -- for this particular relationship,

5   our invoicing terms were for payments to be due 30 days from

6   the sending of an invoice.

7   **Q.**  Okay.

8            MR. SALTZMAN:  We can take this down, please.

9   BY MR. SALTZMAN:

10  **Q.**  Did there come a time when Alley and NESN entered into a

11  second statement of work?

12  **A.**  Yes, later in 2021.

13  **Q.**  And why was it necessary to enter into a second statement

14  of work?

15  **A.**  The first statement of work was for a fixed amount of

16  work.  We had completed that project; however, there was an

17  ongoing need for our services at NESN.  So we decided to

18  enter into a monthly retainer relationship.

19  **Q.**  And do you recall the amount of the retainer for the

20  monthly relationship?

21  **A.**  Yes.  They were paying us $57,000 per month.

22           MR. SALTZMAN:  Okay.  Can we have Exhibit 38?

23  That's in evidence.

24  BY MR. SALTZMAN:

25  **Q.**  Is this the second statement of work?

1  **A.**  Yes, it is.

2           MR. SALTZMAN:  Okay.  And can we have the last

3  page, please?

4  BY MR. SALTZMAN:

5  **Q.**  Is that your signature, Mr. Campeau-Laurion, or your

6  digital signature, I should say?

7  **A.**  Yes.  That is my digital signature via DocuSign.

8  **Q.**  And what is the date of the second statement of work?

9  **A.**  The second statement of work was effective as of July 1st

10 2021, but it was signed on June 8, 2021.

11 **Q.**  Okay.  So did you ever discuss entering into a third

12 statement of work with Mr. Legassa?

13 **A.**  We did have a brief exchange about potentially expanding

14 the relationship, but it was unclear if that would be an

15 expansion of the retainer, or third statement of work, so

16 officially no.

17 **Q.**  So when you say a brief discussion, what do you mean by

18 that?

19 **A.**  Just a brief email exchange about potentially expanding

20 the relationship for some additional projects.

21 **Q.**  And how long did that discussion go on for?

22 **A.**  Not very long at all.  It was fleeting.  Probably just a

23 single email or two.

24 **Q.**  Okay.  And did Alley perform extra work pursuant to

25 statement of work 2, so work outside of that 57K retainer?

1    **A.**  We did not, no.  We stayed within the bounds of that

2    retainer for the remainder of our relationship with NESN.

3    **Q.**  All right.  So let's shift gears.  I want to ask you

4    about billing, invoices and checks.  You have a binder in

5    front of you.

6    **A.**  Uh-huh.

7    **Q.**  And I'm going to ask you to please take a look at

8    Exhibits 1 through 9 -- all in evidence -- and once you've

9    done so, I'll ask you to look up.

10             All right.  What are these documents?

11   **A.**  Those are invoices that were sent by my company, Alley

12   Interactive, to NESN.

13   **Q.**  And if we take a look at Exhibit 1, which is in

14   evidence --

15             MR. SALTZMAN:  We can put it up for the jury,

16   please.  Can we put up Exhibit 1 for the jury, please?

17   Great.  Thank you.

18   BY MR. SALTZMAN:

19   **Q.**  So what is this document?

20   **A.**  This is an invoice sent by my company, Alley Interactive,

21   to NESN.

22   **Q.**  Okay.  And if -- I want to direct your attention to the

23   top right, where it says "Alley."

24   **A.**  Yes.

25   **Q.**  Is that Alley's logo?

1   **A.**   Yes, it is.

2   **Q.**   And does Alley use its logo in other contexts?

3   **A.**   On virtually every document that we put out.

4   **Q.**   That logo is on it?

5   **A.**   Yes.  T-shirts, mugs, hats -- you name it.

6   **Q.**   All right.  And what's the date and amount of the

7   invoice?

8   **A.**   The date of the invoice is April 15, 2021, and the amount

9   is for $25,000.

10   **Q.**   And that address on the top left, is that your business

11   address?

12   **A.**   Yes, it is.

13   **Q.**   And in the center, what's the description that's

14   provided?

15   **A.**   Yes, 253-01, Invoice 2 of 3, midproject installments,

16   dated 4/15/21.

17   **Q.**   I want to ask you about this 253-01.  What does that

18   mean?

19   **A.**   That is our budget code.  So the first part, 253, that is

20   NESN's client -- unique client ID, and the 01 means Statement

21   of Work Number 1.  So every client, every project, has a

22   unique budget code combination.

23   **Q.**   That's an Alley budget code?

24   **A.**   That's correct, yeah.

25   **Q.**   Okay.

1     **A.**   It's used by our accounting system.

2     **Q.**   So do you see where it says, "For electronic payments

3     below," and then Chase Bank is listed?  The account number is

4     redacted.  Do you see that?

5     **A.**   Yes.

6     **Q.**   Is that where Alley maintains that bank account?

7     **A.**   Yes, that's correct.

8     **Q.**   Does Alley bank anywhere else?

9     **A.**   We do not.

10    **Q.**   What about at Santander Bank?

11    **A.**   We do not.

12    **Q.**   All right.  Let's take a look at Exhibit 9, please.  What

13    invoice is reflected here?

14    **A.**   This is an invoice that we sent to NESN under Statement

15    of Work Number 2 for our monthly retainer payment.

16    **Q.**   Of $57,000?

17    **A.**   That's correct.

18    **Q.**   And where it says description, I'd ask that you read the

19    description.

20    **A.**   The description says "253-02 November 2021 NESN

21    maintenance."

22    **Q.**   So what does the "02" correspond to?  If 253 is NESN,

23    what's 02?

24    **A.**   Statement of Work Number 2.

25    **Q.**   Okay.  Do you recall -- consistent with the work that you

1   did for NESN, do you recall how you were paid by NESN?

2   **A.**   Yes.  They mailed us a paper check.

3   **Q.**   All right.  So in that same binder in front of you, can

4   you take a look at Exhibits 28 through 35, please.

5           Do you recognize these documents?

6   **A.**   Yes, I do.

7   **Q.**   And what are they?

8   **A.**   Those are images of checks that were sent by NESN to us

9   for payment of invoices.

10   **Q.**   All right.  Let's just take a look at one of them.

11           MS. QUEENIN:  Can we have Exhibit 28, please?

12   BY MR. SALTZMAN:

13   **Q.**   I'll just ask you what the date and amount is.

14   **A.**   Yeah, the check date is May 20, 2021.  The amount is

15   $25,000.

16   **Q.**   So would this have been statement of work 1, or statement

17   of work 2?

18   **A.**   This was for payment of an invoice issued under Statement

19   of Work Number 1.

20   **Q.**   And the pay to the order of, is that your address list

21   there?

22   **A.**   Yes, that is our address.

23   **Q.**   And is that the same address that appears on all the

24   checks to your business?

25   **A.**   Yes.

1          MR. SALTZMAN:  All right.  We can take this down,

2     please.

3     BY MR. SALTZMAN:

4     **Q.**  So, Mr. Campeau-Laurion, I want to ask you about an

5     entity called Alley Interactive LLC based in Connecticut.

6     Are you familiar with this entity?

7     **A.**  Only in conjunction with this case.

8     **Q.**  All right.  When did you first learn about Alley

9     Interactive LLC that had been formed in Connecticut?

10    **A.**  Yeah, that was in December of 2021.

11    **Q.**  And how did you learn that?

12    **A.**  We were doing a routine public records search and, you

13    know, we were just seeing what documents were in the public

14    record about our company.  Everything was normal except we

15    found this entity in Connecticut that bore our same name.

16    **Q.**  And when you made that discovery, did you -- were you

17    able to determine who had created that Alley Interactive in

18    Connecticut?

19    **A.**  Yes.  In the State of Connecticut, you have to use your

20    real legal name on the articles of incorporation that are in

21    the public record, and I did see the owner's name of the

22    company.

23    **Q.**  And what was the name of the owner?

24    **A.**  Ariel Legassa.

25    **Q.**  So what was your reaction when you learned that someone

1    you were dealing with at NESN had created a business in the

2    same name as your company, Alley Interactive?

3              MR. PARKER:  Objection.

4              THE COURT:  Sustained.  You can ask what he did.

5    We don't need to ask what he was thinking.  Go ahead.

6    BY MR. SALTZMAN:

7    **Q.**  What happened next?

8    **A.**  I advised our counsel to inform NESN's counsel about our

9    discovery, so that they could look into it appropriately.

10   **Q.**  So before the discovery, did you ever have any

11   discussions with Mr. Legassa about creating this entity?

12   **A.**  Absolutely not.

13   **Q.**  Was this Alley Interactive in Connecticut in any way

14   related to your company, Alley Interactive?

15   **A.**  No.

16   **Q.**  Does Alley Interactive, your company, use an internal

17   email system?

18   **A.**  Yes, we do.

19   **Q.**  What is the domain name?

20   **A.**  Alley.co.

21   **Q.**  Are you familiar with an email address,

22   alleyinteractivellc@gmail.com?

23   **A.**  I'm only familiar with it in conjunction with this case.

24   **Q.**  Is it any -- is it related to your business, Alley

25   Interactive?

1    **A.**  No, it is not and not in any way.

2    **Q.**  Did you ever -- was there ever a discussion of a planned

3    merger between your business and the Alley Interactive in

4    Connecticut?

5    **A.**  No.

6    **Q.**  I want to briefly show you two more sets of documents.

7    One is Exhibits 10 through 20 in the binder in front of you,

8    if you can take a look at them.

9           What are these documents?

10   **A.**  These are invoices that bear a resemblance to our invoice

11   template, but these are not invoices that were sent by my

12   company.

13   **Q.**  Did anyone at your business create these documents?

14   **A.**  No.

15   **Q.**  Okay.  Let's take a look at two of them.

16          MR. SALTZMAN:  Can we have Exhibit 12, please,

17   that's in evidence?

18   BY MR. SALTZMAN:

19   **Q.**  So what's depicted here?

20   **A.**  That is an invoice.

21   **Q.**  And directing your attention to the logo on the top

22   right, how does that compare to your company logo?

23   **A.**  That is our logo.

24   **Q.**  And how does the layout of this invoice compare to the

25   invoices created by your company?

1    **A.**  The layout is almost identical.

2    **Q.**  And the business name on the top left?

3    **A.**  That is our business name.

4    **Q.**  What about that address?

5    **A.**  That is not our address.

6    **Q.**  And the description of work?

7    **A.**  Yes.

8    **Q.**  Do you recognize that billing code and statement of

9    work -- the billing code and the description provided next to

10   it?

11   **A.**  I do not recognize them in combination.  While the

12   billing code is the valid billing code that we used for

13   Statement of Work Number 2 for NESN, the description doesn't

14   make any sense.

15          Statement of Work Number 2 was for a monthly

16   retainer, which means that we bill NESN the same amount every

17   month, month over month.  There was no execution payment for

18   a retainer statement of work.  An execution payment only

19   occurs in a fixed cost project, so to say that there was an

20   execution payment for a retainer statement of work, which was

21   the case with Statement of Work Number 2, makes no sense.

22          This is not an invoice that we sent.

23          MR. SALTZMAN:  Can we please have Exhibit 17?

24   BY MR. SALTZMAN:

25   **Q.**  And what's depicted here?

1   **A.**   That is an invoice.

2   **Q.**   And that -- is that your logo on the right?

3   **A.**   That is our logo.

4   **Q.**   And your company name on the left?

5   **A.**   That is our company name.

6   **Q.**   And do you recognize the description of work here?

7   **A.**   I -- I do not recognize the description.

8            MR. SALTZMAN:  Can we pull up Exhibit 6 side by

9   side?

10  BY MR. SALTZMAN:

11  **Q.**   So on the left we have Exhibit 17, which we were just

12  reviewing, directing payment to an Alley Interactive in

13  Connecticut; and on the right, we have Exhibit 6, directing

14  payment to Alley -- to your business, Alley Interactive.

15           How do these two invoices compare, to you,

16  Mr. Campeau-Laurion?

17  **A.**   While they are visually similar, there are some key

18  differences.  The invoice on the right, the one that we sent,

19  you know, has our mailing address in New York, which is not

20  present in the one on the left.

21           Furthermore, the description in the invoice on the

22  left, Exhibit 17, lacks a budget code, whereas the invoice on

23  the right, which we sent, has a budget code, 253-02.  We

24  would never send an invoice without a budget code present in

25  the description.

1          Furthermore, the invoice on the right has our
2    correct banking information on the bottom, which is missing
3    on the invoice that's on the left.
4    Q.  And finally, I just ask you in the binder in front of you
5    if you can take a look at Exhibits 21 through 27.
6          MR. SALTZMAN:  And if we can please have Exhibit 21
7    that's in evidence.
8    BY MR. SALTZMAN:
9    Q.  What's the date and amount of this check?
10   A.  The check date is April 1, 2021, and the amount is for
11   $110,000.
12   Q.  And the address of the -- that it was sent to, that's in
13   Connecticut?
14   A.  Yes.
15   Q.  Did your company ever receive this check?
16   A.  No, we did not.
17   Q.  Authorize this check?
18   A.  No.
19   Q.  Did your company receive any of the checks that you just
20   reviewed, Exhibits 21 through 27?
21   A.  Not a single one of them.
22          MR. SALTZMAN:  No further questions.
23          MR. PARKER:  I have a few questions, Your Honor.
24
25

1           **CROSS-EXAMINATION BY COUNSEL FOR THE DEFENDANT**

2 BY MR. PARKER:

3 **Q.**  Good morning, Mr. Campeau-Laurion.

4 **A.**  Good morning.

5 **Q.**  So you --

6        MR. PARKER:  Could we get Exhibit 150 up, please?

7 The email where it says, "Hello, Brad."

8        This is admitted, right?

9        THE COURT:  No.

10        MR. PARKER:  Just for the witness, then.

11        THE COURT:  150 is in.

12        MR. PARKER:  Yeah.  That's what I thought.

13 BY MR. PARKER:

14 **Q.**  Okay.  "Hello Brad, I'm still waiting on legal to get

15 back to me."

16        Right?  That's what Mr. Legassa wrote in the email?

17 **A.**  Yes.

18 **Q.**  Okay.  And it was your testimony that this was in respect

19 to the master service agreement and the first statement of

20 work?

21 **A.**  Yes.  We had sent both documents, and at this time, they

22 were going through legal review at NESN.

23 **Q.**  That was your understanding, was that Mr. Legassa had to

24 have legal -- the legal department at NESN review the report?

25 **A.**  That was my understanding, yes.

**Q.**  And that was the master service agreement and the
statement of work you said you drafted, right?

**A.**  They were drafted by me using templates that were created
by our general counsel.

**Q.**  Okay.  And you sent those over to Mr. Legassa and you
were waiting to hear back from them before you could start up
the work, right?

**A.**  Yes.  It's quite typical for a legal review to happen for
contracts before a new business relationship starts.

**Q.**  So, again, it was your understanding that the process
would have to take place at NESN, where their legal
department would have to review what you had sent over?

**A.**  Yes, that's correct.

**Q.**  Were there any changes that came back?

**A.**  There were several changes that came back to the master
services agreement, which my general counsel and their
counsel negotiated over the span of a few weeks.

**Q.**  Okay.  So once the first exchange of paperwork happened
from --

**A.**  Yes.

**Q.**  -- your company to NESN and NESN sent it back, you and
Mr. Legassa kind of backed out of the process, and it was
between the two legal departments?

**A.**  Yes, pretty much.  Yep.

**Q.**  Did it take a while for a final contract to get approved?

1    **A.**   From what I recall, the master services agreement took,

2    yes, somewhere between two and three weeks before it was

3    finally approved.

4    **Q.**   And do you know how many versions went back and forth?

5    **A.**   I don't recall the exact number -- certainly at least two

6    or three.

7    **Q.**   Okay.  Again, in the middle of this email, Exhibit 150 --

8    well, before I get to that, you said that you and Mr. Legassa

9    had a brief exchange about either a third statement of work

10   or an expansion of a second statement of work, right?

11   **A.**   Yes.

12   **Q.**   And that those were fleeting discussions, maybe just an

13   exchange of an email or two?

14   **A.**   Yes.

15   **Q.**   And were they fleeting because Alley didn't have the

16   resources to put toward any more NESN work?

17   **A.**   No.  Alley had the resources.  Mr. Legassa never followed

18   up.

19   **Q.**   Okay.  Back to Number 150 in the middle, the last

20   paragraph under "Hello, Brad" from Mr. Legassa, where he

21   says, "Also, I'd like to set up a time to talk about UHD and

22   DTC," right?

23   **A.**   Yes.

24   **Q.**   And he wants Alley to do some research and discovery work

25   in those areas, right?

1    **A.**  That's what's indicated here, yes.

2    **Q.**  Okay.  And did you have conversations about that with

3    Mr. Legassa?

4    **A.**  We did, but the agreement was eventually to just handle

5    that after we signed the contract and started work, which did

6    occur at the beginning of March 20- --

7    **Q.**  What was your understanding of the DTC work that might

8    come your way?

9    **A.**  My understanding was that NESN was moving towards

10   building their own direct to consumer video platform, and the

11   work that we were going to be taking on was going to help

12   enable that.

13   **Q.**  And did you have discussions with Mr. Legassa about that?

14   **A.**  Yeah.  It was certainly germane to the project.

15   **Q.**  And did Alley ever really actually do any work on the DTC

16   front?

17   **A.**  Yes, we did.

18   **Q.**  Okay.  And, again, that was for a NESN DTC project?

19   **A.**  Yes.  It's a project that eventually became NESN 360.

20              MR. PARKER:  Okay.  I have no further questions.

21              THE COURT:  Anything on redirect?

22              MR. SALTZMAN:  No, Your Honor.

23              THE COURT:  Thank you.  You may step down.

24              MS. QUEENIN:  Your Honor, the government calls

25   Leatha Fisher.

```
 1              THE COURT:  Again, feel free to stretch while we're
 2      changing witnesses.
 3              THE DEPUTY CLERK:  Before you sit, could you please
 4      raise your right hand.
 5              (Witness duly sworn.)
 6              THE DEPUTY CLERK:  Please state your name for the
 7      record and spell your last name.
 8              THE WITNESS:  Leatha Fisher, F-i-s-h-e-r.
 9                          LEATHA FISHER
10          having been duly sworn, testified as follows:
11          DIRECT EXAMINATION BY COUNSEL FOR THE GOVERNMENT
12      BY MS. QUEENIN:
13      Q.  Good morning.  I'm over here.
14              Can you pull the microphone closer to you just so
15      you could speak into it?  Thank you so much.
16              Good morning.  Where do you work?
17      A.  New England Sports Network.
18      Q.  And how long have you worked at New England Sports
19      Network for?
20      A.  15 years.
21      Q.  What is your title?
22      A.  Accounts payable and payroll manager.
23      Q.  And what was your title in 2021?
24      A.  Accounts payable and payroll supervisor.
25      Q.  Now, in 2021, who did you report to?
```

1    **A.**   Mary Breiter.

2    **Q.**   Can you tell the jury what your job responsibilities were

3    as the payroll and accounts payable supervisor in 2021?

4    **A.**   Yes.  To process payments for all vendors and to process

5    payroll for all employees.

6    **Q.**   Okay.  First, I want to focus on the part of your job

7    where you process payments for employees.

8    **A.**   Uh-huh.

9    **Q.**   Approximately how many employees does NESN have?

10   **A.**   NESN has currently or at that time?

11   **Q.**   At that time, if you know, approximately.

12   **A.**   Between 200 and 250 employees.

13   **Q.**   And how are those employees paid?

14   **A.**   Through ADP system.

15   **Q.**   What is ADP system?

16   **A.**   It is our payroll system.

17   **Q.**   Okay.  Now I want to ask you a couple of questions about

18   the part of your job where you work with vendors.  Okay?

19   **A.**   Okay.

20   **Q.**   Approximately how many vendors does NESN work with at any

21   given time?

22   **A.**   Not sure the exact number, more than a hundred, I would

23   say.

24   **Q.**   And as part of your responsibilities, do you set up

25   accounts for vendors at NESN?

1   **A.**   Yes, I do.

2   **Q.**   Tell the jury how you go about setting up an account for

3   a vendor at NESN.

4   **A.**   So vendors -- well, I request the W-9 for all vendors.

5   **Q.**   Okay.  So what is a W-9?

6   **A.**   It's a tax identification form that confirms that it's a

7   legitimate business and that they have a tax identification

8   number.

9   **Q.**   Other than a W-9 and the name of the vendor, do you need

10  anything else to set up an account for a vendor?

11  **A.**   No.

12  **Q.**   What about an invoice?  Do you need an invoice to set up

13  an account?

14  **A.**   No, I don't.

15  **Q.**   Now, were you responsible for paying vendors in the 2019

16  through 2021 time period?

17  **A.**   Yes.

18  **Q.**   Can you tell me about the process by which you go about

19  paying a vendor?

20  **A.**   Yes.  So once the vendor is set up in the system and the

21  invoices are received, then I upload the invoices into our

22  invoice approval system, which is called Fidesic.  And it's

23  an electronic approval system, and then invoices are assigned

24  to the manager responsible for the project, or the vendor.

25          They approve.  They get a notification that it's

1   there to approve.  Then, depending on the amount, it goes to

2   another manager, and then I get a notification when all the

3   approvals are done --

4   **Q.**  Okay.

5   **A.**  -- to process.

6   **Q.**  That was a lot of info, so we're going to come back to

7   that later.  But I want to switch gears for a second and ask

8   you are you familiar with an individual named Ariel Legassa?

9   **A.**  Yes.

10  **Q.**  Do you see him seated in the courtroom today?

11  **A.**  Yes, I do.

12  **Q.**  Can you just identify him by an item of clothing he's

13  wearing?

14  **A.**  A black top.

15          MS. QUEENIN:  Can the record reflect that the

16  witness has identified the defendant.

17  BY MS. QUEENIN:

18  **Q.**  How are you familiar with Ariel Legassa?

19  **A.**  The former VP of digital at NESN.

20  **Q.**  And when you say "VP," what do you mean by that?

21  **A.**  Vice president.

22  **Q.**  I want to focus your attention now to around March of

23  2021.  Did you work with Ariel Legassa at NESN in March of

24  2021?

25  **A.**  Yes.

1    Q.   Did you notice a change in his behavior around that time?

2              MR. PARKER:  Objection.

3              THE COURT:  Why don't you not ask a leading

4    question.

5    BY MS. QUEENIN:

6    Q.   What did you notice about his behavior in March of 2021?

7              MR. PARKER:  Objection.

8              THE COURT:  I'll allow that.

9              THE WITNESS:  Can I answer?

10              THE COURT:  Yes.

11              THE WITNESS:  So the only thing I noticed at that

12    time -- we didn't have much conversation in passing.  No

13    words were really said.  I just noticed around that time

14    that, you know, he would speak to me more often in passing

15    and in the lounge, you know, "Good morning.  How are you?"

16    you know, small talk, nothing much, but that's about it.

17    BY MS. QUEENIN:

18    Q.   And why do you remember that, Ms. Fisher?

19              MR. PARKER:  Objection.

20              THE COURT:  I'm going to allow it.

21              THE WITNESS:  Because there was no communication

22    whatsoever before that.

23              MS. QUEENIN:  Okay.  Can I have Exhibit 82 for the

24    witness only.

25    BY MS. QUEENIN:

1    Q.   Ms. Fisher, on your screen in front of you is a document

2    that I've marked for identification as Exhibit 82.  Do you

3    recognize the document?

4    A.   Yes.

5    Q.   What is it?

6    A.   It's an invoice -- I'm sorry.  It's an email from Ariel

7    to myself.

8              MS. QUEENIN:  Your Honor, I'd offer Exhibit 82.

9              MR. PARKER:  No objection.

10             THE COURT:  82 is admitted.

11             (Exhibit 82 admitted into evidence.)

12   BY MS. QUEENIN:

13   Q.   Okay.  So now that the jury has this email in front of

14   them, I'm just going to ask you a couple of questions.  Can

15   you repeat the date of this email?

16   A.   Yes.  March 9, 2021.

17   Q.   And what is the subject line?

18   A.   NESN Watch and 4K Web invoices.

19   Q.   And can you read for me the body of the email, please.

20   A.   "Hello Leatha, I'm attaching invoices from Alley

21   Interactive for NESN Watch and 4K web development.  Please

22   send payment to Alley Interactive LLC, 680 East Main,

23   Number 729, Stamford, Connecticut 06901.  Thank you."

24   Q.   And up at the top, do you see the section that says

25   "attachments"?

1    **A.**  Yes.

2    **Q.**  I want to take a look at some of those.

3           MS. QUEENIN:  If we could scroll to the next page.

4    BY MS. QUEENIN:

5    **Q.**  What is this, Ms. Fisher?

6    **A.**  This is an invoice from Alley Interactive.

7    **Q.**  And what is listed here under the description?

8    **A.**  "253-01, execution of SOW 1."

9    **Q.**  And what is listed in the upper right-hand corner, the

10   word in the upper right-hand?

11   **A.**  "Alley."

12   **Q.**  Focusing your attention on the left-hand side of the

13   document, do you see an entity name listed in the upper

14   left-hand corner?

15   **A.**  Yes.

16   **Q.**  What is it?

17   **A.**  Alley Interactive LLC.

18   **Q.**  And what is this invoice date?

19   **A.**  March 4, 2021.

20   **Q.**  And the amount?

21   **A.**  25,000.

22   **Q.**  Okay.

23           MS. QUEENIN:  Can we look at the next page, please?

24   BY MS. QUEENIN:

25   **Q.**  What is this document?

1    **A.**   Another invoice for Alley Interactive.

2    **Q.**   And same questions, just briefly -- what is the date of

3    this invoice?

4    **A.**   March 4, 2021.

5    **Q.**   Do you see an address listed in the upper left-hand

6    corner of this document?

7    **A.**   No.

8    **Q.**   And what is the description listed?

9    **A.**   253-01 execution of SOW Number 2-1.

10   **Q.**   And the amount of the invoice?

11   **A.**   85,000.

12          MS. QUEENIN:   Okay.   We can take that down, please.

13   BY MS. QUEENIN:

14   **Q.**   Was this the first time you received invoices for the

15   entity Alley Interactive?

16   **A.**   Yes, I believe so.

17          MS. QUEENIN:   Can I have Exhibit 83 for the witness

18   only?

19   BY MS. QUEENIN:

20   **Q.**   Ms. Fisher, in front of you on the screen is an email

21   that's marked for identification as Exhibit 83.   Do you

22   recognize this email?

23   **A.**   Yes.

24          MS. QUEENIN:   Okay.   Your Honor, I'd offer it.

25          MR. PARKER:   No objection.

```
 1              THE COURT:  83 is admitted and may be shown to the
 2    jury.
 3              (Exhibit 83 admitted into evidence.)
 4    BY MS. QUEENIN:
 5    Q.  So first I want to direct your attention to the bottom of
 6    the chain.  Do you see the email we just reviewed?
 7    A.  Yes.
 8    Q.  And I want to focus now on your response to Mr. Legassa's
 9    email sending the Alley Interactive invoices.  How did you
10    respond to that email?
11    A.  "Ariel, can you please have them send W-9 to set them up
12    in the system?"
13    Q.  And why did you request that W-9?
14    A.  It's requested for all vendors, all new vendors.
15    Q.  Okay.  And how did Mr. Legassa respond?
16    A.  He sent the W-9 and said, "Here you go.  Thank you."
17    Q.  Okay.  I want -- do you see an attachment to this email?
18    A.  Yes.
19    Q.  I want to take a look at that.
20              MS. QUEENIN:  Can we scroll to it, please?
21    BY MS. QUEENIN:
22    Q.  What is the entity listed under Section 1 of the form?
23    A.  Alley Interactive LLC.
24    Q.  And what is the address?
25    A.  228 Park Ave South, Number 85467, New York, New York
```

1  10003.

2          MS. QUEENIN:  Okay.  And we can take this down.

3  And if we can go back to the email that we just had up -- I

4  believe it was 83.  And scroll down to the bottom email in

5  the chain --

6  BY MS. QUEENIN:

7  Q.  Can you just remind the jury what the address listed in

8  the bottom email from Mr. Legassa is?

9  A.  Sure.  680 East Main, Number 729, Stamford,

10 Connecticut 06901.

11 Q.  And the sentence before that, can you just read it?

12 A.  Sorry.  "Hello Leatha, I'm attaching the invoices from

13 Alley Interactive for NESN Watch and 4K web development.

14 Please send payment to:  Alley Interactive LLC,

15 680 East Main, Number 729, Stamford, Connecticut 06901."

16         MS. QUEENIN:  Okay.  We can take this down, please.

17 BY MS. QUEENIN:

18 Q.  What did you do when you received the W-9 form from

19 Mr. Legassa?

20 A.  I started to -- I actually set up the vendor in our

21 accounting system.

22 Q.  Okay.  And what did you do with the invoices that you

23 received from Mr. Legassa?

24 A.  The invoices were uploaded into our invoice approval

25 system, Fidesic.

1   **Q.**   And that's -- it's pronounced *Fi-des-ic*?

2   **A.**   Yes.

3   **Q.**   Okay.  And after the invoices were uploaded into the

4   accounting system, is that consistent with your usual

5   practice?

6   **A.**   Yes.

7   **Q.**   Okay.  And after you send the invoices to the Fidesic

8   system, what happens?

9   **A.**   They are assigned to the manager that is responsible for

10  approving them.

11  **Q.**   Okay.  And how do you determine what approvers to assign

12  to an invoice?

13  **A.**   The system defaults to -- depending on the code or the

14  vendor, once it's set up, it goes to the person responsible

15  for the project, or what have you; and depending on the limit

16  of the invoice, it'll go to a second approver.

17  **Q.**   Okay.  So in the 2021 time period, was there a dollar

18  limit on what type of invoices vice presidents like

19  Mr. Legassa could approve?

20  **A.**   Yes.

21  **Q.**   And focusing on Mr. Legassa individually, what was the

22  dollar limit for the invoices Mr. Legassa personally could

23  approve?

24  **A.**   50,000.

25  **Q.**   And what if the invoice was under $50,000?  What happened

1    in that instance?

2    **A.**   I'm sorry?  Repeat that.

3    **Q.**   If an invoice was under $50,000 -- so for example,

4    48,500, or 49,000 -- what would happen to that invoice?

5    **A.**   He would be the only approver.

6    **Q.**   Okay.  And what about if an invoice was over $50,000?

7    **A.**   It would go to another approver.

8    **Q.**   Okay.  And how do you know when a payment gets approved

9    in the Fidesic system?

10   **A.**   I receive a notification from Fidesic.

11   **Q.**   Okay.  And what happens after that?

12   **A.**   After they're all approved, I get my notification.  Then

13   I'm able to pull the invoice into a batch and post it into

14   our accounting system to be paid.

15   **Q.**   Okay.  And what happens after you have the payments

16   posted to the accounting system?

17   **A.**   The invoice is in open status ready to be processed.

18   Then I can process it in my next check run, or whenever the

19   invoice is due.

20   **Q.**   You said you could process it in your next check run.

21   What is a check run?

22   **A.**   It's when I run checks, so a batch of checks that I run

23   for invoices that are approved and ready to be paid.

24   **Q.**   Okay.  And what does that involve?

25   **A.**   It's check printing, so it's actually printing to live

1    paper stock NESN checks, basically, just printing them and
2    then attaching the invoice to the check, and then I give them
3    to our CFO.
4    **Q.**   Okay.  And approximately how many checks -- I'm not
5    asking for an exact number -- but, generally, how many checks
6    are in each check run?
7    **A.**   It could be anywhere from -- I don't know -- 75 or more.
8    **Q.**   Okay.  And how often did you do these check runs?
9    **A.**   Twice a week.
10   **Q.**   Okay.  Once the checks are printed and you give them
11   to -- who do you provide them to for signature in 2021?
12   **A.**   A CFO.
13   **Q.**   And who was that?
14   **A.**   It was Ray Guilbault.
15   **Q.**   And after you receive his signatures on the checks, what
16   happens next?
17   **A.**   If the checks are over 50,000, they would go to our
18   president, or the next in line to sign.
19   **Q.**   Okay.  And then what?
20   **A.**   And then they would come back to me to, basically, take
21   off the remittence, put them, attach them to the invoice, and
22   put the checks in the envelope to mail them, to mail them
23   out.
24   **Q.**   Okay.  And did you follow that process every time you did
25   a check run?

1    **A.**   Yes.

2    **Q.**   And in 2021, did NESN typically pay the majority of its

3    vendors by check?

4    **A.**   Yes.

5    **Q.**   And were all of those checks sent in the mail?

6    **A.**   Yeah.

7    **Q.**   What mail service does --

8    **A.**   United States Postal Service.

9    **Q.**   Sorry?

10   **A.**   United States Postal Service.

11   **Q.**   Thank you.

12           MS. QUEENIN:  For the witness and the jury, can I

13   have Exhibit 21, please.  This is in evidence.

14   BY MS. QUEENIN:

15   **Q.**   Can you read for me this check date?

16   **A.**   April 1, 2021.

17   **Q.**   And what is the amount of this check?

18   **A.**   110,000.

19   **Q.**   And who is it payable to?

20   **A.**   Alley Interactive LLC.

21   **Q.**   And just the city and state.

22   **A.**   Stamford, Connecticut.

23   **Q.**   Okay.  What is that amount, 110 -- $110,000 correspond

24   to?

25   **A.**   The two previous invoices we just saw.

1    **Q.**  Okay.

2            MS. QUEENIN:  Can I have Exhibit 85 for the witness

3    only.  85?

4    BY MS. QUEENIN:

5    **Q.**  Ms. Fisher, on the screen in front of you is an email.

6    Do you recognize it?

7    **A.**  Yes.

8            MS. QUEENIN:  Your Honor, I'd offer Exhibit 85.

9            MR. PARKER:  No objection.

10           THE COURT:  85 is admitted.

11           (Exhibit 85 admitted into evidence.)

12   BY MS. QUEENIN:

13   **Q.**  Okay.  So I want to focus on the bottom email first and I

14   believe it spans two pages.  So let's leave the viewer like

15   this.  And if we can zoom in, I'm going to ask you to read

16   the email.  So if we can zoom in on the second page and you

17   could start reading.

18   **A.**  Okay.  "I need your help creating a separate account for

19   Alley Interactive.  We recently sent payment to them for two

20   invoices, Alley 06, Invoice 4118 and 4508.  Alley is helping

21   us with two big projects, NESN Watch and NESN 4K.  They have

22   two entities working together, but separately incorporated.

23   They plan to merge the two entities at the end of the year

24   and they asked me to please create a separate account and

25   send payment separately until then.

1          "Alley is a small company with diverse developers

2     that I would like to help as much as possible, significantly,

3     if we can save them any money.  They help us tremendously

4     with projects like 4K that we ask them to work on without

5     previous notice.

6          "I'm not sure how you create the accounts in the

7     system, but the only thing we need to change in the existing

8     Alley account is the EIN number."

9     **Q.**  And then if you can continue, just the two -- can you

10    summarize for me the two entities that are listed there?

11    **A.**  Alley Interactive LLC (4K Engineering) and Alley

12    Interactive LLC (Web Development).

13    **Q.**  And the Alley Interactive LLC that says 4K Engineering,

14    what city and state is listed?

15    **A.**  Stamford, Connecticut.

16    **Q.**  And what about the other one, Alley Interactive LLC, Web

17    Development?

18    **A.**  New York, New York.

19          MS. QUEENIN:  And if you could scroll down,

20    Ms. Hallagan, so that the witness can read the remainder of

21    the email.

22          THE WITNESS:  "I plan to call you tomorrow in case

23    you have any questions.  Thank you very much in advance and

24    I'm sorry to bother you."

25          MS. QUEENIN:  Okay.  And if we could scroll up,

1    please.

2    BY MS. QUEENIN:

3    **Q.**  What is the date on that email?

4    **A.**  April 8, 2021.

5    **Q.**  Okay.

6            MS. QUEENIN:  And if we could scroll down.

7    BY MS. QUEENIN:

8    **Q.**  Ms. Fisher, what is Mr. Legassa asking you to do here

9    internally?

10            MR. PARKER:  Objection.

11            THE COURT:  Sustained.

12   BY MS. QUEENIN:

13   **Q.**  What did you do based on Mr. Legassa's email?

14   **A.**  I set up Alley Interactive vendor and set up two separate

15   addresses for the two different projects.

16   **Q.**  Why did you do that?

17   **A.**  Because he asked me to do it.  He was a VP.  I trusted

18   that his explanation was all I needed in order to do so.

19   **Q.**  Okay.  And did you know anything about Alley Interactive?

20   **A.**  No, I did not.

21   **Q.**  Did you know whether there were two entities working

22   together, but separately incorporated?

23   **A.**  No, I did not.

24   **Q.**  Did you know whether those entities planned to merge at

25   the end of the year?

1          MR. PARKER:  Objection.  She said she knows nothing

2     about the two entities.

3          THE COURT:  Sustained.

4          MS. QUEENIN:  If we could scroll up, please.

5     BY MS. QUEENIN:

6     **Q.**  How did you respond to Mr. Legassa's email asking you to

7     set up two different addresses in the system for Alley

8     Interactive LLC?

9     **A.**  "Okay.  Easy enough.  I will make the changes in the

10    system.  Since I don't know Web from 4K invoices, I would

11    need them marked as such when received.  I will confirm when

12    I set them up, and moving forward, they will be separate."

13    **Q.**  What are these references to web and 4K?

14    **A.**  I guess they're two projects that NESN was working on,

15    but I'm not too familiar with them.  I just --

16    **Q.**  Okay.  Let's scroll down in the email.  Do you see

17    Mr. Legassa's email to you, and do you see where he wrote "4K

18    engineering"?

19    **A.**  Yes.

20    **Q.**  What entity -- or what city and state does he correspond

21    with the alleged engineering project?

22    **A.**  Stamford, Connecticut.

23          MR. PARKER:  Objection, Your Honor.

24          THE COURT:  Sustained.

25

1  BY MS. QUEENIN:

2  **Q.**  What city and state does the web development project?

3  **A.**  New York, New York.

4  **Q.**  And -- okay.

5       MS. QUEENIN:  We can exit out of this.

6  BY MS. QUEENIN:

7  **Q.**  And what was Mr. Legassa's response to you?

8  **A.**  "Thank you so much, Leatha.  I will mark each invoice,

9  and if you send me the new code, the new vendor code, I can

10  help you categorizing.

11       "Again, thank you for always helping me."

12       MS. QUEENIN:  Okay.  And we can take this down.

13  BY MS. QUEENIN:

14  **Q.**  You mentioned earlier that you need a W-9 to set up a

15  vendor account.  Did you ask Legassa for another W-9 form for

16  Alley Interactive?

17  **A.**  No.  I already had one.

18  **Q.**  Okay.

19       MS. QUEENIN:  Can I have Exhibit 88 for the witness

20  only.

21  BY MS. QUEENIN:

22  **Q.**  There's a document on the screen in front of you marked

23  as Exhibit 88.  Do you recognize this email?

24  **A.**  Yes.

25       MS. QUEENIN:  Your Honor, I'd offer Exhibit 88.

1              MR. PARKER:  No objection.

2              THE COURT:  88 is admitted.

3              (Exhibit 88 admitted into evidence.)

4              THE COURT:  It may be shown to the jury.

5       BY MS. QUEENIN:

6       **Q.**  Ms. Fisher, who is this email from?

7       **A.**  Ariel Legassa.

8       **Q.**  And who is it to?

9       **A.**  Me.

10      **Q.**  What is the subject line?

11      **A.**  "Alley 06-Engineering-Invoice Number 4518."

12      **Q.**  And can you please read for me the body of this email?

13      **A.**  "Hello Leatha, can you please process the invoice under

14      Alley Engineering?"

15             MS. QUEENIN:  And can we scroll to the next page?

16      BY MS. QUEENIN:

17      **Q.**  What address is listed for Alley engineering in the upper

18      left-hand corner?

19      **A.**  The Stamford Connecticut address.

20      **Q.**  And what is the amount of this invoice?

21      **A.**  85,000.

22      **Q.**  And what is this invoice date?

23      **A.**  April 9, 2021.

24             MS. QUEENIN:  Okay.  We can take this down.  We can

25      take this down and can we have Exhibit 89 for the witness

1    only.

2    BY MS. QUEENIN:

3    Q.   Ms. Fisher, there's a document on your screen marked for

4    identification as Exhibit 89.  Do you recognize this?

5    A.   Yes.

6    Q.   What is it?

7    A.   Another email from Ariel to myself.

8              MS. QUEENIN:  Your Honor, I'd offer Exhibit 89.

9              MR. PARKER:  No objection.

10             THE COURT:  89 is admitted.

11             (Exhibit 89 admitted into evidence.)

12   BY MS. QUEENIN:

13   Q.   Ms. Fisher, now that this is in front of the jury, can

14   you tell me who this email is from, who it's to, and what the

15   date is?

16   A.   From Ariel Legassa to me, dated April 2021.

17   Q.   And can you read this email to the jury?

18   A.   "Hello Leatha, can you please process the invoice under

19   Alley Engineering?"

20             MS. QUEENIN:  And can we scroll to the attached

21   invoice.

22   BY MS. QUEENIN:

23   Q.   Again, what is the address listed with this invoice for

24   Alley Engineering?

25   A.   The Stamford, Connecticut address.

1    **Q.**  And what is the amount of this invoice?

2    **A.**  50,000.

3    **Q.**  And what is the date?

4    **A.**  April 9, 2021.

5           MS. QUEENIN:  Okay.  We can take this down.

6           And can I have Exhibit 22 which is already in

7    evidence, for the witness and the jury?

8    BY MS. QUEENIN:

9    **Q.**  Ms. Fisher, what is this?

10   **A.**  A NESN check to Alley Interactive.

11   **Q.**  And what's the amount?

12   **A.**  135,000.

13   **Q.**  What does that correspond to?

14   **A.**  The previous two invoices we just looked at.

15   **Q.**  Okay.

16          THE COURT:  If this is a good time, it's

17   eleven o'clock.

18          MS. QUEENIN:  It is.

19          THE COURT:  A good place to break?

20          MS. QUEENIN:  Thank you.

21          THE COURT:  Please don't talk about the case.

22   Hopefully, your snacks are there.  We'll see you in

23   20 minutes.

24          All rise for the jury.

25          (Jury not present.)

```
 1              THE COURT:  Anything we need to address on the
 2    break?
 3              MR. SALTZMAN:  No, Your Honor.
 4              MR. PARKER:  No, Your Honor.
 5              THE COURT:  All right.  We're on break.  We'll see
 6    you all at 11:19.
 7              THE DEPUTY CLERK:  All rise.
 8              (Court in recess at 11:01 a.m.
 9              and reconvened at 11:22 a.m.)
10              THE COURT:  Do you want to go get the jury for us?
11              THE DEPUTY CLERK:  Yes, Your Honor.
12              THE COURT:  Thank you.
13              There's no -- just in terms of timing, we need to
14    tell the jury before they leave today, tomorrow while we may
15    get to -- I guess the question is, is there a chance they'll
16    start deliberations tomorrow?
17              MS. QUEENIN:  That's up to Mr. Parker, I think, and
18    what he's doing.
19              THE COURT:  So I'll warn them that there's a chance
20    they may need to clear their calendar for tomorrow afternoon.
21              (Juror present.)
22              MS. QUEENIN:  May I proceed, Your Honor?
23              THE COURT:  Yes, you may.
24              MS. QUEENIN:  Thank you.  I'll just give the jurors
25    a second to get the screens out.
```

BY MS. QUEENIN:

**Q.**  Ms. Fisher, before we took our break, do you recall we looked at two emails attaching invoices for Alley Engineering in Stamford, Connecticut?

**A.**  Yes.

**Q.**  In addition to those two emails, did the defendant send you other emails attaching invoices for Alley Interactive in Connecticut?

**A.**  Yes.

**Q.**  In front of you are a few folders, and there's one that's marked as Exhibits 93 through 95, and it also lists 103, 107, 112, 114, and 115.  I just want you to take a look through that folder and then look up when you're done.

**A.**  Okay.

**Q.**  What are the emails in that folder and do you recognize them?

**A.**  Yes.  They are all emails for Alley Engineering.

**Q.**  And who are they from and who are they to?

**A.**  From Ariel Legassa to myself.

            MS. QUEENIN:  Your Honor, I'd offer that range and I'm happy to read it again, if necessary.

            MR. PARKER:  No objection.

            THE COURT:  93 through 95 and 103, 107, 112, 114, and 115 are admitted.

            MS. QUEENIN:  That's correct.

```
 1              (Exhibits 93- 95 and 103, 107, 112, 114, and 115

 2              admitted into evidence.)

 3    BY MS. QUEENIN:

 4    Q.  Now, Ms. Fisher, we're not going to go through every one

 5    of those emails in detail, and for the jury they'll be in

 6    evidence.  But I'd like to briefly go through them so the

 7    Judge can -- so the jury can at least see them.  And I would

 8    just ask you to read the date of each of the emails as

 9    Ms. Hallagan puts it on the screen, as well as what entity

10    the defendant is referencing in the emails.

11              So let's start with Exhibit 93, please.  So what is

12    the date of this email?

13    A.  May 17, 2021.

14    Q.  And the entity?

15    A.  Alley Engineering.

16    Q.  94, please.  And by the way, I guess before we move on --

17              MS. QUEENIN:  Ms. Hallagan, can you just scroll to

18    the attached invoice.

19    BY MS. QUEENIN:

20    Q.  What entity is -- what city and state is that entity

21    located?

22    A.  Stamford, Connecticut.

23    Q.  Okay.  94?

24    A.  June 1, 2021.

25    Q.  And the entity?
```

1    **A.**  Oh, sorry.  Alley Engineering.

2    **Q.**  Okay.

3         MS. QUEENIN:  And can we take a look at the -- just

4    city and state for the entity on the invoice.

5         THE WITNESS:  Stamford, Connecticut.

6    BY MS. QUEENIN:

7    **Q.**  Okay.  95, please?

8    **A.**  June 4, 2021.

9    **Q.**  And the entity?

10   **A.**  Alley Engineering.

11   **Q.**  And the city and state of the entity listed on the

12   invoice?

13   **A.**  Stamford, Connecticut.

14   **Q.**  And I think that we are now on 103?

15   **A.**  Yes.

16   **Q.**  Same questions -- what's the date of the email?

17   **A.**  July 29, 2021.

18   **Q.**  What is the entity referenced in the invoice?

19   **A.**  Alley Engineering.

20        MS. QUEENIN:  And can we scroll to the invoice?

21   BY MS. QUEENIN:

22   **Q.**  And can you read for me the city and state of the

23   invoice?

24   **A.**  Stamford, Connecticut.

25   **Q.**  Okay.  Great.  107, please.

1    **A.**  September 13, 2021.

2    **Q.**  And the entity referenced?

3    **A.**  Alley Engineering.

4    **Q.**  And the city and state?

5    **A.**  Stamford, Connecticut.

6    **Q.**  Next up, 112.

7    **A.**  October 28, 2021.

8    **Q.**  And the entity?

9    **A.**  Alley Engineering.

10   **Q.**  And the city and state?

11   **A.**  Stamford, Connecticut.

12   **Q.**  Okay.  114?

13   **A.**  December 8, 2021.

14   **Q.**  And the entity?

15   **A.**  Alley Engineering.

16   **Q.**  And city and state?

17   **A.**  Stamford, Connecticut.

18   **Q.**  Okay.  And 115?

19   **A.**  January 3, 2022.

20   **Q.**  And the entity?

21   **A.**  Alley Engineering.

22   **Q.**  And the city and state on that attached invoice?

23   **A.**  Stamford, Connecticut.

24   **Q.**  Okay.  Now, also in front of you is a packet of checks,

25   and those are in evidence as Exhibits 23 through 27.  I just

1    want you to take a look at those checks and look up when

2    you're done.

3                MS. QUEENIN:  And we can take this down, please.

4                THE WITNESS:  Okay.

5                MS. QUEENIN:  And we can pull up Exhibit 23 as an

6    example, please.

7    BY MS. QUEENIN:

8    **Q.**  What are the checks, Ms. Fisher -- in the packet in front

9    of you, Exhibits 23 through 27, what entity are those checks

10   payable to?

11   **A.**  To Alley Interactive Engineering.

12   **Q.**  And -- but in terms of the entity listed on the check,

13   what is the entity listed and the city and state?

14   **A.**  Alley Interactive, Stamford, Connecticut.

15   **Q.**  Okay.  Did you generate those checks, Ms. Fisher?

16   **A.**  Yes.

17   **Q.**  Why?

18   **A.**  I had the invoices for all of these.

19   **Q.**  And what --

20               MS. QUEENIN:  Can I have Exhibit 156?

21   BY MS. QUEENIN:

22   **Q.**  Do you recognize this chart, Ms. Fisher?

23   **A.**  Yes.

24   **Q.**  What does this chart show?

25   **A.**  The dates of all the invoices.

1  **Q.**  And how do you know that?

2  **A.**  I just looked at them.

3  **Q.**  Were all of these invoices for Alley Connecticut paid by

4  NESN?

5  **A.**  All except the last two.

6  **Q.**  And based upon your position as an accounts payable

7  supervisor at the time, do you know what happened to those

8  last two invoices that are listed in the amount of $48,500?

9  **A.**  They were voided out of our accounting system.

10  **Q.**  Did you say they were voided out of the accounting

11  system?

12  **A.**  Yes.

13  **Q.**  Okay.  And focusing your attention on the invoice dates

14  3/4/21, starting with the first one, through 10/28/21, did

15  you cut checks for each of those invoices?

16  **A.**  Yes.

17  **Q.**  I now want to show you what's been marked as Exhibit 98.

18          MS. QUEENIN:  And this is for the witness only for

19  now.

20  BY MS. QUEENIN:

21  **Q.**  Do you recognize the document in front of you,

22  Ms. Fisher?

23  **A.**  Yes.

24  **Q.**  What is it?

25  **A.**  It's an email chain from Ariel to myself.

1        MS. QUEENIN:  Your Honor, I'd offer Exhibit 98.

2        MR. PARKER:  No objection.

3        THE COURT:  98 is admitted and may be shown to the

4    jury.

5        (Exhibit 98 admitted into evidence.)

6    BY MS. QUEENIN:

7    **Q.**   Okay.  And I think I'd like to start at the bottom of

8    this chain.  And if you could read for me the date of the

9    email and please read the email for the jury.

10   **A.**   June 21, 2021.

11   **Q.**   And then if you could read the email?

12   **A.**   Yes.  "Hello, Leatha, I hope you had a great weekend.

13   Alley 06 is missing payment for the 85K invoice.

14        "Let's wait until the end of the week to see if

15   they receive it; if not, how long it will take to issue a new

16   check?  Best."

17   **Q.**   And if we could just scroll up.  You respond -- "sent out

18   last week on 6/15."  And how does Mr. Legassa respond?

19   **A.**   "Thank you.  I'll let them know."

20   **Q.**   When the defendant said to you, "Let's wait to see if

21   they receive it," who did you think "they" was referring to?

22   **A.**   The vendor --

23        MR. PARKER:  Objection.

24        THE COURT:  Hold --

25        THE WITNESS:  -- Alley Interactive.

 1           THE COURT:  Hold on.  When there's an objection you

 2   have to stop.

 3           Her understanding is fine.

 4           You may answer.

 5   BY MS. QUEENIN:

 6   **Q.**  Who did you think "they" was referring to in the sentence

 7   in the defendant's bottom email, "Let's wait until the end of

 8   the week to see if they receive it"?

 9   **A.**  The vendor, Alley Interactive.

10   **Q.**  Okay.  Also in front of you --

11           MS. QUEENIN:  We can take this down.

12   BY MS. QUEENIN:

13   **Q.**  -- is a packet of emails.  It's also a range, which I'll

14   read into the record.  It's Exhibit 87, 90 through 91, 100

15   through 102, 106, 109 through 111, and 113.  So take a minute

16   and look at those, and then if you could please just look up

17   when you're done.

18   **A.**  Okay.

19   **Q.**  Do you recognize those documents?

20   **A.**  Yes.

21   **Q.**  What are they?

22   **A.**  Emails from Ariel to myself, attaching invoices.

23           MS. QUEENIN:  Your Honor, I'd offer that range of

24   exhibits and I'm happy to read the range again if it would be

25   helpful.

1        MR. PARKER:  No objection.

2        THE COURT:  Exhibits 87, 90 and 91, 100

3   through 102, 106, 109 through 111, and 113 are all admitted.

4            (Exhibits 87, 90 and 91, 100-102, 106, 109-111, and

5            113 admitted into evidence.)

6        MS. QUEENIN:  Okay.  And if we could pull up 87 as

7   an example.

8   BY MS. QUEENIN:

9   **Q.**  Ms. Fisher, I'd like to do the same thing we did with the

10  last group of emails and just go through them briefly so the

11  jury can see the documents.  You don't have to read each

12  email, but we're going to go over the date and the invoice

13  location where applicable.  Okay?

14  **A.**  Sure.

15  **Q.**  So let's start with Exhibit 87.  What's the date of this

16  email and what entity does it reference?

17  **A.**  April 13, 2021, Alley Web.

18  **Q.**  And let's take a look at the invoice.  And what is

19  just -- you don't have to read the whole address, but the

20  city and state listed?

21  **A.**  New York, New York.

22  **Q.**  Okay.  Great.  Exhibit 90, please.  And same thing, what

23  the date of this email?

24  **A.**  May 12, 2021.

25  **Q.**  And let's take a look at the invoice.  What is the city

1    and the state?

2    **A.**   New York, New York.

3    **Q.**   91, please.  What is the date of this email?

4    **A.**   May 13, 2021.

5    **Q.**   And let's take a look at the invoice, and what is the

6    city and state listed there?

7    **A.**   New York, New York.

8    **Q.**   Okay.  Exhibit 100, please.  What is the date of this

9    email?

10   **A.**   July 8, 2021.

11   **Q.**   And the entity listed in the body of the email?  In all

12   capitals.  I'm sorry?  I couldn't hear you.

13   **A.**   Alley Web.

14   **Q.**   Thank you.

15           And the city and state listed?

16   **A.**   New York, New York.

17   **Q.**   I've now lost track, but I think we're on 101.  Great.

18           What is the date of this email, Ms. Fisher?

19   **A.**   July 22, 2021.

20   **Q.**   And what entity is listed?

21   **A.**   Alley Web.

22   **Q.**   And let's take a look at the attachment.  What is the

23   city and state?

24   **A.**   New York, New York.

25   **Q.**   102, please.  The date of this email?

1  **A.**  July 22, 2021.

2  **Q.**  The subject?

3  **A.**  Alley Web.

4  **Q.**  And if we could just take a look at that invoice, city

5  and state?

6  **A.**  New York, New York.

7  **Q.**  106, please.  What is the date of this email?

8  **A.**  September 3, 2021.

9  **Q.**  And taking a look at the invoice, the city and state?

10  **A.**  New York, New York.

11  **Q.**  109, please.  What is the date of this email?

12  **A.**  October 5, 2021.

13  **Q.**  Let's take a look at the invoices.  What are the city and

14  states listed?

15  **A.**  New York, New York.

16         MS. QUEENIN:  And we could take this down.  I

17  believe we're on 113 or 111?  Let's do 111.

18  BY MS. QUEENIN:

19  **Q.**  What is the date of this email?

20  **A.**  October 8, 2021.

21  **Q.**  And the address?

22  **A.**  New York, New York.

23  **Q.**  And, finally, 113.

24  **A.**  November 5, 2021.

25  **Q.**  And the address on the invoice?

1    **A.**   New York New York.

2    **Q.**   In front of you --

3          MS. QUEENIN:   We could take this down.

4    BY MS. QUEENIN:

5    **Q.**   In front of you is also a packet of checks.   Those are

6    already in evidence as Exhibits 28 through 35.   Just take a

7    look at them and look up when you're done, if you wouldn't

8    mind.   Thank you.

9    **A.**   Okay.

10          MS. QUEENIN:   And let's pull up Exhibit 28 as an

11    example.

12    BY MS. QUEENIN:

13    **Q.**   What entities are checks 28 through 35 payable to?

14    **A.**   To Alley Interactive, New York, New York.

15    **Q.**   Okay.   Great.

16          Ms. Fisher, in 2021, how many vendors named Alley

17    Interactive did you think NESN was working with?   How many

18    vendors?

19    **A.**   One.

20    **Q.**   Why did you think that?

21          MR. PARKER:   Objection.

22          THE COURT:   I'm going to allow it.   Go ahead.

23    BY MS. QUEENIN:

24    **Q.**   Why did you think there was one entity that you were

25    working with, or one vendor named Alley Interactive?

1  **A.**  Because I was told there was -- it was one vendor with

2  just two separate addresses.

3  **Q.**  Who told you that?

4  **A.**  Ariel Legassa.

5  **Q.**  Based upon your 15 years of experience managing payroll

6  and vendor payments at NESN, are you aware of any instances

7  where an employee has actually been paid as a vendor?

8  **A.**  No.

9        MS. QUEENIN:  No further questions.

10        THE COURT:  Your witness.

11        **CROSS-EXAMINATION BY COUNSEL FOR THE DEFENDANT**

12  BY MR. PARKER:

13  **Q.**  Good morning, Ms. Fisher.

14  **A.**  Good morning.

15  **Q.**  I think that you might have testified that invoices came

16  from Alley to Mr. Legassa directly, and then he submitted

17  them to you; is that correct?

18  **A.**  That -- yes.

19  **Q.**  And that was something that wasn't unusual at -- at NESN,

20  right?

21  **A.**  No.

22  **Q.**  Some of the other VPs or department heads would like to

23  get the invoices directly from their vendors before they

24  passed them in to you for processing, right?

25  **A.**  Yes, that happens.

1    **Q.**   Okay.  The invoices that were marked --

2              MR. PARKER:  Well, could we pull up Exhibit 82,

3    please?

4    BY MR. PARKER:

5    **Q.**   Okay.  So Exhibit 82 is an email from you on the first --

6    to you from Mr. Legassa on the first page, right?

7    **A.**   Yes.

8    **Q.**   And this is the first, I think you said, invoices that

9    you ever got for Alley, right?

10   **A.**   Yes.

11             MR. PARKER:  And can we go to the next page,

12   please?

13   BY MR. PARKER:

14   **Q.**   There's no address on the second page of Exhibit 82,

15   right?

16   **A.**   No.

17             MR. PARKER:  And can we go to the third page?

18   Thank you.

19   BY MR. PARKER:

20   **Q.**   Same with the third page, right?

21   **A.**   No address.

22   **Q.**   Okay.  Did you handwrite in an address on one of these

23   invoices?

24   **A.**   There's no --

25             MS. QUEENIN:  Objection.  I --

```
 1              THE COURT:  It's a fair question.  Go ahead.
 2              MS. QUEENIN:  The document doesn't show a --
 3              THE COURT:  It --
 4              MS. QUEENIN:  Okay.
 5              THE COURT:  The question is a question to the
 6     witness.
 7              MS. QUEENIN:  Okay.
 8     BY MR. PARKER:
 9     Q.  Did you handwrite in an address on one of these invoices?
10     A.  No.  There's no address.
11     Q.  Okay.
12              MR. PARKER:  Can we go back to the second page of
13     this, please?  And then can we put side by side with
14     Exhibit 10, please?
15     BY MR. PARKER:
16     Q.  Do you see Exhibit 10?
17     A.  Yes, I do.
18     Q.  And there's a handwritten address there, right?
19     A.  Yes.
20     Q.  Is that your handwriting?
21     A.  That is.
22     Q.  So you wrote that address in from information that you
23     got from Mr. Legassa, I believe, right?
24     A.  Yes.
25     Q.  Okay.  The invoice references scope of work -- or
```

1   Statement of Work Number 1, right?  On Exhibit 10, the line

2   description, execution of SOW 1?

3   **A.**   I'm sorry; what was the question?

4   **Q.**   Okay.  Do you know what SOW stands for on this invoice?

5   Is it statement of work?

6   **A.**   I do now.  I wasn't aware.

7   **Q.**   Okay.  You didn't before now?

8   **A.**   No.

9   **Q.**   Fair enough.  Then that saves me some questions.

10           Is it unusual to have an invoice from a vendor that

11  doesn't have a preprinted address on it?

12  **A.**   You said is it unusual?

13  **Q.**   Yes.

14  **A.**   They don't all come with an address, so no.

15  **Q.**   Okay.  The majority of the time, do they come with an

16  address?

17  **A.**   Majority, yes.

18  **Q.**   Like, 90 percent of the time?  80, 95?

19           MS. QUEENIN:  If she knows.

20           THE COURT:  That's all she can testify to is what

21  she knows.

22           Go ahead.

23           THE WITNESS:  I don't know.  I would say maybe

24  80 percent do.

25  BY MR. PARKER:

1   **Q.**   Okay.  Is it unusual for an invoice to come in for a

2   vendor for over $100,000 without a preprinted address on an

3   invoice?

4   **A.**   I'm sorry; repeat the question?

5   **Q.**   Yeah.  So 80 percent of all invoices come in and they

6   have a preprinted address on them, right?

7   **A.**   Yeah.

8   **Q.**   Okay.  My next question is, for invoices that are over

9   $100,000, is it a different percentage?  How many have you

10  seen where there is no preprinted address on an invoice for

11  an amount over $100,000?

12          MS. QUEENIN:  Objection, Your Honor.

13          THE COURT:  I'm going to allow it.  Go ahead.

14          THE WITNESS:  I'm not exactly sure exactly how

15  many; but, again, most of them do have an address on them.

16  BY MR. PARKER:

17  **Q.**   Okay.  Did the fact that there was no address written on

18  these first two invoices for Alley that you got from

19  Mr. Legassa raise an issue in your mind?

20  **A.**   It did not at the time.

21  **Q.**   So you didn't raise that with anyone?

22  **A.**   No.

23  **Q.**   Okay.  You prepared the check that corresponded to these

24  two invoices, right?

25  **A.**   Yes.

```
 1            MR. PARKER:  We can take these down.
 2    BY MR. PARKER:
 3    Q.  And then it was your practice to put the check and the
 4    corresponding invoices together, and would you walk them to
 5    Mr. Guilbault for his signature?
 6    A.  Yes.
 7    Q.  He had to sign every check, whether it was below or above
 8    $50,000, right?
 9    A.  Correct.
10    Q.  Okay.  And if it was above $50,000, he had to approve it
11    as well, right?
12    A.  I'm sorry?  Repeat that?
13    Q.  He had to, in addition to signing every check, if the
14    check was for more than $50,000, he had to approve it in the
15    Fidesic --
16    A.  Yes, Fidesic.
17    Q.  So he had to approve anything over $50,000, right?
18    A.  Correct.
19    Q.  And he had to sign every check, right?
20    A.  Correct.
21    Q.  And if the check was more than 50,000, he had to sign it
22    and Mr. McGrail, the CEO, had to sign it as well, right?
23    A.  Yes.
24    Q.  And you would do one or two check runs a week, you think,
25    right?
```

1    **A.**   Yes.  Yes.

2    **Q.**   And they had about 75 checks per run in them, right?

3    **A.**   About.

4    **Q.**   Did you segregate out checks that needed both Guilbault

5    and McGrail's signatures, or were they just in the run of the

6    checks?

7    **A.**   No.  They stayed together.

8    **Q.**   Okay.  So did you hand deliver the packet to

9    Mr. Guilbault?

10   **A.**   Yes.

11   **Q.**   And then how did they get from him to Mr. Guilbault?

12   **A.**   Either he would give them back to me, or he would bring

13   them over himself.

14   **Q.**   "He," being --

15   **A.**   I'm sorry.  Mr. Guilbault, yes.

16   **Q.**   And did he sign them while you waited, or did you drop

17   them off and come back?

18   **A.**   Drop off.

19   **Q.**   Okay.  Could there be a delay?

20   **A.**   I'm sorry?

21   **Q.**   Could there be a delay?  How long of a -- before you

22   dropped them off did you get word, "Okay.  They're ready to

23   pick up"?

24   **A.**   They would just bring them back to me.

25   **Q.**   And then you would take them to McGrail for the ones that

1    needed --

2    **A.**   No.  I'm confused with your question.  If -- they'll drop

3    them to me once they're all done and signed by both.

4    **Q.**   Okay.  So the last time you see it before you get

5    everything back is when you hand it to Guilbault?

6    **A.**   Yes.

7    **Q.**   Okay.  Nobody asked you about the handwritten address on

8    the Alley invoice?

9    **A.**   No.

10   **Q.**   Again, you said about 75 checks per a run, one or two

11   times per a week, right?

12   **A.**   Yes.

13   **Q.**   How many were over $100,000 on average?

14            MS. QUEENIN:  Objection.  Asked and answered.

15            MR. PARKER:  I don't think so.

16            THE COURT:  Go ahead.

17            THE WITNESS:  I don't recall.  It could vary.

18   BY MR. PARKER:

19   **Q.**   5, 10, 20?  Like --

20            MS. QUEENIN:  Objection.

21            MR. PARKER:  -- what did it range, from low to

22   high?

23            THE COURT:  She said she didn't recall.  You can

24   ask a probing question, but not a streaming question like

25   that.

1           MR. PARKER:  Okay.

2   BY MR. PARKER:

3   **Q.**  If you had to give a range of what it might vary, checks

4   over $100,000 in a single check run, what do you think?

5   **A.**  Between 5 and 10.

6           MR. PARKER:  Okay.  Ms. Marchione, is there a way

7   to do the ELMO just for the witness?

8           THE DEPUTY CLERK:  Absolutely.

9           MR. PARKER:  Okay.  I'm going to show what's been

10  marked Exhibit 180 just to the witness.

11  BY MR. PARKER:

12  **Q.**  And ask if you recognize that?

13  **A.**  Yes.

14  **Q.**  Would it be easier if you had a hard copy?

15  **A.**  I can see it.

16  **Q.**  Okay.

17          THE COURT:  Are you asking her --

18          MS. QUEENIN:  Your Honor --

19          THE COURT:  -- just about the first page or the

20  four --

21          MR. PARKER:  It's got multiple pages, so I think

22  it's easier to hand it up, Your Honor.  May I approach?

23          THE COURT:  Yes.

24          MS. QUEENIN:  Your Honor, I just have a question on

25  the document.  Can we use the whisper tech?

1              THE COURT:  Sure.

2              MS. QUEENIN:  Thanks.

3              (Beginning of sidebar.)

4              MS. QUEENIN:  Can you hear me?

5              MR. PARKER:  (Nods head.)

6              MS. QUEENIN:  Your Honor, this document, which I'm

7    seeing for the first time in this fashion, has different

8    Bates labels from our office that are not sequential.  And it

9    seems to me that Mr. Parker has combined documents as a sort

10   of demonstrative of sorts.  So I would object to it coming in

11   in this form.  It was not produced this way.

12             I have no way of verifying whether this is

13   accurate, and it's not proper to put this before the witness

14   if we can't verify that this was actually attached.  He's

15   essentially compiling some sort of file based on different

16   documents that were actually not produced together

17   sequentially.

18             MR. PARKER:  She's -- this witness has already

19   testified about -- first of all, all three of these pages are

20   already in evidence.  I've put them together.  I'm -- she's

21   already testified this witness, that that's what she did, was

22   put the check together with the invoices.

23             I'm going to walk her through these three pages.

24   If she says she recognizes them as the check and the invoices

25   that she prepared and passed up to Guilbault, I'm going to

1       offer it in this form.  If she says she doesn't, I'm going to

2       move on to the next thing.

3               THE COURT:  So you started your questioning by

4       referring to this, to a document, which seems to be, in

5       effect, not in evidence.  It's a compilation of four pages.

6       So I'm going to allow some questioning, but you can't -- I'm

7       really not interested in having you try to have a record

8       of -- created solely by confusion.  So be clear what you're

9       showing her.

10              And I think part of the problem, from my point of

11      view in trying to understand this, is that it seems like

12      there's a computer upload; and it's not clear what gets

13      turned into hard copies and what doesn't, and I'm not sure

14      what all we're looking at.  So you can ask the questions, but

15      don't go beyond what you get from her.  Don't make

16      assumptions.

17              MR. PARKER:  I'm going to do it exactly like I

18      explained to Your Honor.  I'm going to ask her if she

19      recognizes the three pages.  And if she put -- if this is how

20      she transmitted it to Guilbault for his signature.

21              THE COURT:  And I'd direct you to ask the question

22      page by page, and then you can ask it in more combinations

23      than that.

24              MR. PARKER:  That's what I was going to do.

25              MS. QUEENIN:  Your Honor, I still object.  I think

1    it's -- I'm only using the word "deceptive" because I can't

2    think of a better word, but I don't think it's fair that --

3              MR. PARKER:  I can't hear you, Mackenzie.

4              MS. QUEENIN:  I don't think it's fair to be able to

5    compile a document and -- I object.  I understand the Court's

6    ruling, but I object.

7              THE COURT:  Objection noted.

8              And just tread carefully here.

9              (End of sidebar.)

10   BY MR. PARKER:

11   **Q.**  Do you recognize the first page?

12   **A.**  Yes.

13   **Q.**  Do you recognize it as a check?

14   **A.**  Yes, it is.

15   **Q.**  Okay.  If we turn to the second page, do you recognize

16   that, as well?

17   **A.**  Yes.

18   **Q.**  Okay.  If you go to the third page, do you recognize that

19   as an invoice?

20   **A.**  Yes.

21   **Q.**  If you go to the fourth page, do you recognize that as an

22   invoice?

23   **A.**  Yes.

24   **Q.**  And do you recognize these as a NESN check and two Alley

25   invoices, right?

1   **A.**   Yes.

2   **Q.**   And I think you -- you testified that the first check

3   that NESN wrote to Alley was for $110,000, and it was dated

4   4/1/21?

5   **A.**   I believe so, yeah.

6   **Q.**   Okay.  And did that check correspond to the two invoices

7   that are attached?

8   **A.**   Yes.

9   **Q.**   And is this how you would have put this package together

10   before you transmitted it to Mr. --

11          MS. QUEENIN:  Objection.

12          MR. PARKER:  -- Guilbault?

13          (Beginning of sidebar.)

14          THE COURT:  As we know from the records so far --

15          THE DEPUTY CLERK:  Your Honor?

16          THE COURT:  I'm sorry.

17          THE DEPUTY CLERK:  I didn't realize you were going

18   to whisper tech.  I apologize.

19          THE COURT:  As we know from the records so far,

20   there are two versions of Invoice 45 -- 4118 floating around,

21   correct?

22          MR. PARKER:  Yes.

23          THE COURT:  And you're trying to identify whether

24   the invoice with the signature, with the handwritten address,

25   was part of the packet that she gave to the CFO; is that

1   correct?

2           MR. PARKER:  Yes.  And I think he's already

3   testified that it was.

4           THE COURT:  I think she's testified that she added

5   the address and I think she's testified that an invoice went

6   there.  I think, to the extent that she has testified that

7   one with the address written in it is the one that went to

8   Mr. Guilbault, that's hard -- from my recollection -- but if

9   you want to ask questions about the -- did this packet go

10  like this to Mr. Guilbault, I direct you not to refer to this

11  as "the invoice," since we have two invoices that are the

12  same, but refer to it as --

13          Unless you're trying to create a record as confused

14  as possible -- rather, if that's what's going on here, that's

15  pretty upsetting.

16          MR. PARKER:  So I really do not understand that

17  last comment, Your Honor.  What I'm trying to do, the

18  government put everything in separately.  Okay?  I'm trying

19  to establish what flowed, and I'm --

20          THE COURT:  Then ask her --

21          MR. PARKER:  It's not a slight of hand.

22          THE COURT:  Counsel, then just ask her about

23  when -- instead of referring to it as "the invoice," please

24  refer to it as "the invoice with the handwritten notation."

25          MS. QUEENIN:  Your Honor --

1          (End of sidebar.)

2    BY MR. PARKER:

3    **Q.**  So, again, focusing on the third page of this document,

4    of this potential exhibit, with the handwritten address --

5    okay?  Do you see that?

6    **A.**  Yes.

7    **Q.**  Do you have a memory whether that invoice was what was

8    attached to the check that you sent to Mr. Guilbault for his

9    signature?

10   **A.**  I don't recall.

11   **Q.**  Okay.  I'm going to show you -- well, let me do it this

12   way.  So there was a $110,000 check on April 1, 2021, right?

13   **A.**  Yes.

14   **Q.**  And there were two invoices attached, right?

15   **A.**  Yes.

16   **Q.**  And that's how you passed it up to Mr. Guilbault, right?

17   **A.**  Yes.

18   **Q.**  And you're not sure, as you sit here today, whether one

19   of the invoices that he saw had the handwritten address on it

20   or whether it didn't; is that fair to say?

21   **A.**  I'm not sure.

22   **Q.**  Okay.  So on the second check -- and, again, that check

23   was dated April 1, 2021?

24   **A.**  Correct.

25   **Q.**  On the second check, dated April 27, 2021, for $135,000,

1    there were also two invoices attached, right?

2    **A.**   I don't have it in front of me, but --

3    **Q.**   Okay.

4              MS. QUEENIN:  Your Honor, may we use the whisper

5    tech?

6              MR. PARKER:  May I approach, Your Honor?

7              THE COURT:  You --

8              MR. PARKER:  I'm not going to try to offer this.

9              THE COURT:  Do you have questions -- do you have

10   something you need to speak with me if he's not offering it?

11             Is there a document number for what you marked?

12             MR. PARKER:  181, Your Honor.

13             MS. QUEENIN:  If Your Honor has the document, then

14   no.

15             THE COURT:  I have it.

16             MR. PARKER:  Your Honor, may I proceed?  Are you

17   ready?

18             THE COURT:  Can I actually speak to counsel a

19   minute?

20             (Beginning of sidebar.)

21             THE COURT:  On both of these, the packet is clearly

22   not what was given to Mr. Guilbault because it includes the

23   canceled check.

24             MR. PARKER:  Well, I noticed that as I was doing

25   this, Your Honor.  I tried to use admitted exhibits when I

1   put this together, but I'm not offering this.  All I want to

2   do is take her through -- there were two checks in April.

3   One is for 110.  One is for 135.  They totaled this much.

4           And I have some questions for her and I'm off of

5   trying to offer these.

6           THE COURT:  Okay.  Proceed.

7           (End of sidebar.)

8   BY MR. PARKER:

9   **Q.**  Okay.  So, again, to backtrack, there was a check dated

10  April 1, 2021, for $110,000, right?

11  **A.**  Yes.

12  **Q.**  And there was a second check for $135,000 on April 27,

13  2021, right?

14  **A.**  Yes.

15  **Q.**  And whichever versions of whatever invoices were

16  attached, you did prepare those with supporting invoices for

17  Mr. Guilbault's signature, right?

18  **A.**  Yes.

19  **Q.**  And then those had to go from him also to Mr. McGrail

20  because they were over $50,000, right?

21  **A.**  Correct.

22  **Q.**  So there were two checks to Alley in April for a total of

23  $245,000, right?

24  **A.**  Yep.

25  **Q.**  And do you have in your mind an idea of how often it

1    happened at NESN that a single vendor was paid $245,000 in a

2    single month for services rendered?

3    **A.**   It's not uncommon.

4    **Q.**   It's not uncommon?

5    **A.**   Uh-uh.

6    **Q.**   Okay.  So several of the five to ten checks that were

7    over $100,000 in each check run could have been the size of

8    these checks?

9              MS. QUEENIN:  Objection, Your Honor.  I don't

10   even -- I don't understand the question.

11             MR. PARKER:  I think the witness did, Your Honor.

12             THE COURT:  I'll allow the question.

13             MS. QUEENIN:  I'd ask that it be repeated.  I

14   honestly didn't hear it.

15             THE COURT:  The question said, "So several of the

16   five to ten checks that were over $100,000 in each check run

17   could have been the size of these checks?"

18             MS. QUEENIN:  I don't know what that means.

19             THE COURT:  Since the "these checks" -- why don't

20   you try it again?  Be specific.

21             MR. PARKER:  Okay.

22   BY MR. PARKER:

23   **Q.**   You said it was not uncommon for a vendor to be paid

24   $245,000 in a single month, right?

25   **A.**   Yeah.

1    **Q.**  Okay.  So that would be several check runs over the

2    course of a month, right?

3    **A.**  No.  It could be one.

4    **Q.**  It could be one?

5    **A.**  Yeah.

6    **Q.**  Okay.  And I asked you how often did it happen that NESN

7    paid a vendor $245,000 a month, and you said it was not

8    unusual, right?

9    **A.**  Yeah.

10   **Q.**  Okay.  So my next question that we got hung up on was

11   five to ten checks in each check run could be for over a

12   hundred thousand dollars, right?

13   **A.**  Correct.

14   **Q.**  And so that would mean that -- out of those five to ten

15   checks in each check run, how many would be totaling, like,

16   $245,000?

17         MS. QUEENIN:  Your Honor, I -- I still don't

18   understand what counsel is asking.

19         THE COURT:  Okay.  I'm going to allow it.

20         MS. QUEENIN:  Okay.

21         THE WITNESS:  Can you repeat that part, please?

22   BY MR. PARKER:

23   **Q.**  Let's move on to June of 2021.  There were also two

24   checks to Alley from NESN.

25         THE COURT:  What are the document numbers?

```
1                    MS. QUEENIN:  182 and 183.

2                    MR. PARKER:  182 and 183.  May I approach the

3       witness, Your Honor?

4                    THE COURT:  Yes, you may.

5       BY MR. PARKER:

6       Q.   Those are checks from NESN to Alley as well, right?

7       Alley Connecticut?

8       A.   Yes.

9       Q.   And 182, one check is in the amount of $85,000, right?

10      A.   Uh-huh, yes.

11      Q.   And one check is in the amount of $100,000, right?

12      A.   Yes.

13      Q.   So in April, NESN paid Alley Connecticut two checks for

14      $245,000, right?

15      A.   Correct.

16      Q.   And in June, another two checks for another 180 --

17      $185,000, right?

18      A.   Correct.

19      Q.   And that total for the two separate months is $430,000,

20      right?

21      A.   Yes.

22      Q.   And how common is it that NESN would pay a vendor

23      $430,000 over a couple-month period?

24      A.   It's not uncommon.

25      Q.   Okay.
```

1    MR. PARKER:  I have no further questions,

2  Your Honor.

3    THE COURT:  Okay.  Anything on redirect?

4    MS. QUEENIN:  Just very briefly.

5  **REDIRECT EXAMINATION BY COUNSEL FOR THE GOVERNMENT**

6  BY MS. QUEENIN:

7  **Q.**  Okay.  I have a couple of questions, and we'll get you

8  out of here.

9    Mr. Parker asked you several questions about two

10  invoices, one without an address, one with an address.  Do

11  you recall that series of questions?

12  **A.**  Yes.

13  **Q.**  How did you know where to send payment for the invoices

14  for Alley Connecticut?

15  **A.**  They were -- they were given to me in the email chain

16  from Ariel to myself.

17  **Q.**  And at the time that these checks go to the CEO and CFO

18  of NESN, are there still approvals pending in Fidesic, in the

19  Fidesic system?

20  **A.**  I don't understand.

21  **Q.**  By the time you've printed the checks --

22  **A.**  Okay.

23  **Q.**  -- and you take them to the CEO and the CFO for

24  signature, are there still approvals on the payments that are

25  pending?  Are there still approvals that haven't been

1    received on the invoices?

2    **A.**  Oh, no.  No.

3    **Q.**  Okay.  And what manager for the digital group at the time

4    in 2021 first approves those payments?  The first approval?

5    **A.**  Ariel Legassa.

6              MS. QUEENIN:  No further questions.

7              MR. PARKER:  I have no questions.

8              THE COURT:  Thank you.  You may step down.

9              MR. SALTZMAN:  Your Honor, the government calls

10   Paul King.

11             THE DEPUTY CLERK:  Sir, before you sit, could you

12   please raise your right hand.

13             (Witness duly sworn.)

14             THE DEPUTY CLERK:  Please state your name for the

15   record and spell your last name.

16             THE WITNESS:  Paul King, K-i-n-g.

17             THE DEPUTY CLERK:  Thank you.  You may have a seat.

18             THE COURT:  You may proceed.

19                           **PAUL KING**

20         having been duly sworn, testified as follows:

21        **DIRECT EXAMINATION BY COUNSEL FOR THE GOVERNMENT**

22   BY MR. SALTZMAN:

23   **Q.**  Good afternoon, Mr. King.

24   **A.**  Afternoon.

25   **Q.**  Where do you work, sir?

1    **A.**   New England Sports Network.

2    **Q.**   And what is your educational background?

3    **A.**   I have a bachelor's in business management and a minor in

4    finance from Providence College.

5    **Q.**   And what year did you graduate?

6    **A.**   2016.

7    **Q.**   And how long have you worked at NESN for?

8    **A.**   Approximately 5½ years.

9    **Q.**   And during those 5½ years at NESN, what positions have

10   you held?

11   **A.**   Staff accountant, senior accountant, accounting manager

12   and senior finance manager.

13   **Q.**   If I direct your attention to 2021, what was your

14   position, or positions at that time?

15   **A.**   Staff accountant or senior accountant.

16   **Q.**   At the time in 2021, how large was the accounting group?

17   **A.**   Approximately eight people.

18   **Q.**   Who did you report to?

19   **A.**   Mary Breiter.

20   **Q.**   And what were your responsibilities?

21   **A.**   Our responsibilities were tracking expenses and budgeting

22   expenses as well.

23   **Q.**   Were you responsible for any departments or functions at

24   NESN?

25   **A.**   Yes.

1    **Q.**   Which groups or functions were those?

2    **A.**   The digital department, the human resource department,

3    the marketing department, and the creative service

4    department.

5    **Q.**   So focusing on the digital department, who is your point

6    of contact in that group?

7    **A.**   Ariel.

8    **Q.**   Ariel Legassa?

9    **A.**   Yes.

10   **Q.**   Now, Mr. King, did you play a role in setting NESN's

11   annual budget?

12   **A.**   Yes.

13   **Q.**   And during the year, did you play a role in tracking

14   NESN's budget?

15   **A.**   Yes.

16   **Q.**   So what does it mean to track the budget?

17   **A.**   I would meet with the department heads to review expenses

18   that hit during the year, to see if we were unfavorable or

19   favorable for budget.

20   **Q.**   What do you mean by "favorable or unfavorable"?

21   **A.**   If we spent more money than we budgeted or less money

22   than we budgeted.

23   **Q.**   Okay.  So focusing on the digital group, did you play a

24   role in setting its budget in 2021 and 2022?

25   **A.**   Yes.

1    **Q.**  And in 2021, did you play a role in tracking the digital
2    group's budget?
3    **A.**  Yes.
4    **Q.**  How did you go about tracking the digital group's budget?
5    **A.**  I would try to meet with the department head on a monthly
6    basis to review expenses.
7    **Q.**  And the department head was Ariel Legassa, right?
8    **A.**  Yes.
9    **Q.**  Okay.  All right.  So what was it like working with Ariel
10   Legassa in 2021 to track the -- track the budget?
11                 MR. PARKER:  Objection.
12                 THE COURT:  Sustained.  Focus it a little.
13                 MR. SALTZMAN:  Excuse me, Your Honor?
14                 THE COURT:  If you could focus that a little.
15                 MR. SALTZMAN:  Yes.
16   BY MR. SALTZMAN:
17   **Q.**  So what are the ways in which you tried to track -- in
18   connection with your work with Mr. Legassa, how did you try
19   to track the budget?
20   **A.**  I would put meetings on his calendar to -- to meet in
21   person or try to meet in person.
22   **Q.**  And what happened with those meetings?
23   **A.**  He would give excuses as to why he wouldn't be able to
24   meet in person.
25   **Q.**  How often did you want to meet with him?

1    **A.**   Monthly.

2    **Q.**   And how often did you meet with him?

3    **A.**   Approximately, in person, six times during the year.

4    **Q.**   And in connection with your tracking efforts, would you

5    ask him for documentation?

6    **A.**   Yes.

7    **Q.**   Documentation of what?

8    **A.**   I would ask for statement of works, master service

9    agreements, questions on, you know, particular invoices.

10   **Q.**   Invoices from vendors?

11   **A.**   Correct.

12   **Q.**   Why would you ask him for these things?

13   **A.**   I would ask -- ask for these things because tracking was

14   part of my job, and if I had particular questions on

15   invoices, I would hope to get more clarity from -- from

16   Ariel.

17   **Q.**   And how did he respond when you asked for additional

18   documentation?

19   **A.**   He would give excuses.

20   **Q.**   What do you mean by that?

21   **A.**   He would give me the runaround as to why he wouldn't be

22   able to provide --

23             MR. PARKER:  Objection, Your Honor.

24             THE WITNESS:  -- certain documentation.

25             THE COURT:  I'm going to strike that answer and

1    just have you answer it more specifically and not labeling of

2    what you're doing.

3           So the question was what -- the question was -- you

4    answered he would give excuses.  "What do you mean by that?"

5    If you can give a specific answer to that, you can do it.

6    Otherwise, we'll move on.

7           THE WITNESS:  He said it would delay the work that

8    they -- the vendor was doing, so he wouldn't be able to

9    provide said documentation.

10   BY MR. SALTZMAN:

11   **Q.**  That getting -- getting that supporting documentation

12   would delay the vendor work?

13   **A.**  Correct.

14   **Q.**  And that was the reason he couldn't provide it to you?

15   **A.**  Correct.

16   **Q.**  Okay.  So you also had to work with other group heads or

17   function heads to track the budget, right?

18   **A.**  Yes.

19   **Q.**  And when you asked to meet with those group heads or

20   function heads, would they -- would they meet with you on a

21   regular basis?

22   **A.**  Yes.  They know the importance of meeting with the

23   finance team.

24          MR. PARKER:  Objection, Your Honor.

25          THE COURT:  I'm striking the rest of that answer

1    after "Would they meet with you on a regular basis?"  The

2    answer was yes, and the rest of that goes -- is stricken.

3              MR. SALTZMAN:  Understood.

4    BY MR. SALTZMAN:

5    **Q.**  And would those function heads provide you with the

6    requested supporting documentation?

7    **A.**  Yes.

8    **Q.**  Let's focus on the digital group and vendor work.  So in

9    2021, did the digital group work with vendors?

10   **A.**  Yes.

11   **Q.**  Who selected the vendors that the digital group worked

12   with?

13   **A.**  Ariel.

14   **Q.**  Who managed the relationship with vendors for the digital

15   group?

16   **A.**  Ariel.

17   **Q.**  Did you play any role in the vendor-selection process?

18   **A.**  No.

19   **Q.**  Did you play any role in making payments to vendors?

20   **A.**  No.

21   **Q.**  So in 2021, who were the digital vendors that had the

22   largest budget with NESN?

23   **A.**  Alley, ClearBridge, and Brightcove.

24   **Q.**  In connection with your tracking work, would you ever

25   speak with vendors for the digital group?

1    **A.**  Yes.

2    **Q.**  Why would it be necessary for you to speak with vendors

3    from the digital group?

4    **A.**  If I had particular questions that Ariel wasn't able to

5    provide clarity on, I would ask for a contact at -- at the

6    vendor to get more clarity.

7    **Q.**  So you mentioned ClearBridge, Brightcove, and Alley.  In

8    2021, was ClearBridge an existing vendor for Alley -- for

9    NESN?  I'm sorry.

10   **A.**  Yes.

11   **Q.**  And did you have a contact at ClearBridge?

12   **A.**  Yes.

13   **Q.**  And were you able to speak -- did you speak with that

14   contact?

15   **A.**  Yes.

16   **Q.**  And Brightcove, in 2021, was Brightcove an existing

17   vendor for NESN?

18   **A.**  Yes.

19   **Q.**  And did you have a contact at Brightcove?

20   **A.**  Yes.

21   **Q.**  Did you speak with that contact?

22   **A.**  Yes.

23   **Q.**  And turning to Alley Interactive, did you ever speak with

24   anyone at Alley Interactive?

25   **A.**  No.

1    **Q.**  Why not?

2    **A.**  I had asked Ariel for contacts and he did not provide me

3    with one.

4    **Q.**  All right.  So approximately when would you say that you

5    first learned of Alley Interactive, the vendor?

6    **A.**  Approximately February of 2021.

7    **Q.**  Who managed NESN's relationship with Alley Interactive?

8    **A.**  Ariel.

9    **Q.**  Do you know if NESN and Alley New York -- Alley

10   Interactive entered into a master services agreement?

11   **A.**  We did.

12   **Q.**  And did you review it?

13   **A.**  Yes.

14   **Q.**  Do you know if NESN and Alley Interactive entered into a

15   statement of work?

16   **A.**  Yes.

17   **Q.**  How many statements of work did they enter into?

18   **A.**  Two.

19   **Q.**  And did you review them as well?

20   **A.**  Yes.

21   **Q.**  Why did you review those documents?

22   **A.**  To track the expenses, first budget, tracking was part of

23   my job.

24   **Q.**  And focusing on the second statement of work, do you

25   remember how long that agreement lasted for?

1    **A.**   A year.

2    **Q.**   And do you remember how much Alley charged NESN for the

3    work that it was doing?

4    **A.**   Yes.  57K a month.

5    **Q.**   All right.  Mr. King, in 2021, how many vendors named

6    Alley Interactive did you believe that NESN was working with?

7    **A.**   One.

8    **Q.**   In 2021, how many vendors named Alley Interactive did you

9    believe that NESN was making payments to?

10   **A.**   One.

11   **Q.**   All right.  So you just mentioned that you only thought

12   NESN was making payments to one entity named Alley

13   Interactive.  Did there come a time when that changed?

14   **A.**   Yes.

15   **Q.**   When was that?

16   **A.**   Approximately January 2022.

17   **Q.**   And going forward after you learned that in January 2022,

18   did NESN continue making payments to the Alley Interactive

19   based in Connecticut?

20   **A.**   No.

21   **Q.**   All right.  So I want to show you a few emails, Mr. King.

22           MR. SALTZMAN:  For the witness only, can we please

23   have Exhibit 122.

24   BY MR. SALTZMAN:

25   **Q.**   Do you recognize this document?

1    **A.**  Yes.

2    **Q.**  And what is it?

3    **A.**  It's an email chain between me, Ariel, and Mary.

4          MR. SALTZMAN:  Your Honor, I would offer

5    Exhibit 122.

6          MR. PARKER:  No objection, Your Honor.

7          THE COURT:  122 is admitted.

8          (Exhibit 122 admitted into evidence.)

9          MR. SALTZMAN:  Thank you.

10   BY MR. SALTZMAN:

11   **Q.**  I want to direct your attention, Mr. King, to the portion

12   the email from Ariel Legassa to you and Mary Breiter on

13   February 11th at 12:22.  It's the middle of the chain.  And

14   I'll read the email from Ariel Legassa and then I'll ask you

15   to read your response.  The subject is Numbers, "Re: Numbers,

16   I will, Paul.  Just FYI.  We added a new vendor, Alley

17   Interactive, with extensive experience with Brightcove,

18   Amazon Cognito, and BlueConic.  This vendor comes highly

19   recommended and vetted by Automatic (Wordpress VIP corporate

20   arm), which we pay to provide our developers' development

21   environments."

22          It then lists a balance set forth for 10Up and

23   Alley Interactive.

24          What -- just briefly, what is 10Up?

25   **A.**  10Up was a vendor that NESN worked with in regards to

1    development of our direct-to-consumer product.

2    **Q.**   Another digital vendor?

3    **A.**   Yep.

4    **Q.**   Okay.  Let's take a look at your response.  Can you

5    please -- after it's blown up, I'll ask you to please read

6    your email, Mr. King.

7    **A.**   "I just want to clarify, is this 900K from Alley

8    Interactive in addition to the budgeted 1.5 million DTC, 750K

9    UHD, and 950K NESN Bets/Watch, or is this new vendor

10   replacing some of the work that either 10Up or ClearBridge

11   was originally supposed to do?"

12   **Q.**   So just to step back, this email chain is on February 11,

13   2021, right?

14   **A.**   Uh-huh.

15   **Q.**   What is the status of NESN's budget at this time, its

16   budget for 2021?

17   **A.**   The budget had just been approved by the board.

18   **Q.**   Okay.  So the budget is set at this time?

19   **A.**   Uh-huh.  Yes.

20   **Q.**   All right.  In your email, what clarity are you trying to

21   get from Mr. Legassa?

22                MR. PARKER:  Objection.

23                THE COURT:  Sustained.

24                MR. SALTZMAN:  All right.  I -- can we please have

25   Mr. -- the response from Mr. Legassa.

1    BY MR. SALTZMAN:

2    **Q.**  So he writes, "Paul, just switching vendors.  Same budget

3    amount, no increase.  Alley is replacing 10Up in some

4    projects."

5         So going forward, did Alley replace 10Up?

6    **A.**  Yes, for most projects.

7    **Q.**  And what is a -- what is a vendor switch?

8    **A.**  A vendor switch is changing the vendor who was originally

9    scoped out to do the work with another vendor.

10   **Q.**  And did Mr. Legassa have authority to make such a vendor

11   switch in the digital group?

12   **A.**  Yes.

13   **Q.**  Okay.

14        MR. SALTZMAN:  Can we have Exhibit 123, please, for

15   the witness only?

16   BY MR. SALTZMAN:

17   **Q.**  Do you recognize this document?

18   **A.**  Yes.

19   **Q.**  What is it?

20   **A.**  It's an email chain between Ariel and myself.

21        MR. SALTZMAN:  Your Honor, I'd offer Exhibit 123 in

22   evidence.

23        MR. PARKER:  No objection.

24        THE COURT:  123 is admitted.

25        (Exhibit 123 admitted into evidence.)

1    BY MR. SALTZMAN:

2    **Q.**   Mr. King, what is the subject of this email chain?

3    **A.**   "ClearBridge and Alley invoices."

4    **Q.**   And I want to direct your attention to the beginning of

5    the email chain.  And -- and before I ask you to read a part

6    of this, at this time in June of 2021, had Alley Interactive

7    started to perform work for NESN?

8    **A.**   Yes.

9    **Q.**   And to bill NESN for its work?

10   **A.**   Yes.

11   **Q.**   Okay.  Can you please read the paragraph that begins with

12   "also"?

13   **A.**   "Also, the attached Alley invoice for 100K is related to

14   the 4K UHD project, correct?  We already paid 255K to Alley

15   for the UHD streaming project.  You told me it would be 250K

16   a few months back.  This extra 100K invoice would take us to

17   350K.  Is that accurate?"

18   **Q.**   So when you write "Alley," what were you referring to?

19   **A.**   The vendor that we entered a master service agreement

20   with.

21   **Q.**   Okay.  And at the time that you wrote this email, how

22   much had NESN paid Alley?

23   **A.**   255K.

24   **Q.**   And why are you asking about this extra invoice that

25   would bring the payment up to 355K?

1     **A.**   Because tracking was part of my job and this was a

2     budgeted project.

3                MR. SALTZMAN:   Can we please have Exhibit 15

4     alongside 123?   Exhibit 15 is in evidence.

5     BY MR. SALTZMAN:

6     **Q.**   Do you recognize this invoice on the left of your screen?

7     **A.**   Yes.   It's the invoice I was mentioning in the chain.

8     **Q.**   Okay.   And what's the address that's listed in the

9     invoice to the left?

10    **A.**   680 East Main Street, Stamford, Connecticut.

11    **Q.**   And at the time that you looked at this invoice, who did

12    you believe was going to receive payment on this invoice?

13    **A.**   Alley Interactive in New York.

14    **Q.**   The one that you had contracted with in the master

15    services agreement?

16    **A.**   Correct.

17    **Q.**   Okay.

18                MR. SALTZMAN:   I want to direct -- we can take down

19    the invoice, please, Ms. Hallagan, and go back to the email.

20    BY MR. SALTZMAN:

21    **Q.**   And I want to direct your attention to Mr. Legassa's

22    response on June 8, 2021.

23                MR. SALTZMAN:   The one above that, please.   Thank

24    you.

25

1    BY MR. SALTZMAN:

2    **Q.**   He writes "Alley invoice is for the Nielsen, ID3 Tags,

3    4K."  And I want to ask you to read your response to that.

4    Can you please read your response, Mr. King?

5    **A.**   "Okay.  Thanks Ariel.  So does this fall under the

6    Nielsen & Adobe software development kit project?  We

7    budgeted 100K for that project, so will this be the only

8    invoice for that project?"

9    **Q.**   What is the invoice that you're referring to?

10   **A.**   Exhibit 15.

11   **Q.**   Okay.  And are you asking these questions in connection

12   with your tracking responsibilities?

13   **A.**   Yes.

14             MR. SALTZMAN:  And if we can then scroll up.  I'll

15   read Mr. Legassa's response.

16   BY MR. SALTZMAN:

17   **Q.**   He writes, "Yes, only invoice for that project."

18             So what -- what did you do next?

19   **A.**   This, essentially, closed the loop on this project.  The

20   invoice amount tied to the budgeted amount for this

21   particular project.

22   **Q.**   Why did you accept his answer?

23             MR. PARKER:  Objection.

24             THE COURT:  I'll allow it.

25             THE WITNESS:  I accepted -- accepted his answer

1    because he was a vice president and I trusted that that was

2    the case.

3             MR. SALTZMAN:  Can we have Exhibit 126, please?

4    Just for the witness.

5    BY MR. SALTZMAN:

6    **Q.**  Do you recognize this document?

7    **A.**  Yes.

8    **Q.**  What is it?

9    **A.**  It's an email chain between Ariel and myself.

10            MR. SALTZMAN:  I'd offer Exhibit 126, Your Honor.

11            MR. PARKER:  No objection.

12            THE COURT:  126 is admitted.

13            (Exhibit 126 admitted into evidence.)

14   BY MR. SALTZMAN:

15   **Q.**  Okay.  I want to direct your attention to your email on

16   September 8, 2021.  It's entitled "August close check-in."

17   Do you see that?

18   **A.**  Yes.

19   **Q.**  What are you emailing about here?  What is an August

20   close check-in?

21   **A.**  I'm asking Ariel questions in regards to expenses that

22   have hit, year to date.

23   **Q.**  Does this relate to your tracking responsibilities?

24   **A.**  Yes.

25   **Q.**  So as you can see, there's black text, and then there's

1  blue text beneath it.  What does each color represent?

2  **A.**  The black text are my questions for Ariel.  The blue text

3  are Ariel's responses.

4  **Q.**  Why would you communicate this way with him?

5  **A.**  Whenever I was unable to meet in person, I would ask him

6  questions via email.

7  **Q.**  All right.  I want to direct your attention to just two

8  of the questions that you list in this check-in.  They both

9  begin with "for Alley."  So the first one, I'll ask you to

10  read it, and then I'll read the response.

11  **A.**  "For Alley, you mentioned last time we met that we might

12  be getting charged for some extra work they did for NESN Bets

13  and Watch, depending on DraftKings.  So far, we've been

14  charged an extra 100K.  Will we be charged an additional 25

15  to 50K?"

16  **Q.**  And then the response from Mr. Legassa is, "We are

17  finishing developing NESN Watch (Web) and NESN Bets (we

18  transfer the work to Alley from ClearBridge web.)  We should

19  expect a couple more invoices when job is done.  We did some

20  extra work because of the SportsGrid feeds (video and

21  articles) and we may expect more work depending on the

22  operators requests (DraftKings, FanDuel, et cetera)."

23          So what does it mean that work was being

24  transferred from ClearBridge to Alley?

25  **A.**  Work originally scoped out for ClearBridge would now be

1   done by Alley.

2   **Q.**   And to be clear, what is the Alley entity that you are

3   referring to in your email?

4   **A.**   The entity that we contracted with.

5   **Q.**   And what is the Alley entity that you understood

6   Mr. Legassa was referred to?

7   **A.**   Alley New York.

8   **Q.**   And if work was being transferred from ClearBridge to

9   Alley, how would this transfer affect the amount invoiced by

10  Alley to NESN?

11  **A.**   Increased.

12  **Q.**   And then there's a mention of extra work.  Do you see

13  that?

14  **A.**   Yes.

15  **Q.**   What do you -- what did you understand that to mean?

16  **A.**   I understood this to mean that we'd be getting charged

17  more -- more money than we were originally scoped out.

18  **Q.**   And who -- based on this representation that you

19  received, who did you understand would be doing this extra

20  work?

21  **A.**   Alley, the vendor that we contracted with.

22  **Q.**   And did you do anything independently to verify these

23  representations that were made to you?

24  **A.**   Yes.  I would -- I would ask -- I would ask for, you

25  know, the additional backup for the extra work.

1    **Q.**   From Ariel?

2    **A.**   Yes.

3    **Q.**   Okay.  Now, let's take a look at the second bullet?

4           MR. SALTZMAN:  Thank you, Ms. Hallagan.

5    BY MR. SALTZMAN:

6    **Q.**   And I'll ask you to read your invoice -- your invoice --

7    your bullet, please.

8    **A.**   "For Alley, we've only received one July retainer

9    invoice.  Should we expect August and September retainer

10   invoices, even with being invoiced for this additional NESN

11   Bets and Watch work?"

12   **Q.**   And he responds, "Retainer is basic work.  All the rest

13   will be invoiced separately.  I'm trying to get us more

14   resources and get it into an upgraded retainer."

15           So there's mention of an upgraded retainer.  What

16   did you understand that to mean?

17   **A.**   My understanding was Ariel was negotiating an upgraded

18   retainer and this additional work would fall under that

19   upgraded retainer.

20   **Q.**   And did you have additional discussions with him about an

21   upgraded retainer between Alley and NESN?

22   **A.**   Yes.

23   **Q.**   Okay.  And did it ever happen?

24   **A.**   No.

25   **Q.**   And you mentioned, before we were talking about extra

1    work, what did you understand the relationship between an

2    upgraded retainer and extra work?

3    **A.**   It was my understanding that the extra work would fall

4    under this -- this new, upgraded retainer.

5    **Q.**   And when -- you mentioned that you would try to verify

6    these things by asking Mr. Legassa for additional

7    documentation; is that right?

8    **A.**   Correct.

9    **Q.**   And did he provide you with that additional documentation

10   that you requested?

11   **A.**   No.  I asked many times and he did not.

12             MR. PARKER:  Objection, Your Honor.

13             THE COURT:  The question was did he provide you

14   with the additional documentation that you requested?

15             I think that's a yes-or-no question.

16             THE WITNESS:  No, he did not.

17             THE COURT:  The rest of the answer is stricken.

18   BY MR. SALTZMAN:

19   **Q.**   How many times did you -- to the best of your memory, how

20   many times did you ask him for that information?

21             MR. PARKER:  Objection.

22             THE COURT:  Sustained.

23             MR. SALTZMAN:  May I be heard, Your Honor?

24             (Beginning of sidebar.)

25             THE COURT:  Since we're on the whisper tech,

1    Mr. Parker, let me start with the nature of your objection.

2    It would be my assumption --

3            MR. PARKER:  I'm objecting because you sustained my

4    first objection, and I'm not really sure why it's relevant --

5    this witness has already testified that he was having

6    difficulty getting information from Mr. Legassa.  It's kind

7    of asked and answered already, and we're kind of flogging a

8    dead horse here.

9            THE COURT:  So I sustained your question because he

10   went beyond the question, and now I'm sustaining the

11   objection because it assumed facts not in evidence.  Once I

12   had stricken, you asked how many times -- basically, you

13   assumed that he had asked more than once, but that

14   information was stricken.

15           So you need to back up and ask that question before

16   I can let you ask the second one as to that.

17           MR. SALTZMAN:  Should I address what I anticipate

18   will be an objection that will then follow?

19           THE COURT:  Sure.

20           MR. SALTZMAN:  Thank you.

21           I think that if Mr. Parker is allowed to engage in

22   repeated questioning of Ms. Fisher as to the approximate

23   number of invoices that may or may not have come to her

24   attention in a certain amount, which was pure speculation,

25   then I should be able to ask Mr. King to opine as to the

1   approximate number of times he asked the defendant to provide

2   documentation for the invoices that are at the center of our

3   case.

4           THE COURT:  And I haven't stopped you from that.

5   I'm just sustaining objections based on the form of the

6   question.

7           MR. SALTZMAN:  I will save my fire, then.

8           (End of sidebar.)

9           THE COURT:  For any of you who've been on jury duty

10  before, you have to admit that's a whole lot faster than us

11  all moving over to sidebar.

12          So please proceed.

13          MR. SALTZMAN:  Thank you, Your Honor.

14  BY MR. SALTZMAN:

15  **Q.**  So, Mr. King, I was asking you before about the efforts

16  that you made to reach out to Mr. Legassa about supporting

17  documentation.

18  **A.**  Yes.

19  **Q.**  So did you reach out to him to try to get that additional

20  supporting documentation?

21  **A.**  Yes.

22  **Q.**  And how many times would you estimate that you reached

23  out to him in 2021 to try to get that supporting

24  documentation?

25  **A.**  Approximately six times in person, with a handful of

1    emails, as well.

2    **Q.**  What about emails and phone calls?

3    **A.**  Yes.

4    **Q.**  Okay.

5    **A.**  Every time we met, I would ask, I would have questions

6    for him.

7    **Q.**  And did you receive anything in response to those

8    questions that you asked him?

9    **A.**  No.  He would give excuses as to why he would be unable

10   to provide --

11             MR. PARKER:  Objection.

12             THE COURT:  Striking the rest of the answer.  The

13   question was did you receive anything?  The answer was no.

14   Everything that came after that is stricken.

15             MR. SALTZMAN:  Moving on.

16             Can we have Exhibit 127, please.

17   BY MR. SALTZMAN:

18   **Q.**  Do you recognize this document?

19   **A.**  Yes.

20   **Q.**  And what is it?

21   **A.**  It's an email chain between Ariel, myself, and Mary.

22   **Q.**  And what is the subject?

23             MR. SALTZMAN:  I'd offer 127, Your Honor.

24             THE WITNESS:  The subject is --

25             THE COURT:  Hold on.  Hold on.

1          THE WITNESS:  Sorry.

2          MR. PARKER:  No objection.

3          THE COURT:  127 is admitted.

4          (Exhibit 127 admitted into evidence.)

5          MR. SALTZMAN:  Thank you.

6    BY MR. SALTZMAN:

7    **Q.**  What is the subject of this email?

8    **A.**  "Alley Interactive Retainer."

9    **Q.**  And to be clear, what is the Alley entity that you

10   understood was being discussed in this email chain?

11   **A.**  The entity that we contracted with --

12   **Q.**  Okay.

13   **A.**  -- Alley New York.

14   **Q.**  And if I can ask you to please read your email on

15   October the 7th?  I apologize for asking you to read a

16   lengthy email.

17   **A.**  "Hi Ariel, I wanted to follow up in regards to the Alley

18   Interactive retainer.  We currently have the attached

19   contract with them, and I was hoping you could provide us

20   with some clarity on this.  It was my understanding that we

21   would be receiving a 57K a month invoice from them for their

22   work starting in July.  However, this has not been the case,

23   as we've only received a July and September retainer invoice

24   for Alley.

25          "I know you mentioned that Alley performed some

1    extra work on NESN Watch and Bets because of the SportsGrid

2    feeds (video and articles) and that we may expect more work

3    depending on the operators' requests (DraftKings, FanDuel,

4    et cetera).  Is this extra work not covered under the

5    retainer contract?  We will need some clarity on how much

6    they will be invoicing us for the rest of the year as well as

7    a forecasted timeline and amounts for 2022."

8              "You also mentioned last time we spoke that you

9    were negotiating an updated retainer for Alley.  Do you have

10   an update on this?  Could you please provide us with more

11   information on this?

12             "It is also important to note that Alley does not

13   provide a lot of detail on their invoices.  As mentioned

14   before, I will need extensive detail with a breakout of hours

15   consumed, a detailed breakout by project, DTC, Watch, Bets,

16   UHD, and what stage each is in (planning, product backlog

17   grooming, development, quality assurance testing, client

18   feedback, documentation).  Could you please provide us with a

19   contact at Alley to help us answer these questions."

20   **Q.**   Okay.  I want to ask you just about a few parts of this

21   and then turn to your response.

22             The date of this email is -- it's in October,

23   correct?

24   **A.**   Correct.

25   **Q.**   So in the first paragraph that you send to Mr. Legassa,

1    you're asking again about extra work?

2    **A.**   Correct.

3    **Q.**   And what is the extra work that you're asking about?

4    **A.**   The additional work not covered in Statement of Work

5    Number 2, the 57K retainer.

6    **Q.**   That NESN was being billed for?

7    **A.**   Yes.

8    **Q.**   Okay.  And then there's mention of an updated retainer.

9    Is that along the lines of the updated or upgraded retainer

10   that we were -- that you were testifying to a few moments

11   ago?

12   **A.**   Yes.

13   **Q.**   And had you received an update on that possibility at

14   this time?

15   **A.**   No.

16   **Q.**   Okay.  Let's take a look at your response -- or Ariel's

17   response, Mr. King.  I'll read it and then ask you a few

18   questions:

19           He writes, "Hello Paul, I'll set up a call to

20   respond to your questions.  The extra work is divided into

21   two, web and engineering.  This work has separate invoices

22   and vendor coding.  The retainer does not include the extra

23   work.

24           "I'll ask for detailed info, as well as give you

25   access to what we assign Alley to do weekly.

1     "I'll need your help assigning the work since

2 currently I'm swamped and the level of detail is a lot of

3 extra documentation for us.

4     "Happy to help as much as I can."

5     So Mr. Legassa noted that he would provide you

6 access to what we were asking Alley to do weekly.  Did he do

7 that?

8 **A.** No.

9 **Q.** In connection -- one of the things that you asked for in

10 your email, Mr. King, was a contact at Alley New York; is

11 that right?

12 **A.** Correct.

13 **Q.** Or Alley Interactive.  Excuse me.

14     Did you receive that contact in this response?

15 **A.** No.

16 **Q.** Did you ever receive a contact from Mr. Legassa at Alley

17 Interactive?

18 **A.** No.

19 **Q.** And were you ever able to speak with anyone at Alley

20 Interactive?

21 **A.** No.

22 **Q.** Okay.

23     MR. SALTZMAN:  Can I have Exhibit 129, please?  For

24 the witness only.

25

BY MR. SALTZMAN:

**Q.**  Do you recognize this document?

**A.**  Yes.

**Q.**  And what is it?

**A.**  It's an email chain between Ariel, myself, and Mary.

MR. SALTZMAN:  I'd offer Exhibit 129.

MR. PARKER:  No objection.

THE COURT:  129 is admitted.

(Exhibit 129 admitted into evidence.)

MR. SALTZMAN:  Thank you.

BY MR. SALTZMAN:

**Q.**  So the subject -- well, the subject is "Open 2022 Budget Items."  And it's a November email chain.  What does that mean, "open 2022 budget items," Mr. King?

**A.**  The questions I had in regards to the upcoming 2022 budget.

**Q.**  Okay.  And if we can scroll down to your email --

MR. SALTZMAN:  Great.  Thank you, Ms. Hallagan.

BY MR. SALTZMAN:

**Q.**  So what -- what is an open budget item?

**A.**  An open budget item is, you know, we still needed to get the appropriate numbers and backup for the upcoming -- upcoming year.

**Q.**  Again, we have the black and blue text here.  What does that represent?

1    **A.**   The black text are my questions for Ariel, and the blue

2    text are Ariel's responses.

3    **Q.**   Okay.  I'm only going to ask you about one of these, the

4    Alley one.  And if you could read the question, and then I'll

5    read the response.

6    **A.**   "Alley:  2022 retainer costs; currently have an estimate

7    of 1 million.  Is this still an accurate estimate?"

8    **Q.**   So when you say an estimate of 1 million, is that for the

9    2022 budget?

10   **A.**   Correct.

11   **Q.**   Okay.  And then the response is, "Let's budget 1.5 for

12   Alley, considering DTC, Watch, and possible new work."

13        So what Alley entity did you understand that you

14   were discussing in this exchange?

15   **A.**   The entity that we contracted with, Alley New York.

16   **Q.**   And what was Mr. Legassa asking that you do with the

17   budged amount?

18   **A.**   Increase the budget amount.

19   **Q.**   To one and a half million?

20   **A.**   Correct.

21   **Q.**   Okay.  And what did you do with this request?

22   **A.**   I increased the budget.

23   **Q.**   Let's take a look at the top email.  And Mr. Legassa

24   responds, "Thank you so much, Paul.  You rock."  Four

25   exclamation points.

1              How often did you receive messages like this from

2    Mr. Legassa?

3              MR. PARKER:  Objection.

4              THE COURT:  Sustained.

5              THE WITNESS:  Never.

6              THE COURT:  The objection was sustained.

7              THE WITNESS:  Oh, sorry.

8              THE COURT:  That means there's no question there.

9              THE WITNESS:  Sorry.

10              MR. SALTZMAN:  Move on.

11              THE COURT:  The answer is stricken.

12              MR. SALTZMAN:  Let's have Exhibit 130, please.  For

13    the witness only.  Thank you.

14    BY MR. SALTZMAN:

15    **Q.**  Do you recognize this document?

16    **A.**  Yes.

17    **Q.**  What is it?

18    **A.**  It's an email chain between Ariel and myself.

19              MR. SALTZMAN:  I'd offer Exhibit 130.

20              MR. PARKER:  No objection.

21              THE COURT:  130 is admitted.

22              (Exhibit 130 admitted into evidence.)

23              MR. SALTZMAN:  Thank you.

24    BY MR. SALTZMAN:

25    **Q.**  The subject of the email is "Bandwidth Projections."

1   What does that mean?

2   **A.**   It's in regards to a vendor we were working with,

3   Brightcove.

4   **Q.**   Okay.  And if we can scroll down to your email, Mr. King,

5   on December 29, 2021, and I'm going to ask you about --

6   again, we have this black and blue text.  What does it

7   represent?

8   **A.**   The black is my questions for Ariel.  The blue are his

9   responses.

10   **Q.**   So let's --

11          MR. SALTZMAN:  If you could blow up, Ms. Hallagan,

12   the ClearBridge and Alley line item.  Thank you.

13   BY MR. SALTZMAN:

14   **Q.**   If you could read your question and I'll read the

15   response.

16   **A.**   "ClearBridge and Alley -- do we have updated 2022 numbers

17   from them?  Our latest estimate was 3 million ClearBridge

18   (80 percent Capex, 20 percent Opex) and 1 million Alley."

19   **Q.**   What are you asking about here?

20   **A.**   I'm asking for if the estimates are still accurate

21   estimates.

22   **Q.**   For the 2022 --

23   **A.**   The 2022 budget, yes.

24   **Q.**   And what appeared to have happened between the last email

25   and the email that we're viewing right now with respect to

1     the amount budgeted for Alley?

2              MR. PARKER:  Objection.

3              THE WITNESS:  It decreased.

4              THE COURT:  I'm not sure I understood the question.

5     Why don't you try it again.

6              MR. SALTZMAN:  Sure.

7     BY MR. SALTZMAN:

8     **Q.**  So in the last email that we reviewed, you testified that

9     the budget for Alley increased to 1½ million, right?  And

10    here you're asking that the latest estimate is 1 million.  So

11    I'm asking what happened between the previous email and this

12    email?

13    **A.**  It decreased.

14    **Q.**  Okay.  And the response from Mr. Legassa is, "Please add

15    500K to Alley due to entitlement back-end work."

16              So what is he asking you to do?

17    **A.**  Increase the budget.

18    **Q.**  Let's take a look at your email at the top of the chain.

19    And I'll just direct your attention, Mr. King, to that third

20    bullet point.  And if you could please read it to the jury.

21    **A.**  "I added Adobe, the contract labor, and the 500K for

22    Alley."

23    **Q.**  So did you increase the budget back up to 1½ million for

24    Alley?

25    **A.**  Yes.

1          MR. SALTZMAN:  We can take this down, please.

2    BY MR. SALTZMAN:

3    **Q.**  And the last email I want to show you is Exhibit 131,

4    please.

5          MR. SALTZMAN:  Just for the witness.  Thank you.

6    BY MR. SALTZMAN:

7    **Q.**  Do you recognize it?

8    **A.**  Yes.

9    **Q.**  And what is it?

10   **A.**  It's an email chain between Ariel, myself, and Mary.

11         MR. SALTZMAN:  I'd offer Exhibit 131.

12         MR. PARKER:  I'm going to object to this email,

13   Your Honor.

14         THE COURT:  Okay.  Let me take a look at it.

15         (Beginning of sidebar.)

16         MR. PARKER:  Your Honor, my objection to this email

17   is this is January 5, 2022.

18         THE COURT:  I'm sorry.  I missed that.

19         MR. PARKER:  The date of this email is January 5,

20   2022.  Mr. Legassa was fired on January 6, 2022.  I believe

21   that the Alley witness, Mr. Campeau-Laurion, testified that

22   it was, like, earlier in January when they brought the Alley

23   Connecticut discovery to the attention of NESN.

24         What I think that NESN was trying to do with this

25   email -- this is not like a normal course of business email.

1    They're setting up Mr. Legassa to make, essentially,

2    incriminating statements or to further their investigation

3    into the information that had been brought to their attention

4    by Alley.

5            MR. SALTZMAN:  Just to back up here.  At the time,

6    the defendant is still employed at NESN.  This is an email

7    exchange.  These are his admissions.  It's an admission by a

8    party opponent.  There's an exception to the hearsay rule.

9            I mean --

10           THE COURT:  So let me just cut this short.  There's

11    two different issues here.  One is that you can get in

12    business records without greater authentication by

13    establishing that they were kept in the normal course.  We

14    don't have to worry about that here, because you have the

15    witness and you can inquire.  So regardless of whether this

16    is a business record or not, if you can properly authenticate

17    that this is a true and accurate copy through his own

18    recollection, et cetera, you'll get that.

19           But you'll have to make that foundation.  It

20    doesn't meet the business record definition based on the

21    notion that this was maybe something created for litigation.

22           Assuming you can get it past that business record

23    exception, then the statement does come in because it is an

24    exception to the hearsay rule because it's a party admission.

25           (End of sidebar.)

1    BY MR. SALTZMAN:

2    **Q.**  So, Mr. King, I -- just start from the top.  Is -- do you

3    recognize this document?

4    **A.**  Yes.

5    **Q.**  And what is it?

6    **A.**  It's an email chain between Ariel, myself, and Mary.

7    **Q.**  And does NESN keep emails and maintain emails like this

8    in the ordinary course of business?

9    **A.**  Yes.  We keep record of our emails.

10   **Q.**  And does this email accurately describe the communication

11   that you had on that date?

12   **A.**  Yes.

13            MR. SALTZMAN:  I'd offer Exhibit 131.

14            MR. PARKER:  I object, Your Honor.

15            THE COURT:  I'll hear you out.

16            (Beginning of sidebar.)

17            THE COURT:  Why isn't that sufficient if he

18   testifies that he recognizes the document?

19            MR. PARKER:  I thought that what Mr. Saltzman was

20   doing --

21            THE COURT:  I can't hear you.  You have to

22   get closer.

23            MR. PARKER:  Okay.  Can you hear me now?

24            THE COURT:  Now, I can.

25            MR. PARKER:  Okay.  I thought that what Saltzman

1    was doing was marching through the business record

2    qualification.

3           THE COURT:  So he did ask additional questions as

4    to the usual course that he didn't need to ask, and that's

5    the business record exception.

6           The question I'm asking -- I allowed him to ask

7    that was included in there, included was, did he recognize

8    this email?  He got a slightly equivocal answer, but I think

9    that's enough.

10          If you think this is a doctored document, I will

11    allow you voir dire him on the specifics.  You know, emails

12    can be tampered with, but short of that -- and I'll allow you

13    to voir dire him in between, before proceeding.  But short of

14    it being a doctored document or a suggestion that it might

15    be, I think he's saying he recognizes it enough to move on to

16    the next thing.

17          MR. PARKER:  Okay.  I've got no reason to think

18    it's a doctored document and --

19          THE COURT:  Okay.  So your objection is noted, but

20    I'm going to let it in.

21          (End of sidebar.)

22          THE COURT:  So I think we left with your moving it

23    into evidence and 131 is admitted into evidence and may be

24    shown to the jury.

25          (Exhibit 131 admitted into evidence.)

1    BY MR. SALTZMAN:

2    **Q.**   So, Mr. King, what's the date of this email chain?

3    **A.**   January 5, 2022.

4    **Q.**   And what's the subject?

5    **A.**   "Alley Interactive."

6    **Q.**   And at the time, what Alley entity did you understand

7    Alley Interactive to be?

8    **A.**   The entity that we contracted with, Alley New York.

9    **Q.**   And the master of services agreement?

10   **A.**   Uh-huh, yes.

11   **Q.**   Can I ask you to please read your email at the bottom of

12   the chain?

13   **A.**   "Hi Ariel, for Alley Interactive, per SOW Number 2, they

14   should be providing backup for all the overage work.  Could

15   you please reach out so that we can have record of that

16   detail so that we are sure everything is classified correctly

17   for 2021 and going forward."

18   **Q.**   Did Ariel Legassa respond to your email?

19   **A.**   Yes.

20   **Q.**   And he -- I'll read his response and then ask you -- so

21   he responds at 4:33 p.m., "I will request the details.  We

22   asked them for a lot of last-minute projects.  When you said

23   backup, what exactly do you need?"

24          And then there's another reply from Mr. Legassa

25   approximately eleven minutes later, "Thank you for the

1    explanation, Paul.  I'll ask for a more detailed work

2    description.  It will take me a while since I need to review

3    every sprint we worked on and ask them for the info.

4          "If I ask them for the info, they will stop working

5    for DTC and allocate the PM resource to this."

6          What is PM?

7    **A.**  Project managing.

8    **Q.**  So there's a gap -- or there's an 11-minute time

9    difference between these two emails.  Do you agree with that?

10    **A.**  Yes.

11    **Q.**  What, if anything, took place in those eleven minutes?

12    **A.**  Ariel came over to my desk.

13    **Q.**  What happened when he came over to your desk?

14    **A.**  I asked him that -- for the necessary backup and he said

15    that he would provide --

16          MR. PARKER:  Objection.

17          THE COURT:  I'll allow it.

18    BY MR. SALTZMAN:

19    **Q.**  Let me back up.  What happened when he came to your desk?

20    **A.**  I asked him that we needed the necessary backup for the

21    overage work, and he said he would provide me with that

22    documentation.

23    **Q.**  What did you make of the fact that he came to your desk?

24          MR. PARKER:  Objection.

25          THE COURT:  Sustained.

```
1              THE WITNESS:  Strange.  It was --
2              THE COURT:  I sustained the objection.
3              THE WITNESS:  Sorry.
4              THE COURT:  Strike the answer.  The answer is
5    stricken.
6    BY MR. SALTZMAN:
7    Q.  So you are asking him -- in this email chain, you're
8    asking him for additional documentation, right?
9              MR. PARKER:  Objection.  Speaks for itself and
10   we've been through it.
11             THE COURT:  He's -- I will allow it.
12             MR. SALTZMAN:  I'm trying to --
13   BY MR. SALTZMAN:
14   Q.  And you had previously testified that, in other
15   instances, you had also asked for additional documentation,
16   Mr. King?
17   A.  Yes.
18   Q.  In those instances, did Mr. Legassa ever come to your
19   desk to provide you with an explanation?
20             MR. PARKER:  Objection.
21             THE COURT:  Sustained.  I think we should move on.
22             MR. SALTZMAN:  Okay.
23   BY MR. SALTZMAN:
24   Q.  So this email exchange took place on January 5, 2022?  Do
25   you know what happened to Mr. Legassa the next day?
```

1    **A.**  He was terminated.

2           MR. SALTZMAN:  No further questions.

3           THE COURT:  It's five minutes till 1:00, so I think

4    we will wait till tomorrow morning for the cross-examination.

5    But before I let the jury out, let me talk to the lawyers

6    quickly about the schedule for tomorrow.

7           (Beginning of sidebar.)

8           THE COURT:  So we have cross-exam of this witness,

9    and then does the government have anything further?

10          MS. QUEENIN:  Yes, Your Honor.  We have at least

11   two other witnesses, so I'm looking at tomorrow.  I'm not

12   sure how long Mr. Parker intends to cross-examine our

13   financial expert for.

14          THE COURT:  Okay.  I don't think between that --

15   the charge conference and closing arguments that -- or I just

16   don't think we're necessarily going to get to deliberations

17   tomorrow, so I'm going to tell the jury to come for

18   deliberations tomorrow, but tell them that there's a good

19   chance that they'll have it Friday and to clear their

20   calendars Friday.

21          Any disagreement with that?

22          MS. QUEENIN:  No.

23          MR. PARKER:  No, no disagreement.

24          THE COURT:  Okay.

25          (End of sidebar.)

1          THE COURT:  So for -- there's a chance that you'll

2    have the case by Friday for deliberations.  You never know.

3    It depends on how the rest of the case comes in.  But there's

4    a chance.  So please clear your calendars for Friday

5    afternoon that you may need to stay long.

6          And the way -- the length of time you stay I will

7    leave to the jury to decide once you start deliberations, but

8    I don't need you to do that now.  But I'd like you to

9    allot -- I don't want to have people have to fight with

10   traffic in the Seaport, et cetera, but I do want you to stay

11   for the bulk of the afternoon once we start deliberating.  So

12   please clear your calendars accordingly.

13         My same instructions.  Please don't discuss the

14   case with each other, with anyone else at home.  Do not

15   discuss anyone associated with the case.  I appreciate

16   everybody trying to get here at 9:00 in the morning.  I

17   understand that the traffic is really bad, but as a courtesy

18   for everyone, again, we will be starting right at

19   nine o'clock, so please make sure you're here before 9:00 so

20   I can get you in and sitting down at 9:00.

21         And with that, thank you for your attention today.

22         All rise for the jury.

23         (Jury not present.)

24         THE COURT:  You may be seated.

25         The witness can step down.

1          Anything else we need to address today?

2          MS. QUEENIN:  Can we just reiterate what the plan

3     is for tomorrow?  I just want to make sure we're clear.

4          THE COURT:  So I am going to still try to get you

5     the instructions that I am anticipating giving.  And to the

6     extent that you have objections to them and there's time to

7     discuss it at 8:30, we will do that, as a preliminary matter;

8     but, otherwise, we will do it later in the -- later in the

9     day.

10         But it sounds like we are likely -- given that you

11    have several more witnesses, I just don't think we're going

12    to be doing closing arguments tomorrow; and, therefore, I

13    will try to get you dealing with the jury instructions as

14    promptly as possible, but it's a chance that we'll be doing

15    things in the afternoon tomorrow.

16         MS. QUEENIN:  That's fine, Your Honor.  Thank you.

17         MR. SALTZMAN:  Your Honor, if I may, in other

18    instances, I've had the courtesy afforded in that the defense

19    would let us know if the defendant was going to testify the

20    night before it happened.  That night is tonight.

21         I understand that he can maintain the

22    constitutional right until the very last moment.  I get that;

23    but if it's a foregone issue, or if it's one way or another,

24    I would appreciate that courtesy.  It's a courtesy we've been

25    affording to the defense.

1          MR. PARKER:  I might want to do that, but I can't.
2    And part of the reason I can't is because it's a
3    cat-and-mouse game with the government about who they're
4    calling the next day.  Campeau-Laurion wasn't in the email
5    yesterday that I got in the evening.  I didn't complain.
6    I -- I wasn't going to do a lot with him anyway.  I did it.
7          MS. QUEENIN:  That's --
8          MR. PARKER:  I don't -- they've got several other
9    witnesses on their witness list.  They've got Sean McGrail.
10   They've got Mary Breiter.  I don't know if they're calling
11   them or not.  They're going to call their summary -- and that
12   makes a difference.  They are NESN witnesses.
13         THE COURT:  Okay.  Who are you calling for
14   tomorrow?
15         MS. QUEENIN:  We need to discuss it, but it's
16   certainly not a cat-and-mouse game.  And if that witness was
17   left out of an email, it was wholly inadvertent.
18         THE COURT:  So I would assume that if you came in
19   tomorrow and rested, that there's probably -- the defendant
20   would choose one tact on how to go, and if you brought both
21   of those witnesses, both the Mary Breiter and Sean McGrail,
22   that that might affect things differently.  So I do think he
23   gets to know that, and maybe he also gets to know what
24   they're testifying to before he has to make that decision.
25         And I don't see it as a cat-and-mouse game on

1    either side, but it is the difficulties of putting on a trial

2    and how things go.  So --

3                MS. QUEENIN:  We'll confer with each other,

4    Your Honor, as we have been doing throughout the trial.

5                THE COURT:  And I think the other thing to add on

6    the schedule is that, either way, whether Mr. Legassa decides

7    to testify or not to testify, I would need to colloquy him at

8    some point about that decision.  So that will be somewhere on

9    the schedule.

10               So anything else we need to address?

11               MR. SALTZMAN:  No, Your Honor.

12               MR. PARKER:  No, Your Honor.

13               THE COURT:  Okay.  Thank you.

14               THE DEPUTY CLERK:  We are in recess.

15               (Court in recess at 1:01 p.m.)

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

I, Robert W. Paschal, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 1st day of November, 2023.

/s/ Robert W. Paschal
_____
ROBERT W. PASCHAL, RMR, CRR
Official Court Reporter