UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) Crim. No. 22-10038-IT |
| v. | ) |
| | ) |
| | ) |
| ARIEL LEGASSA | ) |

**<u>GOVERNMENT'S SENTENCING MEMORANDUM</u>**

# TABLE OF CONTENTS

INTRODUCTION..................................................................................................................... 5

THE OFFENSE AND RELEVANT CONDUCT..................................................................... 6

THE GUIDELINE SENTENCING RANGE ........................................................................... 6

    Enhancements for Sophisticated Means and Abuse of Position of Trust Apply and Are Not Double Counting ............................................................................................................... 7

    The Enhancement for Obstruction of Justice Applies ....................................................... 9

    The Enhancement for Money Laundering Applies ......................................................... 11

SENTENCING RECOMMENDATION.................................................................................. 11

    Nature and Circumstances of the Offense Warrant a Significant Sentence ................... 11

    The Defendant's History and Characteristics Weigh in Favor of the Government's Requested Sentence ........................................................................................................ 13

    The Need to Avoid Unwanted Sentencing Disparities ..................................................... 16

    A Significant Incarcerative Sentence Promotes Respect for the Law, and Provides Adequate Punishment and Deterrence............................................................................. 16

CONCLUSION ........................................................................................................................ 18

# TABLE OF AUTHORITIES

Page(s)

Cases

*U.S. v. Conner*,
   537 F.3d 480 (5th Cir. 2008) .................................................................................................. 8
*United States v. Alicea*,
   205 F.3d 480 (1st Cir. 2000) ................................................................................................... 8
*United States v. Andrews*,
   808 F.3d 964 (4th Cir. 2015) ................................................................................................. 10
*United States v. Beckman*,
   787 F.3d 466 (8th Cir. 2015) ................................................................................................. 10
*United States v. Colby*,
   882 F.3d 267 (1st Cir. 2018) ................................................................................................. 10
*United States v. Doley*,
   783 F.3d 7 (1st Cir. 2015) ....................................................................................................... 8
*United States v. Healy*,
   451 F. App'x 192 (3d Cir. 2011) ........................................................................................... 10
*United States v. Kitts*,
   27 F.4th 777 (1st Cir. 2022) .................................................................................................... 8
*United States v. Martin*,
   455 F.3d 1227 (11th Cir. 2006) ............................................................................................. 18
*United States v. Matiz*,
   14 F.3d 79 (1st Cir. 1994) ..................................................................................................... 10
*United States v. Mercer*,
   834 F.3d 39 (1st Cir. 2016) ................................................................................................... 11
*United States v. Mueffelman*,
   470 F.3d 33 (1st Cir. 2006) ................................................................................................... 18
*United States v. Pacheco-Martinez*,
   791 F.3d 171 (1st Cir. 2015) ................................................................................................... 8
*United States v. Vazquez-Molina*,
   389 F.3d 54 (1st Cir. 2004) ..................................................................................................... 7

Statutes

18 U.S.C. § 1341 .......................................................................................................................... 5
18 U.S.C. § 1957 .......................................................................................................................... 5
18 U.S.C. § 3553(a) .................................................................................................................... 11
18 U.S.C. § 3553(a)(1) ............................................................................................................... 13
18 U.S.C. § 3553(a)(2) ............................................................................................................... 17
18 U.S.C. § 3553A ....................................................................................................................... 6

Rules

U.S.S.G. § 2B1.1 .......................................................................................................................... 8

U.S.S.G. § 2B1.1(b)(1)(H) ............................................................................................................ 7
U.S.S.G. § 2B1.1(b)(2) ................................................................................................................. 8
U.S.S.G. § 2B1.1(b)(10) ............................................................................................................... 7
U.S.S.G. § 3B1.3 ....................................................................................................................... 7, 8
U.S.S.G. § 3C1.1 ..................................................................................................................... 7, 10
U.S.S.G. §§2B1.1(b)(10)(C) ........................................................................................................ 7

I.  **INTRODUCTION**

Over the course of eleven months in 2021, Ariel Legassa took advantage of his trusted position at New England Sports Network ("NESN") and orchestrated a complex fraud to steal over $575,000 from his employer. He would have stolen more, but for the fact that one of the victims unexpectedly discovered his crime.

Following a five-day trial, the defendant was swiftly convicted of seven counts of mail fraud in violation of 18 U.S.C. § 1341 and three counts of unlawful monetary transactions, in violation of 18 U.S.C. § 1957. Notwithstanding his conviction by a jury of his peers and the overwhelming evidence presented at trial, Legassa refuses to accept responsibility for his brazen fraud. The evidence at trial established that Legassa repeatedly chose to lie to carry out his scheme. He lied to NESN employees—including the Chief Executive Officer ("CEO"), the Chief Financial Officer ("CFO"), and employees in the accounting and accounts payable departments. He lied to Alley Interactive, Santander Bank, the Federal Bureau of Investigation, and others. The evidence at trial also showcased how he used all the stolen money to fund a lavish lifestyle—cars, a private plane, home improvement, and massive credit card expenses. He did all of this notwithstanding the fact that he made more than $250,000 in annual salary. While the crime itself may have been complex, the motive was simple: greed.

For Legassa's actions, the government requests that the Court impose the following sentence: incarceration of 63 months, three years of supervised release, restitution in the amount of $580,500, forfeiture in the amount of $575,500[1], and a $1,000 mandatory special assessment.

---

[1] The government respectfully requests that the Court enter the Order of Forfeiture (Money Judgment) and Preliminary Order of Forfeiture. *See* ECF No. 162.

## II. THE OFFENSE AND RELEVANT CONDUCT

Following pre-trial litigation and a five-day jury trial, the Court is by now familiar with the facts of the case. *See generally* Presentence Investigation Report (PSR) ¶¶ 8-31. In short, as NESN's Vice President of Digital, Legassa took advantage of his senior position to steal from his employer. To do so, he created a fake company in the name of a real NESN vendor (Alley Interactive) and submitted several fake invoices directing NESN to make payment to this fake company. He then spent all that money on himself. Below, in connection with its discussion of the relevant factors under 18 U.S.C. § 3553A, the government has highlighted certain aspects of the fraud.

Beyond the evidence presented at trial, the government's statement of offense conduct also details the defendant's lies under the pains and penalties of perjury, in the parallel civil litigation between NESN and Legassa. PSR ¶¶ 29-30. In connection with the ongoing civil litigation, under oath, the defendant set forth an incredible defense of his fraud that he similarly told the FBI in a post-arrest interview and that he again set forth in pre-trial filings. He stated that the CEO and CFO agreed to pay him through this fake company via a side-deal/handshake agreement and that they wanted to hide the payments from everyone else at NESN. This invented, unsubstantiated story contradicts all the evidence presented at trial and ultimately, defies logic.

## III. THE GUIDELINE SENTENCING RANGE

The government agrees with most of the United States Probation Office's calculation of the Sentencing Guidelines set forth in the final PSR. The United States Probation Office calculated the applicable total offense level as 25. *See* PSR ¶45. The government agrees with Probation's application of the following enhancements and the Court should dismiss Legassa's arguments to the contrary:

- U.S.S.G. § 2B1.1(b)(1)(H) (loss exceeds $550,000)
- U.S.S.G. § 2B1.1(b)(10) (sophisticated means)
- U.S.S.G. § 3B1.3 (abuse of a position of a trust)
- U.S.S.G. § 3C1.1 (willful obstruction of justice)

However, as set forth below, the government submits that the base offense level should be seven (not six), because the offense of conviction is mail fraud. Accordingly, the total offense should be 26 (not 25), which results in a Guideline Sentencing Range of 63 to 78 months.

### A. Enhancements for Sophisticated Means and Abuse of Position of Trust Apply and Are Not Double Counting

Contrary to Legassa's assertion, the enhancements for sophisticated means and abuse of position of trust apply to his conduct. The application of both enhancements does not constitute impermissible double counting. U.S.S.G. §§2B1.1(b)(10)(C); 3B1.3. First, the enhancements are aimed at different facets of the offense—the manner in which Legassa carried out his scheme and the senior position that he held at NESN which allowed him to commit the fraud. Second, even if the enhancements addressed the same conduct—and they do not—the Sentencing Guidelines permit the application of both, and do not contemplate the enhancements in the disjunctive. *United States v. Vazquez-Molina*, 389 F.3d 54, 60 (1st Cir. 2004), vacated on other grounds and remanded for reconsideration ("The same fact sometimes can serve multiple purposes at sentencing and those multiple uses are generally permissible except in instances in which the sentencing guidelines explicitly forbid double counting.") (citations omitted)); *United States v. Alicea*, 205 F.3d 480, 486 n.7 (1st Cir. 2000) ("We do not mean to imply, however, that double-counting is never permissible. The contrary is true.") (citations omitted).

The Application Note to the Guidelines defines sophisticated means as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."

7

U.S.S.G. § 2B1.1, App. Note 9. Several examples of conduct constituting sophisticated means are included in the notes, including the means that Legassa employed—the use of fictitious entities. U.S.S.G. § 2B1.1(b)(2) cmt. n.9(B); *United States v. Kitts*, 27 F.4th 777, 790 (1st Cir. 2022) (finding enhancement warranted based on unauthorized use of client's signature and creating a fake company, and collecting cases); *United States v. Pacheco-Martinez*, 791 F.3d 171, 179 (1st Cir. 2015) (upholding application of the sophisticated means enhancement where the defendant "set up multiple corporate entities in order to facilitate his fraudulent schemes"); *U.S. v. Conner*, 537 F.3d 480, 491 (5th Cir. 2008) (using fake IDs to purchase goods then resold on eBay was "not the most sophisticated fraud" but qualified for the sophisticated means enhancement).

The First Circuit has recognized that sophisticated means may apply even where the conduct is *less* sophisticated than the examples in the Application Note. *United States v. Doley*, 783 F.3d 7, 25 (1st Cir. 2015). The evidence at trial and the language of the notes in the Guidelines clearly establish that Legassa's conduct constitutes sophisticated means—he incorporated a fake company and opened a bank account, P.O. Box, and email account in the name of that company. He did so because it allowed him to hide his fraud.

The evidence presented at trial also clearly supports that Legassa abused a position of trust. U.S.S.G. § 3B1.3 provides for a two-point enhancement "[i]f the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." The Court heard testimony that the defendant was a member of the senior executive team at NESN and that as a result of his position, he was afforded a great deal of trust and responsibility. *See, e.g.,* Tr. Day 3, p. 24 at 1-18; Tr. Day 3 p. 100 at 17-18; Tr. Day 4, p. 46 at 4-5. For example, Legassa was given the discretion to select different vendors for the digital

team. The Court also heard testimony that he was able to approve certain vendor payments, which in turn helped facilitate and hide his scheme for so long. *See* Tr. Day 3, p. 24 at 1-18.

### B. The Enhancement for Obstruction of Justice Applies

Legassa should also receive an enhancement under §3C1.1 for obstruction of justice. On February 24, 2023, in the civil litigation stemming from Legassa's embezzlement from NESN, he responded to and signed civil interrogatories under the pains and penalties of perjury. In his submission, he knowingly included at least the following false statements:

> *Legassa states that he at least three oral conversations with Ray Guilbault about NESN's agreement to pay Legassa indirectly for his work toward the development of a DTC white label project. In one of those conversations, Guilbault agreed on behalf of NESN that Legassa would establish a vendor company through which he would receive payments for developing the DTC product and that NESN would pay Legassa through the vendor company.*
>
>> *In one of those conversations, Guilbault agreed on behalf of NESN that Legassa would set up Alley CT.*
>>
>> *In at least one conversation, Guilbault assured Legassa that NESN would continue to pay Alley CT's invoices.*
>
> *Legassa further states that he had at least three oral conversations with Sean McGrail about NESN's agreement to pay Legassa indirectly for his work toward the development of a DTC white label project. In the first of those conversations, McGrail told Legassa that he was familiar with and approved the agreement that Guilbault and Legassa had reached and told Legassa to let him, McGrail, know if there was anything else that Legassa needed.*
>
>> *In at least one conversation, McGrail also assured Legassa that NESN would continue to pay Alley CT's invoices.*
>
> *"The agreement with NESN was not based on hours worked. Legassa was not required to and did not bill NESN for hours worked. Legassa was paid through Alley CT for developing strategy and engineering for a DTC white label project. Legassa performed work from early 2021 to January 5, 2022.*

*See* PSR at ¶¶29-30. Application Note 4 to the Guideline states that §3C1.1 applies to "committing, suborning, or attempting to suborn perjury, including during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction."

9

§3C1.1, Application Note 4 (emphasis added); *United States v. Matiz*, 14 F.3d 79, 84 (1st Cir. 1994)("[C]omitting perjury is an example of the type of conduct to which this enhancement applies."). "In order to impose the enhancement, the district court must make factual findings that encompass the elements of perjury --falsity, materiality, and willfulness." *United States v. Colby*, 882 F.3d 267, 273 (1st Cir. 2018).

Contrary to what the defendant's objection suggests, there is no requirement that the defendant's perjury occur in connection with the criminal case—it need only relate to the offense of conviction.  U.S.S.G. § 3C1.1; *United States v. Beckman*, 787 F.3d 466, 496 (8th Cir. 2015) (applying two point enhancement for obstruction when defendant testified and submitted false affidavit in civil litigation, defendant also testified falsely during criminal trial); *United States v. Healy*, 451 F. App'x 192, 195 (3d Cir. 2011) (court did not commit plain error when applying obstruction of justice enhancement, defendant's false testimony in the civil deposition and providing false documents to the U.S. Attorney's Office fall squarely within examples contemplated by Guidelines); *see United States v. Andrews*, 808 F.3d 964, 968-69 (4th Cir. 2015) ("[i]t is rational for a sentencing authority to conclude that a defendant who commits a crime and then perjures herself in an unlawful attempt to avoid responsibility is more threatening to society and less deserving of leniency than a defendant who does not so defy the trial process.") (internal citations omitted).

The Application Note for the Guidelines enhancement states that in "applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice."  But this case does not present that situation.  Rather, "[t]he nature of

the material falsehood[s] . . . is not one in which the willfulness of the falsehood[s] could reasonably be questioned." *United States v. Mercer*, 834 F.3d 39, 49 (1st Cir. 2016). To the extent the defendant attempts to argue that he did not have a choice but to respond to the civil interrogatories, the government notes that it moved to stay the civil litigation prior to the date of the interrogatories. *NESN v. Ariel Legassa*, 22-CV-1024-MJJ, Dkt. Nos. 79, 80. The defendant refused to do so. He chose to lie instead—about the exact topic at issue in the criminal case. The enhancement clearly applies.

### C. The Enhancement for Money Laundering Applies

For the reasons set forth in the government's objection contained in the PSR, the Court should find the base offense level for the money laundering offense is 7, not a 6 as probation suggests. *See* PSR, at p. 28.

## IV. SENTENCING RECCOMENDATION

The government's recommended sentence—incarceration at the low end of the Guidelines as calculated by the Government—is a reasonable and just outcome that is sufficient but not greater than necessary to achieve the goals of sentencing under 18 U.S.C. § 3553(a) for this defendant.

### A. The Nature and Circumstances of the Offense Warrant a Significant Sentence

Legassa took advantage of his trusted, senior position at NESN to repeatedly steal money that he was not entitled to. This crime would not have been possible without the substantial level of trust that NESN placed in Legassa. NESN's CEO, Sean McGrail, explained as much in a letter that he submitted to the Court:

> [W]e have remained a relatively small business where people work together and trust one another to perform at the highest level. We are a company built on the trust and integrity of our colleagues. Ariel Legassa shattered that trust…
>
> In his position as the senior officer in charge of our digital operations, it was Ariel's responsibility to review and approve the invoices to NESN by those contractors. Ariel was

not only a trusted member of my senior leadership team, he was among the most generously compensated employees in the company.

Legassa shattered the trust that NESN placed in him in several ways. He repeatedly deceived the NESN employees that he worked with. Some of those lies are highlighted here:

- He created a *fake* company with the same as a *real* NESN vendor to trick his co-workers into thinking that they were approving legitimate payments. And that is exactly what happened—the CFO and CEO testified at trial that they did not scrutinize the digital group's invoices, because they trusted Legassa (a fiduciary) to make decisions that were in the best interests of the company.

- Over a roughly ten-month period, Legassa created eleven different fraudulent invoices directing payment to his fake company. He styled his fake invoices to look just look like the real Alley Interactive invoices, using the same font, descriptions, layout, and Alley's signature logo, to trick his co-workers into thinking that these were legitimate invoices. He then submitted each one of these invoices to NESN's accounting department for approval. *See* PSR ¶13.

- Legassa repeatedly lied to the accounting department to justify the payments to his fake company. For example, he told accounting that Alley Interactive had two different business entities that planned to merge at the end of the year—that was not true. The truth was that one Alley Interactive entity was the real business and the other was the fake business that he created to receive the proceeds of his fraud. *Id.* ¶¶15-17. At trial, the Court heard from an employee who worked in the accounting department and in sum and substance, she testified that she followed Legassa's instructions because he was a trusted, senior vice president at the company.

- Legassa repeatedly lied to internal audit when they asked for justifications for the payments to Legassa's fake company. He invented explanations about "additional work" and an "upgraded" retainer. *Id.* ¶20. At trial, the Court also heard from an employee who worked in the audit department, and just like his colleague in accounting, he believed Legassa's lies because Legassa was a trusted, senior executive.

But Legassa did not just lie internally at NESN to promote his fraud, he also lied outside the business to set up the fraud. He established a fake company with the Connecticut Secretary of State's Office. He set up an email address, mailing address, and bank account for the fake company. He needed a fake mailing address to receive the NESN checks (he couldn't have them sent to his home). He needed to incorporate the fake company to set up a business bank account (he couldn't deposit the checks into his personal bank account). This was a carefully designed

12

fraud orchestrated to make the fake company appear legitimate. It worked perfectly for nearly eleven months.

All of this shows that this was not an isolated crime of opportunity. It was not a mistake or a momentary lapse of judgment. It was a series of calculated steps—a fake company, fake invoices, a new bank account and mailing address, countless emails, and endless excuses. It was an effort to steal as much money as possible without getting caught. Legassa even took steps to increase the budget for Alley Interactive for 2022, which meant that there would have been even more money for him to steal. PSR at ¶20. The defendant's crimes stopped solely because he was caught. At every point during this eleven-month period, he tried to promote and prolong his fraud. The trial showcased the staggering number of times Legassa consistently chose to do the wrong thing. These factors weigh in favor of a substantial incarcerative sentence. *See* 18 U.S.C. § 3553(a)(1).

### B. The Defendant's History and Characteristics Weigh in Favor of the Government's Requested Sentence

Legassa's history and characteristics also underscore the need for a significant incarcerative sentence. *See* 18 U.S.C. § 3553(a)(1). Legassa has had more advantages than most defendants who appear before this Court. He attended college in Argentina, and achieved professional success at renowned companies, like EPSN and NESN. He owns a large, three-car garage home in Connecticut replete with a swimming pool. *See* PSR ¶¶ 59-63. He has a loving, supportive family, including his wife of almost 20 years and four children. *Id.* ¶¶ 59-64. He also has several friends in his community as evidenced by the letters of support submitted on his behalf.

Unlike many of the defendants that appear before this Court, the defendant has not struggled with poverty, addiction, or a lack opportunity. To be clear, while these challenges do not excuse criminal behavior, they sometimes provide context for criminal conduct. That is not

13

the case here.  There are no mitigating factors in this case.  The evidence in this case only supports one reasonable explanation for the defendant's conduct: greed.  A desire to steal as much money as possible without getting caught, and a mistaken belief that he was somehow above the law in these efforts.

The Court should also give weight to the context in which the crime was committed. Remarkably, the defendant began the instant offense while making $250,000 (without bonus).  *Id.* ¶9.  While orchestrating the fraud, he even negotiated a salary increase that brought his salary to $325,000 (not including his bonus).  Accordingly, before his bonus, Legassa was making almost five times the average salary in Massachusetts at the time that he decided to start stealing from NESN.  https://www.forbes.com/advisor/business/average-salary-by-state/  (visited  2/20/24) (average salary in Massachusetts is $76,600).

The defendant then spent the stolen money on luxury items, like a new Tesla, a personal airplane, a Land Rover, a new pool, and over $250,000 in credit card expenses.  *Id.* ¶27.  He also satisfied personal loans and a home equity loan.  This was discretionary spending.  He wanted to fund an increasingly lavish lifestyle, and that's exactly what he did.[2]

In addition to the brazen greed that motivated this fraud, Legassa's refusal to accept responsibility for his crimes counsels in favor of a substantial sentence.  To this day, Legassa continues to cast himself as the ultimate victim in this case, as evidenced by an email that he sent to a former colleague at NESN.  *See* Exhibit 1, attached hereto.  In requesting that she write a

---

[2] Notably, a few days after he fired from NESN, the defendant transferred almost $80,000 for a joint account that he held with his wife into an account exclusively held by his wife in order to shield those funds from detection and seizure.  *See* PSR ¶28

sentencing letter for him (an email that he likely never thought this Court would see), Legassa showed his true character:

> I blindly trusted the CEO and CFO, without signing contracts or taking legal precautions. Everything went wrong and, at the beginning of 2022, I not only lost my job, but also faced criminal and civil lawsuits.  The last two years have been like a movie: fighting against some of the most powerful lawyers in the world…. The verdict has been devastating, a turn that has transformed my reality into a nightmare.

In the email, Legassa continues to suggest that he was the victim of some sort of agreement gone wrong with the CEO and CFO, which unfairly turned his life into a "nightmare."  Legassa then provided his former co-worker with a template that she could follow in writing a letter of support.  She declined.  Notably, the same template appears in several of the letters of support this Court received on his behalf.

This email confirms what was evident at trial and during the pre-trial proceedings—Legassa will say whatever is necessary to advance his own interest.  If there is value in casting himself as a victim to garner sympathy, then he will do that.  However, one thing is abundantly clear—Legassa has not genuinely accepted responsibility for his crimes.  He exhibits no actual remorse.

Consistent with his lack of acceptance of responsibility, the defendant has chosen to withhold his financial information from Probation.  He has failed to submit a completed Financial Statement that would allow Probation to conduct a "Net Worth Analysis" and "Cash Flow Analysis."  *See* PSR ¶¶ 74-75.  This was not a mistake or an oversight.  The defendant has litigated issues related to his assets in the past—he knows the importance of this issue. *See* ECF No. 44.  This was yet another choice made by the defendant that demonstrates a lack of transparency and accountability.  Without this information, the government and the Court is left to speculate as to the defendant's financial condition at sentencing.

## C. The Need to Avoid Unwanted Sentencing Disparities

The need to avoid unwanted sentencing disparities also weighs in favor of a lengthy incarcerative sentence. Of course, comparisons to other embezzlement cases are inherently imperfect, given the case-specific circumstances that drive sentencing in each case. While recognizing the limited value of these comparisons, the government's recommendation in this case is reasonable based upon sentences imposed in other similar cases in this district. For example, in *United States v. Figelski*, No. 20-cr-10008-FDS, Judge Saylor accepted a Rule 11(c)(1)(C) plea and imposed a 36-month sentence on a woman who embezzled approximately $800,000 from her employer over two years. There, the defendant, a single mother to a young child, was a first-time offender who did not use the funds to live a life of luxury, but rather to fund her opioid addiction. In *United States v. Prince*, No. 16-cr-10020-RWZ, Judge Zobel sentenced the defendant, a repeat offender who used embezzled funds for vacations and personal entertainment expenses, and ultimately pled guilty, to 48 months in prison. In *United States v. DiDonato,* 21-cr-10332-DJC, Judge Casper sentenced the defendant to 62 months incarceration for stealing approximately $1.8 million from her employer, collecting unemployment assistance while employed fulltime and committing related tax charges. Unlike the defendant in *DiDonato* who pled guilty*,* Legassa still fails to accept any responsibility whatsoever for his crimes—even after he was convicted at trial.

## D. A Significant Incarcerative Sentence Promotes Respect for the Law, and Provides Adequate Punishment and Deterrence

The government's recommended sentence of 63 months also promotes respect for the law and provides both adequate punishment and deterrence. 18 U.S.C. § 3553(a)(2). In this case, there is a need for both specific and general deterrence.

There is a need for specific deterrence because the defendant has not accepted responsibility for his crimes. It is one thing to invoke one's right to silence in advance of a likely

16

appeal. This case is different. In advance of trial, Legassa provided *sworn* testimony in a parallel civil case where he repeatedly lied. He continued to advance his unsubstantiated and incredible explanation that he only stole from NESN at the direction of its two most senior executives. His story flies in the face of the evidence presented at trial as well as general common-sense. But Legassa did more than just invent a factual defense, he also falsely accused NESN executives of racism. As McGrail noted in his letter to the Court, "[h]is lies were so offensive that I am reticent to repeat them here." So, too, is the government.

There is also the need for general deterrence. The defendant's crimes offend the rule of law. Theft perpetuated by employees is a relatively common crime that often occurs with a disquieting ease and across a spectrum with varying degrees of severity. It also is accomplished through different methodologies, both sophisticated and unsophisticated, and is not always easily detected. There are countless small to medium sized business in Massachusetts and throughout this country that run on trust. Companies depend on their employees, especially senior management, to operate with integrity. If employees routinely acted like Legassa, the local and national economy would be crippled with inefficiency and distrust. A substantial term of imprisonment is necessary to deter others who might be tempted to take advantage of positions of trust and responsibility to steal. Those who exploit the trust of their employers should know that when they get caught, they will face serious consequences.

The First Circuit has recognized that the concept of general deterrence carries particular import in arriving at the appropriate sentence in white-collar and fraud cases. *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006). Failure to sentence Legassa to a substantial term of incarceration in this case would send the wrong message: "that would-be white-collar criminals

stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006).

Recently, Courts in this district have imposed substantial sentences in white-collar cases. *See United States v. Omoruyi*, 21-CR-10217-PBS (defendants--two brothers that immigrated to the US from Nigeria-- convicted at trial for participating in a multi-year money laundering scheme involving more than $1.5 million in loss received a 72- and 78-month incarcerative sentence); *United States v. Abbas*, 20-CR-10016-LTS (defendant—an attorney—convicted at trial for participating in a multi-year money-laundering scheme involving more than $1.5 million in loss received a 108-month sentence); *United States v. Buoi*, 20-CR-10130-FDS (defendant convicted at trial for *attempting* to receive more than $2 million in Paycheck Protection Program funds received a 39-month incarcerative sentence). The loss amount in this case is less than in widespread money-laundering cases, like *Omoruyi* and *Abbas*. And while Legassa was a Vice President at a major company and had more opportunities and responsilbities than the defendants in *Buoi* and *Omoruyi*, he did not have a law license, like in *Abbas*. Accordingly, the government's recommended 63-month sentence (at the low end of the guidelines as calculated by the government) fits comfortably in the middle within these recent sentences in this district.

V.      **CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court impose a sentence of 63 months incarceration, followed by 3 years of supervised release, restitution in the amount of $580,500, forfeiture in the amount of $575,500, and a $1,000 special assessment. The government's requested sentence falls at the low end of the Guidelines as calculated by the government. It is sufficient, but not greater than necessary, to reflect the seriousness of the

offense, history and characteristics of the defendant, promote respect for the law, provide just punishment, and afford adequate deterrence.

                                      Respectfully submitted,

                                      JOSHUA S. LEVY
                                      ACTING UNITED STATES ATTORNEY

By:    */s/ Benjamin A. Saltzman*
        BENJAMIN A. SALTZMAN
        MACKENZIE A. QUEENIN
        ASSISTANT U.S. ATTORNEYS

Date:  February 20, 2024

## **CERTIFICATE OF SERVICE**

I, Benjamin A. Saltzman, certify that on this 20th day of February 2024, I caused this document to be filed via the ECF system.

*/s/ Benjamin A. Saltzman*
Benjamin A. Saltzman
Assistant U.S. Attorney

Dated: February 20, 2024