UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.    ) | Criminal No.   22-CR-10038-IT |
| ) | |
| ARIEL LEGASSA    ) | |

**Defendant's Sentencing Memorandum**

Ariel Legassa has had a profoundly positive influence on the lives of his family, friends, colleagues, neighbors, and others. In over 70 letters of support, the people in Ariel's life describe him as a responsible, generous, and compassionate person who does not hesitate to help those around him overcome difficulties and thrive. He is above all else dedicated to ensuring the well-being of his family and has succeeded in instilling and nurturing the development of those same values and character traits in his four children.

The way Ariel has lived his life over five decades stands in stark contrast to the conduct for which he now faces sentencing. He has not lost the capacity to impact the lives of others in all of the ways the letter writers describe. He is ready, willing, able, and committed to continuing to do so. The court has the ability to structure a sentence that, while sufficiently punitive and deterrent, provides an opportunity for Ariel to continue to help others. For the reasons set forth below, the court should impose a sentence of 18 months followed by two years of supervised release with a community service component.

1. **An 18-Month Sentence is Sufficient But Not Greater Than Necessary For These Offenses Committed by This Defendant**

Ariel lives in Connecticut with his wife and partner of over 20 years, Nilda Legassa. They have two children together, Juliet, 19, who attends college in Florida, and Niko, 13, who is in middle school. Ariel also has two children from a previous marriage, Francisco, 25, an Architect in Argentina, and Bautista, 23, who attends community college and lives with Ariel and Nilda in Connecticut.

Ariel has always been an engaged parent who is very active in the upbringing of all of his children. In a letter to the court, Nilda writes that Ariel "has taught our children to be lifelong learners, teaching this by example each and every day" and that he has been an "unwavering guide" in their lives. Exhibit 1, Letter from Nilda Legassa, at 0001.[1] Nilda describes how Ariel's "influence extends beyond conventional lessons, shaping our children into resilient, resourceful individuals poised for success." *Id*. at 0002

Juliet writes that her father has "instilled great values in me and my brothers, such as respect, honesty, reliability, kindness, resilience, a strong work ethic and dedication." *Id*. at 0004. Juliet writes that her father "showed me the true meaning of love and support." *Id*.

Francisco describes the depth of his father's dedication to family and the sacrifices that Ariel made when he emigrated to the United States to seek better economic opportunities: "his decision to immigrate to the United States was an act of love and sacrifice, seeking to secure our economic well-being." *Id*. at 0009. Ariel did not plan on living in this country alone. He expected his first wife Luciana, Francisco, and his other son Bautista to to join him once he got settled.

---

[1] Exhibit 1 consists of 72 character letters. Cites in this memorandum are to page number.

2

But Luciana changed her mind, stayed in Argentina with the children, and Ariel and Luciana ultimately separated. *See* PSR at ¶ 60. That was hard on Ariel. Nilda remembers how years later, Ariel "cried himself to sleep, after talking to his little boys in Argentina, without the ability to hold them each night." *Id*. at 0001

Bautista writes that Ariel made a "brave decision by moving to an unknown country in search of a better future for my brother and me." Exhibit 1 at 0013. Bautista has recently decided to join his father here. Bautista has been inspired by how his father "faces challenges with determination" and has seen how his father "always shows empathy and concern for others" *Id*. at 0013-14.

Ariel's deep-rooted devotion to family and strong desire to care for others was in part born of necessity. When he was five and living in his home country of Argentina, Ariel's father passed away. His sister Alma writes that after the death of their father, Ariel "naturally assumed the role of protector in our family." *Id*. at 0021. Alma writes that no matter how far from home Ariel is, he has "always remained attentive to us, demonstrating a sense of responsibility and commitment that has prevailed throughout his life." *Id*.

Other members of Ariel's extended family also describe Ariel's efforts to remain an active part of their lives despite the physical distance between them. Mario Borra, Ariel's brother-in-law and friend for over 30 years, writes that Ariel's "commitment to family and constant emotional support are qualities that highlight his integrity and altruistic spirit." *Id*. at 0025. Borra identifies Ariel's defining traits as "kindness, generosity and empathy." *Id*.

Adela Lorenzatto, Nilda's mother, who has known Ariel for over 20 years, writes that Ariel is "always putting others ahead of himself." *Id*. at 0029. Adela describes the

incomprehensibly devastating still birth of Nilda and Ariel's son Lukas, how deeply it affected Ariel, and how in the aftermath Ariel was the one who "took care of my daughter, their daughter Juliet, and me." *Id*. Adela describes Ariel as a "compassionate, intelligent man with integrity and fortitude," who continues to care for Adela and "checks up on me at times more often than my own children." *Id*.

Maria Fernanda Pantoja Silva, an au pair who lived with the Legassas, writes that both Ariel and Nilda had a "highly positive impact on me and are a role model in the way I educate my 3-year-old son today." *Id*. at 0049.

Nancy McGonigle, who has known Ariel for over 20 years, describes Ariel's commitment to his children as "exemplary." *Id*. at 0059. She writes that Ariel "has fostered strong bonds with each of them, evident in their shared activities and the significant milestones he has been present for … [his] dedication as a parent goes beyond the ordinary, highlighting his deep sense of responsibility and love." *Id*.

It should come as no surprise that in his own letter to the court, Ariel focuses on the emotional toll his conduct has taken on his family: "as a father and a husband, I am deeply pained by the anguish my actions have caused my loved ones." Exhibit 2, Ariel Legassa letter to court. As a result of Ariel's conduct, Bautista and Juliet have suffered anxiety attacks and Nilda "has been shouldering these burdens." *Id*. Ariel realizes and regrets that his actions have put his family "in a state of profound distress, and we are striving to navigate these turbulent times together." *Id*.

Ariel's generous nature and concern for the well being of others extends to neighbors and professional colleagues. Dale Smith, a neighbor with children the same age as Ariel's who has

known Ariel for 15 years, writes that Ariel is a "positive father figure who taught solid moral values." Exhibit 1 at 0039. Dale "trusted Ariel with my children and my home … Ariel has always been there for us… I trust Ariel with my life." *See also id*. at 0062, Letter from John Hurd ("Ariel has always been a hospitable and helpful neighbor, going out of his way to create a warm and welcoming environment for everyone around him").

Ame Cividanes, who has known Ariel for 15 years, considers him to be "one of the most genuine, helpful, and generous individuals … who will drop what he is doing to help." *Id*. at 0043. Maria Elena Franco Arriaga, who has known Ariel and his family for 30 years, has seen Ariel "participate in community initiatives and offer his help to those in need, always with a selfless attitude and an open heart." *Id*. at 0053. She writes that "Ariel's life has been characterized by acts of kindness, firm resilience in the face of difficulties, and an unwavering commitment to family and friends." *Id*.

Two letter writers describe instances where Ariel stepped up to speak on behalf of those who could not speak up for themselves even though there was nothing in it for him and it could have been personally detrimental. Patricia Gorneualt Pinto worked alongside Ariel at a nursing home where both were nurses assistants. She writes that Ariel "distinguished himself … through his profound sense of compassion and humanity." *Id*. at 0058. She describes how Ariel would go above and beyond what was expected and how he "coordinated a group … to report the substandard conditions at the facility. This action, taken without regard for personal gain or potential repercussions, highlighted his commitment to ethical practices and the wellbeing of others." *Id*. at 0059.

A coworker at ESPN writes that Ariel "was always a brave guy capable of denouncing what other people were silent about and defending first those who suffered attacks … this trait … was always highly applauded by most of his colleagues." *Id*. at 0118, Letter from Manuel Damian Martin Garcia.

Two other letter writers describe instances where Ariel volunteered time and resources to worthy causes. To assist a Connecticut non-profit organization, Ariel "offered his professional services, bringing his camera crew and resources to conduct video interviews with corporate leaders, enhancing the mission of our organization - all without compensation or even covering his costs." *Id*. at 0067, Letter from Arvind Chaudhary.  In connection with a fundraiser at a children's hospital, Ariel devoted his time contacting potential donors. *See* Exhibit 1 at 0134, Letter from Vanessa Martinez.

The responsible manner in which Ariel has lived his life, the virtues he extolls, and the values he has instilled by words and example in those closest to him are the true nature of the person he is. In cases like this, the government typically seeks to turn that against a defendant at sentencing. *See* Government's Sentencing Memorandum at 13 ("Legassa's history and characteristics also underscore the need for a significant incarcerative sentence … Legassa has had more advantages than most defendants who appear before this Court").  To the government, the crime defines the person. Here, the government asserts that only one character trait matters - "brazen greed" and a "desire to steal as much money as possible." *Id*. In the government's view, that alone should drive the sentence in the first instance. And then, the government perversely suggests, the sentence should be increased because Ariel comes with a good background and did not have to commit a crime.

6

A sentencing court must, of course, "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007), *quoting Koon v. United States,* 518 U.S. 81, 98 (1996). *See also U.S. v. Martin*, 520 F.3d 87, 91 (1st Cir. 2008) ("a sentencing court should not consider itself constrained by the guidelines to the extent that there are sound, case-specific reasons for deviating from them. Nor should a sentencing court operate in the belief that substantial variances from the guidelines are always beyond the pale.").

The way Ariel has lived his life apart from this offense matters. It matters when criminal conduct is a single blemish on an otherwise law-abiding, unselfish, and exemplary life - a life here that spans 52 years and counting. It is a factor that cuts in a defendant's favor, not one that should be held against him.

Even when the guidelines were mandatory and courts were required to impose a sentence within the specified range, departing downward where criminal behavior was markedly out of character with how a defendant had otherwise lived was an encouraged ground for a below-guidelines sentence. *See United States v. Grandmaison*, 77 F.3d 555, 563 (1st Cir 1996). *See also United States v. Bradstreet*, 135 F.3d 46, 56 (1st Cir. 1998) (below-guidelines sentence appropriate where defendant's conduct was marked departure from the past and unlikely to reoccur). This departure was available to first-time offenders whose criminal conduct was more than a spontaneous, single act of bad judgment and extended to "offenders whose course of criminal conduct involves more than one criminal act." *Grandmaison*, 77 F.3d at 563.

In the present advisory guidelines sentencing era, a sentencing court is even more free to impose a sentence below the advisory range where a defendant has otherwise lived an exemplary life and may do so when the criminal conduct at issue is more than a spontaneous, one-off, or opportunistic event. *See U.S. v. Howe*, 543 F.3d 128 (3rd Cir. 2008) (affirming probation with home confinement for wire fraud where offense was an "isolated mistake" in the context of defendant's otherwise long and upstanding life, despite assertion that defendant waged a two-year campaign to cover up a six-figure fraud on the Air Force); *United States v. Prosperi*, 686 F.3d 32, 40 (1st Cir. 2012) (upholding probationary sentence 87 months below low end for years-long fraud scheme during the Big Dig based in part on defendants' characters as reflected in letters of support the sentencing court found "sincere, supportive, and, I'm sure, an accurate portrayal of the defendants' lives").

### 2. An 18-Month Sentence is Sufficiently Punitive and Promotes Both General and Specific Deterrence

An 18-month sentence for a first-time offender is by no means a lenient sentence. It is a significant sentence that adequately punishes the criminal conduct here.

It is also a sentence that will promote specific and general deterrence. The court should have no doubt that a committed sentence of any length would be sufficient to deter Ariel from reoffending. His 50-plus-year law abiding life is strong indicator that he will not reoffend. In addition to the loss of his liberty and the hardship of incarceration, he has lost his job, his reputation, his chosen career, the ability to secure a high salary corporate position, and he will be apart from his family at a time when they need him the most.

In *Prosperi*, the First Circuit Court of Appeals imposed a sentence of probation for defendants who had defrauded the government to the tune of $5,000,000. The government appealed the sentences arguing, in part, that anything short of a jail sentence would not afford sufficient deterrence. The court upheld the probationary sentence and adopted the sentencing judge's rationale as to why the sentence would promote deterrentce:

> I think it is very difficult at times, for those of us who are judges or prosecutors or lawyers, to put ourselves in the shoes of a person with no prior experience with the criminal justice system who finds himself or herself accused of a crime. I do not think, sometimes, we fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed.

686 F.3d at 48. The Court of Appeals rejected the government's argument that this amounted to preferential treatment for white-collar offenders and held that it was an appropriate consideration when fashioning a sentence for any first-time offender: "This reasoning applies equally well to defendants convicted of white-collar and blue-collar crimes. Also, we understand the court's comments on the burdens of the criminal process to be a comment on the specific deterrence of these defendants from any future criminal conduct." *Id*.

Ariel already has experienced the same anguish, penalty, and burden of being called to account in this case. On top of that, he likely will go to jail. And he will owe restitution and be subject to forfeiture. No one who looks at those consequences will think that it is worth it to commit mail fraud.

### 3. The Loss Guideline Is Empirically Flawed and Overstates Culpability

A sentencing court may impose a below-guidelines sentence where it disagrees with the policy underlying a provision of the advisory sentencing guidelines. *See Pepper v. U.S.*, 562 U.S. 476, 501 (2011) ("a district court may in appropriate cases impose a non-Guidelines sentence based on a disagreement with the Commission's views"); *Kimbrough v. United States*, 552 US 85, 101 (2007) ("as a general matter, courts may vary from Guidelines ranges based solely on policy considerations, including disagreements with the Guidelines"); *Prosperi*, 686 F.3d at 48 ("post-Booker, a judge may vary from the GSR, disagreeing with details or even major premises"); *U.S. v. Stone*, 575 F.3d 83, 89 (1st Cir. 2009) ("the point of *Kimbrough* is to recognize 'district courts' authority to vary from the crack cocaine Guidelines based on *policy* disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case'") (emphasis in original) (citation omitted).

Few guideline provisions have been subject to more consistent criticism than the fraud and loss provisions. Courts have been particularly skeptical of the guideline loss table, which provides for very large sentencing enhancements based solely on aggregate loss amount: "[b]y making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, … and, by contrast, effectively guaranteed that many such sentences would be irrational on their face." *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012). As Judge Rakoff explained in *Gupta*:

> The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense. Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results.

*Id*. at 350.

Beyond this general concern about the fraud guideline's "sentencing by numbers" approach, several jurists have criticized the loss table on the grounds that the astronomical sentencing increases it calls for are utterly lacking in empirical support:

> the numbers assigned by the Sentencing Commission to various sentencing factors appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology - thus maximizing the risk of injustice. … The Guidelines' calculations for this offense are no longer tied to the mean of what federal judges had previously imposed for such crimes, but instead reflect an ever more draconian approach to white collar crime, unsupported by any empirical data.

*Id*. at 351 (emphasis added); *see also United States v. Musgrave*, 647 F. App'x 529, 538 (6th Cir. 2016) ("[T]here is reason to believe that, because the loss Guidelines were not developed using an empirical approach based on data about past sentencing practices, it is particularly appropriate for variances."); *United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013), Underhill concurring ("the loss guideline … was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices. As such, district judges can and should

11

exercise their discretion when deciding whether or not to follow the sentencing advice that guideline provides"); *United States v. Johnson*, 16-CR-457-1 (NGG), at *8 (E.D.N.Y. Apr. 26, 2018) ("[a]s far as this court can tell, the Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime").

Disagreement with the Sentencing Commission's "unusual[]" approach to fraud "is a circumstance that a sentencing court is entitled to consider" in imposing a variant sentence. *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016). Sentencing courts have repeatedly varied downward from large guideline sentencing ranges driven by loss amount. *See Gupta*, 904 F. Supp. 2d at 355 (varying downward from GSR of 78-97 months to impose 24-month sentence); *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (noting "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense") (emphasis added); *United States v. Herink*, No. 10-CR-169, 2012 WL 3112002, at *7 (D. Neb. July 30, 2012) (imposing sentence of 18 months despite GSR of 51-63 months and explaining that "because the fraud offense Guidelines were promulgated pursuant to Congressional directive rather than by application of the Sentencing Commission's unique area of expertise, the court afford[ed] them less deference than it would to empirically-grounded Guidelines").

For all of these reasons, the Court can and should disregard the mechanical, loss-driven calculation underlying the advisory offense level and the corresponding sentencing range and impose an individualized 18-month sentence based on the particular facts and circumstances of this case and the history and characteristics of this defendant.

### 4. The Enhancement for Obstruction of Justice Does Not Apply

The court should not add two levels for obstruction of justice because the two necessary requirements for that enhancement set forth in USSG § 3C1.1 are not met. Neither the government nor the PSR show how the trigger for the enhancement - alleged perjury in a pleading filed in a civil case between New England Sports Network ("NESN") and Ariel - constitutes obstruction with respect to the investigation, prosecution, or sentencing of the offenses of conviction. Both the PSR and the government claim that it is enough that alleged perjurious statements were made in the civil without any showing as to how the alleged perjury impacted the criminal investigation, prosecution, or sentencing. That interpretation, based entirely on an application note, is contrary to the text of § 3C1.1 and would read out one of its necessaryrequirements.

In order for the obstruction enhancement to apply, two requirements must be met: (1) willful obstructive conduct by a defendant "with respect to the investigation, prosecution, or sentencing of the instant offense;" and (2) "the obstructive conduct related to … the defendant's instant offense of conviction." USSG § 3C1.1. While the alleged civil perjury arguably relates to the instant offense of conviction (the second requirement of § 3C1.1), that does not automatically

mean that the alleged perjury also "occurred with respect to the investigation, prosecution, or sentencing of the instant offense" (the first requirement of § 3C1.1).

The two elements of § 3C1.1 are, in fact, distinct and both must be satisfied. In other words, perjury in a civil case that relates to the instant offense of conviction is not enough: "[c]ertainly, there are circumstances in which perjury in a state civil action would be utterly irrelevant to a federal criminal matter, even if the same defendants were involved." *United States v. Zagari*, 111 F.3d 307, 328 (2d Cir. 1997) (vacating and remanding obstruction enhancement because sentencing judge did not find that perjury in civil case was material). The *Zagari* court held that materiality was two-pronged - the false testimony must not only be material to the civil proceeding, it must also be material to the criminal proceeding: "[j]ust because perjured testimony is given in a related action, and simply because that testimony is found to have been material to the related proceeding, does not mean that the statements are material to the instant proceeding." *Id*. at 329. The court held that "even if the court finds that [defendant's] statements constituted perjury to the state proceeding, it must also find that the perjury was material to the instant federal offense before applying the state perjury as the basis for a Section 3C1.1 enhancement of the federal sentence." *Id. See also id*. at 328 ("[a]n enhancement for obstruction of justice may therefore be granted if the court finds that the defendant willfully and materially impeded the search for justice in the instant offense").

The District of Columbia Court of Appeals reached a similar conclusion in *United States v. Barry*, 938 F2d 1327 (D.C. Cir 1991). Like the Zagari court, the court emphasized that the first

element of § 3C1.1 is distinct from the second and must be independently satisfied: "Section 3C1.1 indicates that the obstruction of justice does not apply to any and all obstructive conduct that a defendant may have attempted or committed, but instead applies only to willful attempts 'to obstruct or impede the administration of justice during the investigation or prosecution of the instant offense.'" *Id*. at 1333 (citation and footnote omitted). It held that "an obstruction of justice enhancement is warranted only if the defendant attempted to obstruct the investigation, prosecution, or sentencing of the offense of conviction." *Id*. at 1337. The court vacated the sentence and remanded "[b]ecause the district court has not adequately explained how [defendants'] perjurious grand jury testimony was calculated to obstruct the investigation of the offense of conviction, we are constrained to conclude that the district court's decision to award an enhancement pursuant to § 3C1.1 is infirm." *Id*.

      Here, the PSR and the government make no attempt to show how the alleged perjury in the civil case was material to the criminal case, how it "impeded the search for justice in the instant offense" (*Zagari*, *supra*), or how the alleged perjury was "calculated to obstruct the investigation of the offense of conviction." (*Barry*, *supra*). It was not. It could not have done so.

      The alleged perjury is contained in documents dated February 24, 2023, more than one year after Ariel was arrested on February 2, 2022 and indicted on February 17, 2022. *See* PSR at pp. 2, 4, and ¶¶ 29-30. For all intents and purposes, the government's investigation had concluded long before the alleged perjury.

More importantly, the government was aware of Ariel's assertions that NESN officers had agreed to pay him through a fictitious vendor for his work on NESN digital projects and had authorized him to proceed in that manner. Ariel had told arresting agents the same thing more than a year earlier minutes after he was arrested. *See* PSR at ¶¶ 24-25. The agents and the government instantly rejected Ariel's story as false. *Id*. Significantly, the PSR and the government do not rely on false statements to law enforcement officers as a basis for an obstruction enhancement. That would require a showing that the statements were material and had "significantly obstructed or impeded the official investigation or prosecution of the instant offense." USSG § 3C1.1 App. Note 4(G). The government cannot make that showing because the agents instantly rejected Ariel's version of events and told him so, forcefully and repeatedly, during the interview. *See* Defendant's Motion to Exclude Evidence, Dkt. Entry 111 at 2-4.

Repeating the same things in the civil case a year later, which investigators in the criminal case already had categorically rejected as false, had zero impact on the search for justice in the criminal case, cannot possibly be material to the instant offense, and was in no way calculated to obstruct the investigation of the offense of conviction. For those reasons, the two-level enhancement for obstruction of justice does not apply.

**Conclusion**

For all of the foregoing reasons, the court should impose an 18-month sentence followed by two years of supervised release with a community service component.

ARIEL LEGASSA
By his attorney,

/s/ *E. Peter Parker*
E. Peter Parker
B.B.O. #552720
Law Office of E. Peter Parker
The Wheelhouse at Bradford Mill
33 Bradford St
Concord, MA  01742
(617) 742-9099
peter@parkerslaw.com

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 22, 2024.

/s/ *E. Peter Parker*
E. Peter Parker